Receipt No. 068347

ORIGINAL

FILED
JUL 10 2008
U.S. COURT OF FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PUBLIC SERVICE COMPANY OF OKLAHOMA, )
)
PLAINTIFF, )
)
VS. ) CASE NO.
) JUDGE
UNITED STATES OF AMERICA, )
)
DEFENDANT. )

08-501 C

## COMPLAINT

Plaintiff, Public Service Company of Oklahoma (PSO), states as follows for its claims against Defendant.

### Parties

1. PSO is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. PSO is a public utility that makes retail electric sales in certain territories in Oklahoma.

2. Defendant is the United States of America acting through the Department of the Army, McAlester Army Ammunition Plant (MCAAP).

### Jurisdiction

3. This is a civil action brought by PSO against the United States pursuant to Section 10 of the Contract Disputes Act of 1978, 41 U.S.C. § 609 and the Tucker Act, 29 U.S.C. § 1491.

4. On June 9, 1997, PSO and MCAAP entered into Contract No. DAAA31-97-002 (the Contract). A copy of the Contract is attached as Exhibit A.

5. On May 8, 2007, PSO certified a claim to the Directorate of Contracting under the Contract Disputes Act seeking the amount of $159,007.94 for MCAAP's breach of the Contract. A copy of the Contract Dispute Act claim is attached as Exhibit B.

6. On July 23, 2007, MCAAP issued the Contracting Officer's Final Decision denying PSO's claim. A copy of the Contracting Officer's Final Decision is attached as Exhibit C.

7. In accordance with 41 U.S.C. § 609(a)(1), PSO timely appeals from the July 23, 2007 Contracting Officer's Final Decision.

**Nature of Claim**

8. PSO seeks to recover $159,007.94 from Defendant for underpayment for electric service. PSO and MCAAP have an arrangement by which PSO buys hydro-power from MCAAP which MCAAP is able to purchase from the Southwest Power Administration. PSO also provides electric service and ancillary services to MCAAP. The price PSO is to pay for the hydro-power is netted against the price MCAAP is to pay for electric service. The balance is payable to PSO. MCAAP has underpaid PSO because it has unilaterally, and in violation of the Contract, increased the price of the hydro-power and therefore the amount it may offset against PSO's bill for electric service.

**Statement of Facts**

**A. Beginning in the late 1970s, SWPA sold hydro-power ("Federal Energy") to MCAAP (and contracted with PSO to deliver the Federal Energy).**

9. Non-party Southwestern Power Administration (SWPA) is an agency of the United States of America. SWPA operates within the Department of Energy under the authority of the Flood Control Act of 1944. SWPA markets hydro-electric power in several states including Oklahoma.

10. SWPA is legally required to market and deliver its hydro-electric power to "preference" customers. MCAAP, as an entity of the Department of the Army, is qualified as a preference customer. The hydro-electric power that MCAAP purchases from SWPA will be referred to in this Complaint as "Federal Energy."

11. In the late 1970s, MCAAP entered into a contract with SWPA for the delivery of electric service. Under this contract, SWPA did more than sell Federal Energy to MCAAP as a preferred customer. MCAAP did not have transmission facilities to transmit power from the SWPA facilities to the MCAAP facilities. Therefore SWPA also contracted with MCAAP to bundle other services. Those other services included transmission of the Federal Energy from the SWPA system to the MCAAP facility, transformation services, provision of "peaking power" that MCAAP might need in excess of the available Federal Energy, and ancillary services such as power scheduling.

12. Although SWPA contracted to provide this bundled service to MCAAP, it did not have the capability to do so. Therefore, to perform under the contract between SWPA and MCAAP, SWPA entered into a separate contract with PSO. Under the separate contract, PSO provided transmission services, transformation, peaking power, and related ancillary services (such as power scheduling) that were necessary for SWPA to perform under the SWPA/MCAAP contract.

13. The SWPA/PSO relationship was structured so that power was delivered by SWPA at a location called the Tupelo switch. After that point, PSO provided transmission and transformation services so that the power was transmitted from the Tupelo switching point to the MCAAP facilities. PSO also provided peaking power through its transmission facilities from its own generating facilities.

**B. In 1997, SWPA signed a new contract with MCAAP so that it only sold Federal Energy. MCAAP then directly contracted with PSO for all other related services.**

14. In early 1994, SWPA gave MCAAP notice that the SWPA/MCAAP contract would expire on May 31, 1997, and that thereafter SWPA would supply only Federal Energy to a remote delivery point.

15. The arrangement between SWPA and MCAAP was renegotiated. Rather than delivering bundled services to MCAAP (i.e., Federal Energy, peaking power, transmission, associated transformation and ancillary services) SWPA required that its preference customers make their own arrangements for delivery of preference power. This meant that SWPA sold the Federal Energy at a delivery point and it was necessary from and after that delivery point for the customer to arrange for transmission, transformation, scheduling services, and any necessary peaking power.

16. MCAAP, like SWPA, did not have its own distribution facilities to transmit the Federal Energy from the Tupelo switching point to the MCAAP facilities. MCAAP was not in the business of delivering ancillary services (such as power scheduling). It also continued to need a supplier of peaking power (that is, power to meet its needs in excess of the Federal Energy).

17. The structure of the new relationship involved several agreements.

a. MCAAP purchased Federal Energy from SWPA and entered into a contract for the purchase of that Federal Energy.

b. At the Tupelo switching point, MCAAP resold that Federal Energy to PSO. This arrangement was covered by a Power Agreement signed by PSO and MCAAP.

c. A Contract for Electric Services was signed between MCAAP and

PSO. Under that contract, PSO supplied electric service to MCAAP and was paid under a rate established by the Oklahoma Corporation Commission (the state regulator of retail power sales in Oklahoma).

18. Contract No. DAAA31-97-002, which is at issue, consists of four sections which cover the relationship between PSO and MCAAP: General Provisions, Technical provisions, a Contract for Electric Service, and a Power Agreement. The SWPA/MCAAP contract is a separate document and is appended to the PSO/MCAAP contract as Exhibit E.

19. The price under the Power Agreement that is to be paid by PSO for the Federal Energy is calculated by a formula contained in the Power Agreement. This dispute involves the meaning of one term in the formula. That term is the "SE" term and the dispute involves what SWPA Rate Schedule to use to calculate "SE." The formula is as follows, and the term at issue is emphasized with italics:

> 4.1 Energy Charge. PSO will pay MCAAP each month during the Delivery Term in accordance with the following formula:
>
> FSE = SE + ME (A1 + A2)
>
> FSE = Total amount payable by PSO to MCAAP for the purchase of Federal Energy.
>
> ***SE = Amount payable in dollars by MCAAP to SWPA for Federal Energy Scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P90A in effect on May 22, 1997. (Exhibit E).***
>
> ME = An amount of PSO energy (KWH) equivalent to the amount of energy (KWH) multiplied by a factor of .9744 scheduled for and delivered to MCAAP by SWPA to the Delivery Point.
>
> A1 = PSO's applicable Oklahoma Corporation Commission approved embedded fuel cost (Exhibit B).

A2 = Fuel Cost Adjustment (FCA) in accordance with PSO's Oklahoma Corporation Commission approved Fuel Cost Adjustment Rider (Exhibit C).

20. Under the Contract for Electric Service, PSO provides all of MCAAP's power and energy needs by delivering service at delivery points at the MCAAP facility. It also acts as MCAAP's agent with SWPA to schedule the Federal Energy deliveries to MCAAP (which are then immediately sold to PSO at the Tupelo switch).

21. The Contract for Electric Service provides that the amount due by PSO for its purchase of Federal Energy is to be netted against the amount due from MCAAP for electric service. MCAAP is then to pay that net difference to PSO as the net cost of service (thereby allowing MCAAP to take advantage of its ability to purchase preference power from SWPA, even though it has no facilities to transmit the Federal Energy).

**C. The 1997 contract was signed for a short initial term with an evergreen clause for subsequent terms.**

22. The original term of the contract was for nineteen months. The original term expired December 31, 1998.

23. PSO anticipated that deregulation would occur within the State of Oklahoma in January, 1999, and therefore negotiated the non-standard nineteen month term.

24. Deregulation did not occur in January, 1999.

25. The Contract has an evergreen provision that allows it to continue beyond the primary term on a year-to-year basis until canceled pursuant to the provisions of the contract.

26. Neither PSO nor MCAAP elected to cancel the contract after the initial term and it has continued at all relevant times.

**D. MCAAP claims that it can offset its electric bill by unilaterally increasing the price for which it sells the Federal Energy to PSO (which under the Contract is a direct offset to the amount owed to PSO for electric services.)**

27. The Power Agreement specifically provides that the amount payable by PSO to MCAAP for Federal Energy will be based on the amount payable in dollars by MCAAP to SWPA in accordance with "SWPA rate schedule P90A in effect on May 22, 1997."

28. Rate Schedule P90A was adopted effective October 1, 1990, had an initial effective term until September 30, 1994, and was extended by order of the FERC from and after September 30, 1994 until March 31, 1998.

29. May 22, 1997, the date specified in the Contract formula, was not the effective date of any of the orders extending Rate Schedule P90A.

30. May 22, 1997, the date specified in the Contract formula, was not the terminal date of any of the orders extending Rate Schedule P90A.

31. The use of the phrase "SWPA Rate Schedule P90A in effect on May 22, 1997" creates a benchmark that is tied to that particular schedule.

32. After the initial term expired, MCAAP has never canceled the Contract but has continued to be contractually obligated to sell Federal Energy based on SWPA Rate Schedule P-90A in effect on May 22, 1997.

33. From the date the Contract was signed until December, 2004, the May 22, 1997 P90A rate schedule has been used to calculate the amount payable for the Federal Energy.

34. During this time, SWPA replaced Rate Schedule P-90A several times with the approval of the FERC. Rate P-90A was replaced by Rate P98A on January 1, 1998. Rate P98A was replaced by Rate P98B on January 1, 1999. Rate P98B was replaced by Rate P98C on January 1, 2000. Rate P98C was replaced by Rate P98D on April 1, 2001. Rate P98D was replaced by Rate P-02 on October 1, 2002.

35. The Contract was never amended to utilize any of those rate schedules.

36. MCAAP was billed under Rate Schedule P90A during the effective dates of Rate Schedules P90A, P98A, P98B, P98C, P98D, and P02.

37. MCAAP paid the billings under the rate schedules identified in the preceding paragraph without objection.

38. In or around January, 2005, MCAAP began to unilaterally underpay its billing from PSO. The underpayment was the result of MCAAP recalculating the Federal Energy Credit using the newly adopted SWPA Rate P04. PSO continued to bill MCAAP under the rate schedule specified in the contract, SWPA Rate P90A, and carried forward a past due amount based on MCAAP's underpayments.

39. Sometime in the Spring of 2005, MCAAP representative Kevin Henderson contacted PSO representative Regina Watson and told her that the newly adopted SWPA rate schedule P04 should be used under the contract. Watson is the PSO employee who manually prepares the MCAAP bill each month.

40. Watson thereafter began calculating the amount payable for Federal Energy under Rate Schedule P04.

41. PSO management discovered the change and informed MCAAP representatives, including Henderson, that the schedule was not the appropriate schedule under the contract.

42. Beginning in October, 2005, PSO returned to cacluating the Federal Energy Credit based on the rate schedule specified in the contract, SWPA Rate P90A.

43. In October, November, and December, 2005, MCAAP paid the amounts as they were calculated under SWPA Rate P90A.

44. In or around January, 2006, MCAAP once again began underpaying its billing from PSO.

45. On July 19, 2006, MCAAP submitted a solicitation for amendment to adopt Rate Schedule P05.

46. PSO declined to amend the contract.

47. MCAAP continued to unilaterally reduce its payments for electric service by taking larger credits for the sale of Federal Energy.

48. The mechanism by which MCAAP has accomplished this underpayment is a recalculation of the credit for Federal Energy sales using Rate Schedule P05 (and subsequently P06) instead of the applicable Rate Schedule P90A.

## Claims for Relief

49. Each allegation of this Complaint is incorporated in each claim for relief.

## First Claim for Relief
## (Breach of Contract)

50. PSO and MCAAP are parties to the Contract.

51. MCAAP has breached the Contract.

52. PSO has performed all conditions necessary to maintain this action.

53. PSO has been injured as a direct result of MCAAP's breach of contract.

54. PSO has been damaged in the amount of $159,007.94

## Second Claim for Relief
## (Declaratory Judgment)

55. An actual controversy exists between PSO and MCAAP regarding interpretation of the Contract.

56. PSO contends that Rate Schedule P-90A applies until the Contract expires or is amended. MCAAP contends that a subsequently adopted rate schedule applies.

57. This dispute affects the ongoing performance of the parties under the Contract and is determinative of the amount of money MCAAP owes on a monthly basis.

58. PSO is entitled to a declaration interpreting the contract.

59. The purpose of this claim is present for decision MCAAP's continuing breach of contract that extends beyond the time period covered by PSO's certified claim. PSO's damages continue to accrue.

WHEREFORE, Plaintiff respectfully requests that this Court award money damages for MCAAP's material breach of the Contract; enter a declaratory judgment confirming PSO's interpretation of the Contract; award PSO its recoverable costs; and grant such other and further relief to which PSO may be entitled.

Respectfully submitted,

Dated: July 9, 2008

By: ______________________

Tom Q. Ferguson, OBA No. 12288
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
320 South Boston Avenue, Suite 500
Tulsa, Oklahoma 74103
Telephone (918) 591-5308
Facsimile (918) 591-5398

Counsel for Public Service Company of Oklahoma

Of Counsel:
Dallas E. Ferguson, OBA No. 2871
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
320 South Boston Avenue, Suite 500
Tulsa, Oklahoma 74103
Telephone (918) 591-5218
Facsimile (918) 925-5218