# EXHIBIT A

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) — RATING — PAGE 1 OF 112 PAGES

2. CONTRACT (Proc. Inst. Indent.) NO. DAAA31-97-C-0002

3. EFFECTIVE DATE: SEE BLOCK 20C

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.

5. ISSUED BY — CODE DAAA31
CONTRACTING OFFICER SIOMC-PC
MCALESTER ARMY AMMO PLANT W44W9M
1 C TREE ROAD
MCALESTER OK 74501-9002
Linda Savage C02 (918) 421-3390

6. ADMINISTERED BY (If other than Item 5) — CODE LS
MCALESTER ARMY AMMUNITION PLANT
ATTN SIOMC PC LINDA SAVAGE 918 421 3390
1 C TREE ROAD
MCALESTER OK 74501-9002

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and Zip Code)
PUBLIC SERVICE COMPANY OF OKLAHOMA
PO BOX 201
212 EAST 6TH STREET
TULSA OK 74102-0201

CODE — FACILITY CODE

8. DELIVERY: [ ] FOB ORIGIN [X] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ITEM 15

11. SHIP TO/MARK FOR — CODE W44W9M

12. PAYMENT WILL BE MADE BY — CODE ROCK
Defense Finance & Accounting Office
Operating Location-Rock Island,Attn: DFAS-RI-FPV 309-782-9155
Rock Island IL 61299

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[X] 10 U.S.C. 2304(c) ( 1 ) [ ] 41 U.S.C. 253(c) ( )

14. ACCOUNTING AND APPROPRIATION DATA
APPLICABLE FUNDS WILL BE CITED ON EACH PAYMENT DOCUMENT

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | SUBMIT INVOICES TO:<br>Commander<br>McAlester Army Ammunition Plant<br>Attn SIOMC DEW (Scott Kosco, Bldg 9)<br>1 C Tree Road<br>McAlester OK 74501-9002<br><br>ESTIMATED ANNUAL COST: $240,000 | | | | |

EXHIBIT A

15G. TOTAL AMOUNT OF CONTRACT $

## 16. TABLE OF CONTENTS



| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 15 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 1 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 25 | X | J | LIST OF ATTACHMENTS | Encls |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| | F | DELIVERIES OR PERFORMANCE | | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 1 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |



**CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE**

17. [X] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return Original copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [ ] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)
General Manager
William R. McKamey

20A. NAME OF CONTRACTING OFFICER
Stephen Dunbar c07 (918) 421-3401

19B. NAME OF CONTRACTOR
BY Public Service Company of Oklahoma
(Signature of person authorized to sign)

19C. DATE SIGNED: 5/24/97

20B. UNITED STATES OF AMERICA
BY [signature]
(Signature of Contracting Officer)

20C. DATE SIGNED: 6/9/97

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE
26-107
STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)
USAPPC V1.00

DUPLICATE ORIGINAL

A.1 AMC-LEVEL PROTEST PROGRAM (October 1996)

If you have complaints about this procurement, it is preferable that you first attempt to resolve those concerns with the responsible contracting officer. However, you can also protest to Headquarters, AMC. The HQ, AMC-Level Protest program is intended to encourage interested parties to seek resolution of their concerns within AMC as an Alternative Dispute Resolution forum, rather than filing a protest with the General Accounting Office or other external forum. Contract award or performance is suspended during the protest to the same extent, and within the same time periods, as if filed at the GAO. The AMC protest decision goal is to resolve protests within 20 working days from filing. To be timely, protests must be filed within the periods specified in FAR 33.103. Send protests (other than protests to the contracting officer) to:

HQ, Army Materiel Command
Office of Command Counsel
Attn: AMCCC-PL
5001 Eisenhower Avenue
Alexandria, VA 22333-0001

Facsimile number (703)617-4999/5680
Voice Number (703)617-8176

The AMC-level protest procedures are found at:

HTTP://WWW.DTIC.DLA.MIL/AMC

If internet access is not available contact the contracting officer or HQ, AMC to obtain the AMC-Level Protest Procedures.

END OF SECTION A

SECTION B
SUPPLIES OR SERVICES AND PRICES/COSTS

| ITEM | DESCRIPTION | QUANTITY | U/I | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Provide electric power and energy to fulfill MCAAP's electric service requirements. Account for and compensate MCAAP for all Federal Power and Energy available from Southwestern Power Administration in accordance with: Section C; Enclosures 1,2; Exhibits A, A1, B, C, D, E. | | LARGE POWER AND LIGHT SERVICE LEVEL 1 LPL-1, PRICE CODE 0610 AND LIMITED USAGE GENERAL SERVICE SERVICE LEVEL 5 LUGS-5, PRICE CODE 0675 | | |

END OF SECTION B

**WHEREAS,** MCALESTER ARMY AMMUNITION PLANT (MCAAP) HAS, OR WILL CONTRACT TO PURCHASE ELECTRIC POWER AND ENERGY FROM SOUTHWESTERN POWER ADMINISTRATION (SWPA), AND

**WHEREAS,** CONTRACTOR SHALL PURCHASE AND RECEIVE ALL THE FEDERAL ENERGY TO WHICH THE GOVERNMENT IS ENTITLED TO RECEIVE PURSUANT TO GOVERNMENT'S CONTRACT WITH SWPA, AND

**WHEREAS,** MCAAP SHALL PURCHASE ELECTRIC POWER AND ENERGY REQUIREMENTS FROM CONTRACTOR, AND

**WHEREAS,** MCAAP MAY BE LIMITED IN THE QUANTITY OF SUCH ELECTRIC POWER AND ENERGY AVAILABLE FROM SWPA BECAUSE OF THE GENERATING CAPABILITY AND OPERATING CHARACTERISTICS OF THE RESERVOIR DAM PROJECTS FOR WHICH SWPA HAS BEEN DESIGNATED AS THE MARKETING AGENCY, AND UNDER THE TERMS AND CONDITIONS HEREINAFTER SET FORTH,

NOW, THEREFORE, CONTRACTOR WILL PROVIDE AS FOLLOWS:

# MCALESTER ARMY AMMUNITION PLANT GENERAL, TECHNICAL & INCORPORATED CONTRACTOR PROVISIONS FOR ELECTRIC UTILITY SERVICE

## I. GENERAL PROVISIONS

1. SCOPE

A. THE DEPARTMENT OF THE ARMY, MCALESTER ARMY AMMUNITION PLANT (MCAAP) IS SEEKING AN ELECTRIC UTILITY SERVICE CONTRACT FROM A QUALIFIED CONTRACTOR TO PROVIDE MCAAP'S ELECTRIC DISTRIBUTION SYSTEM AS MAY BE REQUIRED TO FULFILL ITS PRESENT AND FUTURE ELECTRIC SERVICE REQUIREMENTS. MCAAP WILL PURCHASE FROM THE DEPARTMENT OF ENERGY, SOUTHWESTERN POWER ADMINISTRATION (SWPA) WHOLESALE POWER AND ENERGY. A COPY OF THE MCAAP/SWPA POWER SALES CONTRACT IS ATTACHED AS EXHIBIT "E". CONTRACTOR SHALL PURCHASE AND RECEIVE ALL THE FEDERAL ENERGY TO WHICH MCAAP IS ENTITLED TO RECEIVE PURSUANT TO MCAAP'S CONTRACT WITH SWPA.

B. THE CONTRACTOR MUST ALSO ADDRESS THE ADMINISTRATION OF ALL FEDERAL POWER AND ENERGY FROM SWPA THAT IS MADE AVAILABLE TO MCAAP AND PURCHASED BY THE CONTRACTOR.

C. THE PROPOSALS MUST LIST ALL APPLICABLE RATES, AN UNDERSTANDABLE DESCRIPTION OF THE RATE, AND HOW EACH PARTICULAR RATE WILL BE APPLIED TO THE PRODUCTS AND/OR SERVICES PROVIDED BY THE CONTRACTOR. IT MUST ALSO INDICATE ANY TIME-VARYING, OR SEASONAL VARYING WHOLESALE RATES AVAILABLE AND HOW THEY WOULD BE APPLIED.

2. SERVICE FOR ACCOUNT OF SWPA

A. FROM EXHIBIT "E", CONTRACTOR RECOGNIZES THAT MCAAP WILL PURCHASE ELECTRIC POWER AND ENERGY GENERATED AT RESERVOIR PROJECTS UNDER THE CONTROL OF THE DEPARTMENT OF THE ARMY, PURCHASED FROM THE UNITED STATES, ACTING THROUGH THE SECRETARY, DEPARTMENT OF ENERGY, AS REPRESENTED BY THE ADMINISTRATOR AND MARKETING AGENCY, SOUTHWESTERN POWER ADMINISTRATION (SWPA), AND THAT MCAAP HAS ENTER INTO A POWER SALES CONTRACT WITH SWPA TO PROVIDE 2,688 KW OF FIRM POWER AND ASSOCIATED ENERGY.

3. TERM OF THE CONTRACT

A. FOR AN INITIAL PERIOD OF NINETEEN (19) MONTHS, BEGINNING 1 JUNE 1997 AND ENDING AT MIDNIGHT, 31 DECEMBER 1998.

B. IF MCAAP CONTINUES TO TAKE SERVICE AFTER THE EXPIRATION OF THE INITIAL PERIOD, THIS CONTRACT SHALL CONTINUE IN FULL FORCE AND EFFECT FROM YEAR TO YEAR THEREAFTER UNTIL TERMINATED BY THE PARTY DESIRING TERMINATION GIVING THE OTHER PARTY AT LEAST 12 MONTHS PRIOR WRITTEN NOTICE.

4. EXAMPLE INVOICE: NOT REQUIRED.

5. PAYMENT

A. THE CONTRACTOR SHALL BE PAID BY THE DESIGNATED DISBURSING OFFICER FOR SERVICES DESCRIBED HEREIN AT THE RATES SPECIFIED; PROVIDED, THAT MCAAP SHALL BE LIABLE FOR THE MINIMUM MONTHLY CHARGE, IF ANY, SPECIFIED IN THE AWARDED CONTRACT COMMENCING WITH THE BILLING PERIOD IN WHICH SERVICE IS INITIALLY FURNISHED AND CONTINUING UNTIL THE CONTRACT IS TERMINATED, EXCEPT THAT THE MINIMUM MONTHLY CHARGE SHALL BE EQUITABLY PRORATED FOR THE BILLING PERIOD IN WHICH COMMENCEMENT AND TERMINATION OF THE CONTRACT SHALL BECOME EFFECTIVE.

B. PAYMENTS HEREIN SHALL BE CONTINGENT UPON THE AVAILABILITY OF APPROPRIATIONS THEREOF, AND SHALL NOT BE MADE IN ADVANCE OF THE SERVICE RENDERED.

C. INVOICES FOR SERVICES RENDERED HEREIN SHALL CONTAIN STATEMENTS OF THE METER READINGS AT THE BEGINNING AND END OF THE BILLING PERIOD, METER CONSTANTS, CONSUMPTION DURING THE BILLING PERIOD, ALL UNIT OR FEE COST ELEMENTS USED TO CALCULATE THE INVOICED DOLLAR AMOUNT, AND SUCH OTHER PERTINENT DATA AS SHALL BE REQUIRED BY MCAAP TO VERIFY INVOICED ELECTRICITY USAGE AND COSTS. INVOICES MUST CONTAIN THE METER READINGS FROM THE METERS AT THE DELIVERY POINT(S) WHICH THE BILLED ELECTRICITY USAGE IS BASED UPON. A MCAAP REPRESENTATIVE SHALL BE ABLE TO VISUALLY VERIFY METER READINGS AT SITE. THE YEARLY METER CALIBRATION TESTS RESULTS MAY BE INCLUDED IN WITH THE ELECTRICITY INVOICES OR DELIVERED IN PERSON TO THE CONTRACTING OFFICER'S REPRESENTATIVE.

D. THE CONTRACTOR HEREBY DECLARES THAT RATES ARE NOT IN EXCESS OF THE LOWEST RATES NOW AVAILABLE TO ANY EXISTING OR PROSPECTIVE CUSTOMER UNDER LIKE CONDITIONS OF SERVICE, OR OF THE SAME CLASSIFICATION, AND AGREES THAT DURING THE LIFE OF THE CONTRACT MCAAP SHALL CONTINUE TO BE BILLED AT THE LOWEST AVAILABLE RATE FOR SIMILAR CONDITIONS OF SERVICE.

E. MCAAP SHALL BE ENTITLED TO ANY DISCOUNTS CUSTOMARILY APPLICABLE TO PAYMENT OF BILLS BY ALL CUSTOMERS OF THE CONTRACTOR.

6. RATES AND CHARGES: PUBLIC REGULATION AND CHANGE OF RATES

A. SERVICE FURNISHED UNDER THIS CONTRACT SHALL BE SUBJECT TO REGULATION IN THE MANNER AND TO THE EXTENT PRESCRIBED BY LAW THROUGH ANY FEDERAL, STATE OR LOCAL REGULATORY COMMISSION HAVING JURISDICTION. A COPY OF THE CONTRACTOR'S CURRENT EXISTING RATES (INCLUDING CHANGES) SHALL BE FURNISHED PROMPTLY TO THE CONTRACTING OFFICER UPON REQUEST.

B. CHANGE IN RATES, CHARACTER OF SERVICE, OR VOLUME

(I) IF, DURING THE TERM OF THIS CONTRACT, THE PUBLIC REGULATORY COMMISSION HAVING JURISDICTION RECEIVES FOR FILING IN AN AUTHORIZED MANNER ANY CHANGE IN THE RATE SCHEDULE(S) STIPULATED HEREIN DIRECTLY OR BY REFERENCE WHICH RESULT IN HIGHER OR LOWER CHARGES FOR SERVICE, THE CONTRACTOR SHALL CONTINUE TO FURNISH SERVICE AS STIPULATED IN THIS CONTRACT AND MCAAP SHALL PAY FOR SERVICE AT THE HIGHER OR LOWER CHARGES FROM THE EFFECTIVE DATE THEREOF, SUBJECT TO JUDICIAL APPEAL.

(II) IN THE EVENT THE CONTRACTOR, DURING THE TERM OF THIS CONTRACT, SHALL MAKE EFFECTIVE ANY NEW OR AMENDED RATE SCHEDULE, NOT INCORPORATED HEREIN DIRECTLY OR INDIRECTLY, APPLICABLE TO ANY LIKE CONDITIONS OF SERVICE FURNISHED UNDER THIS CONTRACT, WHICH CONTAINS A LOWER RATE OR CONDITIONS MORE FAVORABLE TO MCAAP, THE CONTRACTOR SHALL FORWARD TO THE CONTRACTING OFFICER A COPY OF THE NEW OR AMENDED RATE SCHEDULE WITHIN FIFTEEN (15) DAYS AFTER THE EFFECTIVE DATE THEREOF, AND UPON RECEIPT OF WRITTEN REQUEST FROM MCAAP SHALL SUBSTITUTE THE NEW OR AMENDED RATE SCHEDULE FOR THE RATE SCHEDULE THEN IN EFFECT UNDER THIS CONTRACT, COMMENCING WITH THE BILLING PERIOD IN WHICH THE WRITTEN REQUEST IS RECEIVED.

(III) IN THE EVENT OF A PERMANENT CHANGE IN THE CLASS OF SERVICE FURNISHED MCAAP UNDER THIS CONTRACT, SERVICE SHALL, EFFECTIVE SIXTY (60) DAYS AFTER WRITTEN REQUEST IS MADE BY EITHER PARTY OR AT SUCH TIME AS MAY BE AGREED UPON, BE FURNISHED AT THE LOWEST AVAILABLE RATE SCHEDULE OF THE CONTRACTOR WHICH IS APPLICABLE TO THE CLASS OF SERVICE FURNISHED FOLLOWING THE PERMANENT CHANGE.

(IV) MCAAP MAY REQUEST A CHANGE IN THE CHARACTER OF SERVICE DURING THE TERM OF THIS CONTRACT SHOULD AN ALTERNATIVE RATE SCHEDULE, NOT INCORPORATED HEREIN DIRECTLY, CONTAIN A LOWER RATE OR CONDITIONS MORE FAVORABLE TO MCAAP. UPON RECEIPT OF WRITTEN REQUEST FROM MCAAP, THE ALTERNATIVE RATE SCHEDULE SHALL BE INCORPORATED INTO THIS CONTRACT. SERVICE SHALL, EFFECTIVE

SIXTY (60) DAYS AFTER WRITTEN REQUEST IS RECEIVED, BE FURNISHED UNDER ALL RATE SERVICES IN THE CONTRACT.

(V) THE CONTRACTOR SHALL GIVE THE CONTRACTING OFFICER WRITTEN NOTICE OF THE FILING OF AN APPLICATION FOR RATE CHANGES CONCURRENTLY WITH THE FILING OF AN APPLICATION. THE NOTICE SHALL FULLY DESCRIBE THE PROPOSED RATE CHANGE.

(VI) IN THE EVENT THAT THE REGULATORY BODY PROMULGATES ANY REGULATION NOT CONCERNING RATES WHICH MATERIALLY AFFECTS THIS CONTRACT, THE CONTRACTOR SHALL IMMEDIATELY NOTIFY THE CONTRACTING OFFICER.

(VII) THE CONTRACTING OFFICER SHALL GIVE REASONABLE NOTICE TO THE CONTRACTOR RESPECTING ANY MATERIAL CHANGES ANTICIPATED IN THE VOLUME OR CHARACTERISTICS OF THE UTILITY SERVICE REQUIRED AT MCAAP. UPON RECEIPT OF WRITTEN REQUEST FROM MCAAP, CONTRACTOR SHALL SUPPLY SUCH ADDITIONAL CAPACITY AS MAY BE REQUIRED BY MCAAP, PROVIDED SUCH SUPPLY OF ADDITIONAL CAPACITY DOES NOT REQUIRE INSTALLATION OF ADDITIONAL FACILITIES BY THE CONTRACTOR. WHEN ADDITIONAL FACILITIES ARE REQUIRED, A NEW CONTRACT SETTING OUT THE CHANGED CONDITIONS, RATES AND TERMS SHALL BE MUTUALLY AGREED UPON.

7. CHOICE OF RATES

WHERE OPTIONAL RATE SCHEDULES, APPROVED BY THE OKLAHOMA CORPORATION COMMISSION AS APPLICABLE FOR ELECTRIC SERVICE AT MCAAP'S SERVICE LOCATION, ARE AVAILABLE, THE CHOICE OF RATE SCHEDULES TO BE APPLIED TO MCAAP'S SERVICE SHALL BE AT MCAAP'S OPTION, PROVIDED, HOWEVER, THAT NO MORE THAN ONE RATE CHANGE SHALL BE MADE IN ANY TWELVE-MONTH PERIOD, UNLESS DURING SUCH PERIOD MCAAP MAKES A MATERIAL AND PERMANENT CHANGE IN ITS USE OF SERVICE. THE CONTRACTOR OFFERS MCAAP ASSISTANCE, UPON REQUEST, IN DETERMINING THE MOST FAVORABLE RATE FOR MCAAP'S OPERATING CONDITIONS, BUT DOES NOT CONTRACT TO DETERMINE FOR MCAAP SAID MOST FAVORABLE RATE; AND IT IS UNDERSTOOD THAT NO REFUND WILL BE MADE TO MCAAP UPON PAST BILLS EVEN THOUGH CHANGES IN THE APPLICATION OF SCHEDULES MADE AS A RESULT OF INVESTIGATION BY THE CONTRACTOR, OR BY REQUEST FROM MCAAP, SHOW A REDUCTION TO MCAAP ON FUTURE BILLS.

8. EASEMENT RIGHTS

GOVERNMENT GRANTS CONTRACTOR THE RIGHT TO INSTALL AND MAINTAIN ON GOVERNMENT'S PROPERTY SUCH POLES, WIRES, TRANSFORMERS, AND OTHER EQUIPMENT AS ARE NECESSARY, IN THE CONTRACTOR'S JUDGMENT, TO PROVIDE ELECTRIC SERVICE TO MCAAP; ALSO TO CUT DOWN, TRIM, OR REMOVE ANY TREES THAT MAY, IN THE CONTRACTOR'S JUDGMENT, INTERFERE WITH SERVICE TO MCAAP, OR ENDANGER SERVICE TO OTHER CUSTOMERS.

9. RIGHT OF ENTRY

THE CONTRACTOR SHALL HAVE THE RIGHT TO ENTER THE PREMISES OF GOVERNMENT AT ALL TIMES FOR THE PURPOSE OF INSPECTING, TESTING, REPAIRING, OR CHANGING ITS APPARATUS, OR FOR THE REMOVAL OF ITS PROPERTY FROM THE PREMISES OF MCAAP, EITHER DURING OR AFTER THE TERMINATION OF ANY ELECTRIC SERVICE CONTRACT.

10. CONTINUITY OF SERVICE AND CONSUMPTION

A. THE CONTRACTOR SHALL USE REASONABLE DILIGENCE TO PROVIDE ELECTRIC CAPACITY AND ENERGY TO MCAAP TO SATISFY ITS BEST ESTIMATED MONTHLY AND YEARLY REQUIREMENTS. HOWEVER THE CONTRACTOR SHALL NOT BE LIABLE TO MCAAP FOR DAMAGES, BREACH OF CONTRACT, OR OTHERWISE, FOR FAILURE, SUSPENSION, DIMINUTION, OR OTHER VARIATIONS OF SERVICE OCCASIONED BY ANY CAUSE BEYOND THE CONTROL AND WITHOUT THE FAULT OR NEGLIGENCE OF THE CONTRACTOR. SUCH CAUSES MAY INCLUDE, BUT ARE NOT RESTRICTED TO, ACTS OF THE PUBLIC ENEMY, ACTS OF MCAAP IN EITHER ITS SOVEREIGN OR CONTRACTUAL CAPACITY, FAILURE OR BREAKDOWN OF TRANSMISSION OR OTHER FACILITIES, FIRES, FLOODS, EARTHQUAKES, EPIDEMICS, QUARANTINE RESTRICTIONS, STRIKES, OR OTHER NATURAL DISASTERS; PROVIDED, THAT WHEN ANY FAILURE, SUSPENSION, DIMINUTION, OR VARIATION OF SERVICE SHALL AGGREGATE MORE THAN ONE (1) HOUR DURING ANY BILLING PERIOD HEREUNDER, AN EQUITABLE ADJUSTMENT SHALL BE MADE IN THE MONTHLY RATES SPECIFIED IN THIS CONTRACT (INCLUDING THE MINIMUM MONTHLY CHARGE).

B. IN THE EVENT MCAAP IS UNABLE TO OPERATE THE SERVICE LOCATION IN WHOLE OR IN PART FOR ANY CAUSE BEYOND ITS CONTROL AND WITHOUT ITS FAULT OR NEGLIGENCE, INCLUDING BUT NOT LIMITED TO, ACTS OF THE PUBLIC ENEMY, ACTS OF MCAAP IN EITHER ITS SOVEREIGN OR CONTRACTUAL CAPACITY, FAILURE OR BREAKDOWN OF TRANSMISSION OR OTHER FACILITIES, FIRES, FLOODS, EARTHQUAKES, EPIDEMICS, QUARANTINE RESTRICTIONS, STRIKES, OR OTHER NATURAL DISASTERS; AN EQUITABLE ADJUSTMENT SHALL BE MADE IN THE MONTHLY RATES SPECIFIED IN THIS CONTRACT (INCLUDING THE MINIMUM MONTHLY CHARGE) IF THE PERIOD DURING WHICH MCAAP IS UNABLE TO OPERATE THE SERVICE LOCATION IN WHOLE OR IN PART SHALL EXCEED FIFTEEN (15) DAYS DURING ANY BILLING PERIOD HEREUNDER.

11. CONTRACTOR'S FACILITIES/EQUIPMENT

A. THE CONTRACTOR AT OWN EXPENSE, SHALL PROVIDE, INSTALL, OPERATE, AND MAINTAIN ALL FACILITIES/EQUIPMENT REQUIRED TO FURNISH SERVICE HEREIN TO, AND TO MEASURE THE SERVICE AT THE POINT(S) OF DELIVERY. TITLE TO ALL OF THESE FACILITIES SHALL REMAIN WITH THE CONTRACTOR. CONTRACTOR SHALL BE RESPONSIBLE FOR ALL LOSS OF OR DAMAGE TO THOSE FACILITIES/EQUIPMENT EXCEPT THAT ARISING OUT OF THE FAULT OR NEGLIGENCE OF MCAAP, ITS AGENTS OR ITS EMPLOYEES. ALL TAXES AND OTHER CHARGES IN CONNECTION

THEREWITH, TOGETHER WITH ALL LIABILITY ARISING OUT OF THE NEGLIGENCE OF THE CONTRACTOR IN THE CONSTRUCTION, OPERATION, OR MAINTENANCE OF THESE FACILITIES/EQUIPMENT, SHALL BE ASSUMED BY THE CONTRACTOR.

B. MCAAP WILL GRANT THE CONTRACTOR, FREE OF ANY RENTAL OR SIMILAR CHARGE, BUT SUBJECT TO THE LIMITATIONS SPECIFIED IN THE AWARDED CONTRACT, A REVOCABLE PERMIT TO ENTER THE SERVICE LOCATION FOR ANY PROPER PURPOSE UNDER THE CONTRACT, INCLUDING USE OF THE SITE OR SITES AGREED UPON BY THE PARTIES HERETO FOR THE INSTALLATION, OPERATION, AND MAINTENANCE OF THE FACILITIES OF THE CONTRACTOR REQUIRED TO BE LOCATED UPON GOVERNMENT PREMISES. AUTHORIZED REPRESENTATIVES OF THE CONTRACTOR WILL BE ALLOWED ACCESS TO THE FACILITIES OF THE CONTRACTOR AT SUITABLE TIMES TO PERFORM THE OBLIGATIONS OF THE CONTRACTOR WITH RESPECT TO THESE FACILITIES. IT IS EXPRESSLY UNDERSTOOD THAT MCAAP MAY LIMIT OR RESTRICT THE RIGHT OF ACCESS HEREIN GRANTED IN ANY MANNER CONSIDERED TO BE NECESSARY FOR THE NATIONAL SECURITY.

C. WITHIN A REASONABLE TIME AFTER TERMINATION OF THIS CONTRACT, THE FACILITIES/EQUIPMENT SHALL BE REMOVED AND GOVERNMENT PREMISES RESTORED TO THEIR ORIGINAL CONDITION, ORDINARY WEAR AND TEAR EXCEPTED, BY THE CONTRACTOR AT HIS EXPENSE. IN THE EVENT OF TERMINATION DUE TO FAULT OF THE CONTRACTOR, THESE FACILITIES/EQUIPMENT MAY BE RETAINED IN PLACE AT THE OPTION OF MCAAP UNTIL SERVICE COMPARABLE TO THAT PROVIDED FOR HEREUNDER IS OBTAINED ELSEWHERE.

12. HOURS OF OPERATION:

A. WORK HOURS

NORMAL WORK HOURS FOR MCAAP PERSONNEL ARE MONDAY THROUGH THURSDAY, 6:30 A.M. TO 5:00 P.M. MCAAP'S NORMAL WORK SCHEDULE IS FOUR(4), TEN (10) HOUR DAYS.

B. LEGAL HOLIDAYS FOR MCAAP ARE AS FOLLOWS:

| | |
|---|---|
| NEW YEARS DAY | JANUARY 1ST |
| MARTIN L. KING'S BIRTHDAY | THIRD MONDAY IN JANUARY |
| GEORGE WASHINGTON'S BIRTHDAY | THIRD MONDAY IN FEBRUARY |
| MEMORIAL DAY | FOURTH MONDAY IN MAY |
| FOURTH OF JULY | JULY 4TH |
| LABOR DAY | FIRST MONDAY IN SEPTEMBER |
| COLUMBUS DAY | SECOND MONDAY IN OCTOBER |
| VETERANS DAY | NOVEMBER 11TH |
| THANKSGIVING DAY | FOURTH THURSDAY IN NOVEMBER |
| CHRISTMAS DAY | DECEMBER 25TH |

13. CONFLICTS

TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PROVISION OF THIS CONTRACT, AND THE PROVISIONS OF ANY SCHEDULE, RIDER, OR EXHIBIT INCORPORATED IN THIS CONTRACT BY REFERENCE OR OTHERWISE, THE PROVISIONS OF THIS CONTRACT SHALL CONTROL.

14. ADDITIONAL INFORMATION

IF ADDITIONAL INFORMATION IS NEEDED, THE POINTS OF CONTACT FOR THIS ACTION ARE:

* SCOTT KOSCO, CONTRACTING OFFICER'S REPRESENTATIVE, SIOMC-DEW (PHONE: COMMERCIAL 918-421-3455, DSN 956-7455)

* LINDA SAVAGE, CONTRACTING SPECIALIST, SIOMC-PC (PHONE: COMMERCIAL 918-421-3390; DSN 956-7390).

* STEPHEN DUNBAR, CONTRACTING OFFICER, SIOMC-PC (PHONE: COMMERCIAL 918-421-3401; DSN 956-7401).

## II. TECHNICAL PROVISIONS

1. POINTS OF CONNECTION/DELIVERY

A. MCAAP HAS TWO DELIVERY POINTS WHICH ARE BOTH METERED. DELIVERY POINT #1 (DP1) IS AT THE MAIN SUBSTATION. DELIVERY POINT #2 (DP2) IS AT THE RIFLE RANGE.

B. ELECTRICITY DELIVERED AT DP2 SHALL BE INVOICED SEPARATELY AND BE UNDER A DIFFERENT PRICE CODE THAN THE DP1 METER. MCAAP OWNS THE SUBSTATION AT THE DP1 METER SITE.

2. SERVICE REQUIREMENTS

A. FOR DP1, SERVICE SHALL BE FURNISHED AS 60 CYCLE ALTERNATING CURRENT AT NOMINAL VOLTAGE OF 69,000 VOLTS, THREE PHASE, THREE WIRE, AND A MAXIMUM CAPACITY OF APPROXIMATELY 4,300 KVA. SERVICE SHALL BE METERED AT 12,470/7,200 VOLTS.

B. FOR DP2, SERVICE SHALL BE FURNISHED AS 60 CYCLE ALTERNATING CURRENT AT NOMINAL VOLTAGE OF 480 VOLTS AND SINGLE PHASE. SERVICE SHALL BE METERED AT 480 VOLTS.

C. AN EXAMPLE OF THE HOURLY LOAD FOR A TYPICAL MCAAP SUMMER WORK WEEK IS IN ENCLOSURE #1. KILOWATT DEMAND AND KILOWATT-HOUR USAGE DATA FOR THE PAST SEVERAL YEARS CAN BE FOUND IN ENCLOSURE #2.

3. MEASUREMENT OF SERVICE AND EQUIPMENT

A. ALL SERVICE FURNISHED BY THE CONTRACTOR SHALL BE MEASURED BY METERING EQUIPMENT OF STANDARD MANUFACTURE, FURNISHED AND INSTALLED, MAINTAINED, CALIBRATED, AND READ BY THE METER OWNER (OR DESIGNEE) AT OWN EXPENSE. A GOVERNMENT REPRESENTATIVE SHALL BE ABLE TO VERIFY METER READINGS USED FOR BILLING PURPOSES BY VISUAL INSPECTION OF THE METER. IN THE EVENT THAT ANY METER FAILS TO REGISTER OR REGISTERS INCORRECTLY, THE QUANTITY OF SERVICE DELIVERED THROUGH IT DURING THAT PERIOD SHALL BE DETERMINED AND AN EQUITABLE ADJUSTMENT SHALL BE MADE IN MCAAP'S BILL (FOR THIS PURPOSE ANY METER WHICH REGISTERS NOT MORE THAN TWO (2) PERCENT SLOW OR FAST SHALL BE DEEMED CORRECT). FAILURE TO AGREE ON ANY ADJUSTMENT SHALL BE A DISPUTE CONCERNING A QUESTION OF FACT WITHIN THE MEANING OF THE "DISPUTES" CLAUSE OF THIS CONTRACT.

B. THE METER OWNER, AT OWN EXPENSE, SHALL INSPECT, TEST, AND CALIBRATE THE BILLING METER(S) AT INTERVALS OF NO LONGER THAN ONE (1) YEAR. CONTRACTOR IS REQUIRED TO MAIL THE TEST RESULTS TO THE CONTRACTING OFFICER'S REPRESENTATIVE. AT THE WRITTEN REQUEST OF THE CONTRACTING OFFICER, THE CONTRACTOR (OR

DESIGNEE), IN THE PRESENCE OF GOVERNMENT REPRESENTATIVES, SHALL MAKE ADDITIONAL TESTS OF ANY OR ALL METERS. THE COST OF SUCH ADDITIONAL TESTS SHALL BE BORNE BY MCAAP IF THE PERCENTAGE OF ERROR IS FOUND TO BE NOT MORE THAN TWO (2) PERCENT SLOW OR FAST. NO METER SHALL BE PLACED IN SERVICE WHICH ON TEST REGISTERS IN EXCESS OF ONE HUNDRED (100) PERCENT UNDER NORMAL OPERATING CONDITIONS.

C. ALL TESTS, CALIBRATIONS, AND ADJUSTMENTS PERFORMED ON ANY METERS SHALL BE PRECEDED BY REASONABLE WRITTEN OR ORAL NOTICE TO THE CONTRACTING OFFICER'S REPRESENTATIVE SO THAT MCAAP MAY BE PRESENT DURING SUCH ACTIVITIES.

D. IF ANY METER OR AUXILIARY EQUIPMENT IS OUT OF SERVICE OR OUT OF REPAIR FOR A PERIOD OF TIME SO THAT THE AMOUNT OF ELECTRICITY DELIVERED CANNOT BE ASCERTAINED OR COMPUTED FROM THE READING THEREOF, THEN THE ELECTRICITY DELIVERED DURING SUCH PERIOD SHALL BE ESTIMATED UPON THE BASIS OF THE BEST DATA AVAILABLE, USING THE FIRST OF THE FOLLOWING METHODS WHICH IS FEASIBLE: (1) BY CORRECTING THE ERROR IF THE PERCENTAGE OF ERROR IS ASCERTAINABLE BY CALIBRATION, TEST, OR MATHEMATICAL CALCULATIONS; (2) BY USING THE REGISTRATION OF ANY CHECK EQUIPMENT INSTALLED WHICH IS ITSELF ACCURATELY REGISTERING; OR (3) BY ESTIMATING THE AMOUNT DELIVERED ON THE BASIS OF DELIVERIES DURING PRECEDING PERIODS UNDER SIMILAR CONDITIONS WHEN THE EQUIPMENT WAS REGISTERING ACCURATELY; OR (4) ANY OTHER METHOD PROPOSED BY THE CONTRACTOR AND APPROVED BY MCAAP.

E. METER OWNER (OR DESIGNEE) SHALL READ ALL BILLING METERS AT PERIODIC INTERVALS OF APPROXIMATELY THIRTY (30) DAYS AND COINCIDE WITH THE MONTHS OF THE YEAR. ALL BILLINGS BASED ON METER READINGS OF LESS THAN TWENTY-SEVEN (27) DAYS OR MORE THAN THIRTY TWO (32) DAYS SHALL BE PRORATED ACCORDINGLY.

F. IF TELEMETERING EQUIPMENT IS TO BE USED TO GATHER METER READINGS AT THE SERVICE LOCATION, CONTRACTOR IS REQUIRED TO MAKE ALL THE METERING DATA/INFORMATION AVAILABLE TO MCAAP AT NO CHARGE BY EITHER PROVIDING A PRINT OUT WITH THE MONTHLY INVOICE OR THE REQUIRED TELECOMMUNICATION SOFTWARE AND ACCESS.

G. GOVERNMENT SHALL INSTALL, OWN, OPERATE, AND MAINTAIN ALL WIRING AND EQUIPMENT (EXCEPT CONTRACTOR'S METERS AND METERING EQUIPMENT) NECESSARY FOR MCAAP'S UTILIZATION OF SERVICE, LOCATED ON ITS SIDE OF THE CONTRACTOR'S POINT OF SERVICE. GOVERNMENT'S WIRING AND EQUIPMENT SHALL BE INSTALLED AND MAINTAINED IN ACCORDANCE WITH GOOD PRACTICE AND THE REQUIREMENTS OF ANY LOCAL OR STATE AUTHORITIES HAVING JURISDICTION AT THIS LOCATION, AND WHERE REQUIRED, GOVERNMENT SHALL SECURE APPROVAL OF ITS WIRING AND INSTALLATION BEFORE THE CONTRACTOR'S CONNECTION IS MADE. GOVERNMENT SHALL PROVIDE SPACE AND FACILITIES FOR INSTALLATION OF CONTRACTOR'S METERING EQUIPMENT AS SPECIFIED BY THE CONTRACTOR IN

ACCORDANCE WITH ITS STANDARD PRACTICE IN EFFECT AT THE TIME OF INSTALLATION OR ENLARGEMENT OF GOVERNMENT'S FACILITIES.

H. THE CONTRACTOR DOES NOT ASSUME RESPONSIBILITY FOR THE DESIGN OR CONDITION OF MCAAP'S INSTALLATION AND SHALL NOT BE LIABLE FOR ANY LOSS OR INJURY TO MCAAP OR OTHER PERSONS RESULTING FROM ANY DEFECTIVE EQUIPMENT OWNED OR INSTALLED BY MCAAP.

## III. INCORPORATED CONTRACTOR PROVISIONS: CONTRACT FOR ELECTRIC SERVICE

## CONTRACT FOR ELECTRIC SERVICE

This contract and agreement made and entered into this 28th day of May, 1997, by and between **Public Service Company of Oklahoma**, its successors and assigns, hereinafter called "PSO," and **Department of the Army, McAlester Army Ammunition Plant**, hereinafter called "MCAAP," doing business on premises known as McAlester Army Ammunition Plant, Witnesseth.

### ARTICLE I

FOR AN INITIAL PERIOD OF NINETEEN (19) MONTHS, BEGINNING 1 JUNE 1997 AND ENDING AT MIDNIGHT, 31 DECEMBER 1998, AND SUBJECT TO THE TERMS AND CONDITIONS HEREINAFTER STATED, PSO SHALL DELIVER AND SELL TO MCAAP ALL ITS REQUIRED ELECTRIC SERVICE AND MCAAP SHALL RECEIVE AND PAY FOR ELECTRIC SERVICE FOR THE OPERATION OF THE ARMY AMMUNITION PLANT LOCATED AT MCALESTER, OKLAHOMA, WITH TWO DELIVERY POINTS FOR ELECTRIC SERVICE FROM PSO'S TRANSMISSION SYSTEM. MCAAP'S TWO DELIVERY POINTS ARE BOTH METERED. DELIVERY POINT #1 (DP1) IS AT THE MAIN SUBSTATION. DELIVERY POINT #2 (DP2) IS AT THE RIFLE RANGE.

If MCAAP continues to take service after the expiration of the initial period, this contract shall continue in full force and effect from year to year thereafter until terminated by the Party desiring termination giving the other party at least 12 months prior written notice.

### ARTICLE II

EACH MONTH MCAAP AGREES TO PAY PSO, FOR ALL ELECTRICAL SERVICE FURNISHED BY PSO DURING THE PRECEDING MONTH, AN AMOUNT DETERMINED IN ACCORDANCE WITH THE APPLICABLE RATE SCHEDULES FOR EACH DELIVERY POINT, UNTIL AND UNLESS EITHER RATE SCHEDULE IS SUPERSEDED BY ANOTHER APPLICABLE RATE SCHEDULE EITHER BY ORDER OF THE OKLAHOMA CORPORATION COMMISSION OR BY MEANS OF A "STANDARD RATE CHANGE ENDORSEMENT" EXECUTED BY BOTH PARTIES AND ATTACHED HERETO. THE MINIMUM MONTHLY BILLING DEMAND SHALL BE AS PROVIDED IN THE RATE SCHEDULE.

### ARTICLE III

**STANDARD CONDITIONS OF SERVICE:**

**1. USE OF SERVICE**

Electric service furnished by PSO shall be used by MCAAP solely in conjunction with MCAAP's business operations described in Article I. MCAAP shall not deliver electricity purchased from PSO to any connection wherein said electricity is to be used off of MCAAP's premises described in Article I hereof or by entities over whom MCAAP has no control.

EXCEPT AS PROVIDED BY SPECIAL AGREEMENT, MCAAP SHALL USE NO OTHER ELECTRIC SERVICE AT THE POINT OF DELIVERY EXCEPT THE ELECTRIC SERVICE FURNISHED BY PSO AS DESCRIBED HEREIN. THE "OTHER ELECTRIC SERVICE" REFERRED TO MAY BE EITHER PURCHASED OR PRIVATELY GENERATED. COGENERATION OF ELECTRICITY ON MCAAP PROPERTY FOR USE IN MCAAP BUSINESS OPERATIONS IS PERMITTED.

2. **RATE SCHEDULE CHOICE**

PSO HAS DETERMINED THAT FOR THE DP1 AND DP2 DELIVERY POINTS, THE LPL-1 (PRICE CODE 0610) RATE SCHEDULE (EXHIBIT A) AND THE LUGS (PRICE CODE 0675) RATE SCHEDULE (EXHIBIT A1), RESPECTIVELY, ARE THE MOST FAVORABLE FOR MCAAP GIVEN ITS CONDITIONS OF SERVICE AT EACH LOCATION.

THOSE CONDITIONS OF SERVICE AT DP1 (LPL-1 (PRICE CODE 0610)) ARE:

1. SINGLE POINT OF SERVICE
2. ONE STANDARD VOLTAGE
3. SERVICE TAKEN DIRECTLY FROM PSO TRANSMISSION SYSTEM (69KV OR GREATER) WITH NO TRANSFORMATION PROVIDED BY PSO.

THOSE CONDITIONS OF SERVICE AT DP2 (LUGS (PRICE CODE 0675)) ARE:

1. SINGLE POINT OF SERVICE
2. LOW YEARLY USAGE
3. REMOTENESS OF SITE

IN THE FUTURE, MCAAP WILL BE PROVIDED NOTIFICATION OF RATE SCHEDULE CHANGES AND IF MCAAP BELIEVES ANOTHER RATE SCHEDULE IS MORE FAVORABLE TO IT, MCAAP MAY CHANGE TO THE MORE FAVORABLE RATE SCHEDULE. PROVIDED, HOWEVER, MCAAP MAY CHANGE ITS RATE SCHEDULE FOR THE APPLICABLE DELIVERY POINT ONLY ONCE IN ANY 12 MONTH PERIOD UNLESS DURING SUCH PERIOD MCAAP MAKES A MATERIAL AND PERMANENT CHANGE TO ITS USE OF ELECTRIC SERVICE.

3. **METERING OF SERVICE**

PSO may install and maintain, at a suitable location on the premises of MCAAP, or at other suitable location, meters and metering equipment necessary to determine the capacity required and the energy used by MCAAP, and all billing for electric service shall be determined by the registration of these meters.

MCAAP may install measuring instruments at MCAAP's own expense for the purpose of checking the measurements made by PSO. Such instruments, if installed, shall be subject to the same test of accuracy as is used for PSO's instruments. In case of questions as to the accuracy of PSO's measuring instruments, either party shall have the right at any time, and from time to time, upon giving 48 hours written notice to the other party, to have them tested with both parties represented at the test, and if necessary, recalibrated. If it should be shown by test that any of the measuring instruments are incorrect, proper allowances as indicated by such test shall be made to the party entitled thereto in accordance with the applicable Oklahoma Corporation Commission Rules and Regulations governing the use of electric service in the State of Oklahoma. If PSO's measuring instruments should fail to register at any time during the month, the energy delivered during such month shall be estimated upon the basis of the amount of energy delivered during the last preceding month or next succeeding period of one month that MCAAP's facility is operated under conditions similar to those existing during the month in which said instruments failed to register, or if MCAAP should have its own instruments, the billing of MCAAP's electric service may be based on the registration of MCAAP's instruments. The expense of any requested test and recalibration, other than routine test made by PSO, shall be borne by MCAAP if PSO's meters should be found to be accurate within 2%, otherwise, the cost of the test will be paid by PSO. No allowance in the

charge for energy shall be made to MCAAP unless the error of the meter or meters should exceed 2%.

4. **MCAAP'S WIRING AND EQUIPMENT**

MCAAP shall install, own, operate, and maintain all wiring and equipment (except PSO's meters and metering equipment) necessary for utilization of service, located on MCAAP's side of PSO's point of delivery. MCAAP's wiring and equipment shall be installed and maintained in accordance with good practice and the requirements of any authority having jurisdiction or other requirements as agreed to by the parties of this agreement. MCAAP shall secure all required approval of its wiring and installation before PSO's connection is made. MCAAP shall provide space and facilities for installation of PSO's metering equipment as specified by PSO in accordance with its standard practice in effect at the time of installation or enlargement of MCAAP's facilities.

PSO does not assume responsibility for the design or condition of MCAAP's installation and shall not be liable for any loss or injury to MCAAP or other persons resulting from any defective equipment or installation of MCAAP.

5. **LIMITATION OF COMPANY'S LIABILITY**

PSO shall not be liable for loss or damage caused by interruption or failure of service or delay in commencing service due to accident or breakdown to plant, lines, or equipment, strike, riot, act of God, or causes reasonably beyond PSO's control or due to shutdowns for reasonable periods to make repairs to generating or distributing equipment.

6. **PAYMENT OF BILLS**

If MCAAP fails to perform any of its contractual obligations, including the prompt payment of monthly bills, but not limited thereto, PSO retains the right to pursue all remedies at law or equity available to PSO.

No delay by PSO in enforcing any of its rights shall be deemed a waiver of such rights nor shall waiver by PSO of any default by MCAAP be deemed a waiver of any other or subsequent default; however, in case a fire or other casualty shall occur whereby MCAAP's premises are rendered wholly unfit for the continued operation of the McAlester Army Ammunition Plant, billing for electric service shall be suspended until such time as the Army Ammunition Plant has been reconstructed, reconditioned, and reoccupied by MCAAP for purpose of its business.

7. **EASEMENT RIGHTS**

MCAAP grants PSO the right of ingress and egress for the purpose of installing, removing or maintaining on MCAAP's property such poles, wires, transformers and for other lawful services in which PSO may engage. MCAAP also grants PSO the right to cut down, trim, or remove any trees that may, in PSO's judgment, interfere with service to MCAAP, or endanger service to other customers.

PSO shall have the right to enter the premises of MCAAP at all times for the purpose of inspecting, testing, maintaining, repairing, meter reading or changing its apparatus, or for the removal of its property from the premises of MCAAP, either during or after the termination of this electric service contract. PSO acknowledges MCAAP's premises constitute a military post and

therefore PSO may be required to obtain certain security clearances before entering the Army Ammunition Plant in times of national emergency.

8. **RULES OF GOVERNMENTAL AUTHORITIES**

This agreement and service rendered thereunder shall in all respects be subject to the Rules, Regulations and orders of all Governmental Authorities having jurisdiction of the subject matter hereof, and subject to the Rules and Regulations of PSO governing terms and conditions of service, now or hereafter in effect and filed with the Oklahoma Corporation Commission.

9. **NOTICES**

Any notices as provided in this contract that either party may desire to give to the other shall be in writing and mailed by certified or personal mail delivered to the post office address of the party intended to receive the same, as follows:

Public Service Company of Oklahoma
P.O. Box 201
201 East 6th Street
Tulsa, OK 74102-0201
Attn: General Manager

COMMANDER
MCALESTER ARMY AMMUNITION PLANT
ATTN: SIOMC-PC (MR. STEPHEN DUNBAR, BLDG 8)
MCALESTER, OK 74501-9002

or to other such address as either party shall designate by formal written notice to the other.

10. **SEVERABILITY**

If any of the provisions of this Contract are declared null and void by a court or regulatory body of competent jurisdiction, such determination shall not affect the remaining terms and conditions which shall remain in full force and effect.

## ARTICLE IV

FOR DP1, SERVICE SHALL BE FURNISHED AT 60 CYCLE ALTERNATING CURRENT AT A NOMINAL VOLTAGE OF 69,000 VOLTS, 3 PHASE, 3 WIRE, WITH A CAPACITY OF APPROXIMATELY 4,300 KVA. SERVICE SHALL BE METERED AT 12,470/7,200 VOLTS, 3 PHASE. FOR DP2, SERVICE SHALL BE FURNISHED AS 60 CYCLE ALTERNATING CURRENT AT NOMINAL VOLTAGE OF 480 VOLTS AND SINGLE PHASE. SERVICE SHALL BE METERED AT 480 VOLTS.

On receipt of written request from MCAAP for a change of service capacity, PSO shall use best efforts to meet MCAAP's requirements for additional capacity provided this increase in electrical usage does not constitute a material change in PSO facilities. When additional facilities are required to provide service to MCAAP, PSO shall not be bound under the terms and conditions of this contract and a new contract setting out the changed conditions, rates and terms shall be mutually agreed upon.

## ARTICLE V

This contract and agreement shall bind and benefit the successors and assigns of PSO and may be assigned by MCAAP upon written consent of PSO.

## ARTICLE VI

**HELD IN RESERVE**

## ARTICLE VII

**IN WITNESS WHEREOF**, the parties hereto have caused this contract to be executed by their duly authorized representatives all as of the day and year first above written. This contract is subject to the written approval of the Army Power Procurement Officer or his duly authorized representative.

**DEPARTMENT OF THE ARMY**
**MCALESTER ARMY AMMUNITION PLANT**

By: ______________________

**ATTEST:**

______________________

______________________

**PUBLIC SERVICE COMPANY OF OKLAHOMA**

By: William R. McKamey
**William R. McKamey**
**General Manager**

**ATTEST:**

M. Louise Winsworth
Asst. Corp. Sec.

**"Corporate Seal"**

Approved as to Legal Form and Sufficiency

______________________
Army Power Procurement Officer

IV. INCORPORATED CONTRACTOR PROVISIONS: POWER AGREEMENT

## POWER AGREEMENT

This Power Agreement (this "Agreement") is entered into effective as of the 1st day of June 1997 (the "Effective Date"), by and between THE DEPARTMENT OF THE ARMY, acting through its duly authorized officials at the McAlester Army Ammunition Plant, (hereinafter referred to as "MCAAP"), and PUBLIC SERVICE COMPANY OF OKLAHOMA, an Oklahoma Corporation, (hereinafter referred to as "PSO"). MCAAP and PSO are also referred to herein individually as a "Party" and collectively as the "Parties".

## ARTICLE 1
## DEFINITIONS

1.1 Definitions. As used in this agreement, the following terms shall have the respective meanings set forth below. Certain other capitalized terms are defined where they appear in this Agreement.

"Billing Period" means the period of days utilized for the purpose of billing.

"Contract Quantity" means the amount of energy to be purchased hereunder, as set forth in Article 3.

"Delivery Point" means all existing and future points of interconnection between the Southwestern Power Administration and PSO.

"Delivery Term" means the period of time during which PSO purchases energy from MCAAP pursuant to this Agreement.

"Energy Charge" means the price to be paid by PSO to MCAAP each month during the Delivery Term as set forth in Section 4.1.

"Federal Energy" means hydro electric power and associated energy generated at United States Army Corps of Engineers operated dams and marketed by the Southwestern Power Administration including, without limitation, energy scheduled for and delivered to MCAAP in accordance with SWPA rate schedule PSOA.

"KW" means kilowatt.

"KWH" means on kilowatt hour.

"Month" means a calendar month.

"KVA" means on kilo-volt-amp.

"Primary Transmission System" shall mean the facilities immediately connected on each side of the Delivery Point.

"Schedule" or Scheduling" means the acts of MCAAP, PSO and/or their designated representatives of notifying, requesting and confirming to each other the quantity of energy to be delivered hourly on any given day or days during the Delivery Term at the Delivery Point.

"SWPA" means the Southwestern Power Administration, an agency of the Department of Energy.

"Uncontrollable Force" shall include, but not be limited to, acts of God, acts of the public enemy, failure of facilities, explosion, breakdown, flood, accident, earthquake, storm, hurricane, wind, blue northers, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, strike, sabotage, or restraint by court or public authority having jurisdiction, fuel curtailment, rationing or shortage, material shortage, delay in delivery, national emergency, delay or failure of performance by other parties, governmental, delay, action or inaction (including voluntary cooperation in any method of, operation with, or in any program recommended or requested by, civil or military authorities, or other acts or conditions, whether of the same or different character than those above referred to, and are beyond the reasonable control of the Party affected.

## ARTICLE 2
## TERM

2.1 **Contract Term.** Subject to Section 13.6 regarding winding up arrangements, this Agreement will begin with the Effective Date and shall continue until midnight, December 31, 1998, and continue year to year thereafter subject to the termination provisions of Section 10.1.

2.2 **Delivery Term.** The Delivery Term and PSO's obligation to purchase and McAlester AAP's obligation to sell Federal Energy shall commence on the first hour and day that MCAAP or its designated scheduling agent schedules Federal Energy to PSO's Delivery Point.

## ARTICLE 3
## SALE AND PURCHASE OBLIGATIONS

3.1 **Sale and Purchase Obligations.** MCAAP shall sell and cause to be delivered, and PSO shall purchase and receive all the Federal Energy to which MCAAP is entitled to receive pursuant to MCAAP's contract with SWPA during the Delivery Term. PSO will accept and purchase every KWH of supplemental peaking energy that is offered to MCAAP by SWPA under the MCAAP/SWPA contract.

## ARTICLE 4
## ENERGY CHARGE

4.1 **Energy Charge**. PSO will pay MCAAP each month during the Delivery Term in accordance with the following formula:

$$FSE = SE + ME\ (A1 + A2)$$

with the factors defined as follows:

FSE = Total amount payable by PSO to MCAAP for the purchase of Federal Energy.

SE = Amount payable in dollars by MCAAP to SWPA for Federal Energy Scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P90A in effect on May 22, 1997. **(EXHIBIT E)**.

ME = An amount of PSO energy (KWH) equivalent to the amount of energy (KWH) multiplied by a factor of .9744 scheduled for and delivered to MCAAP by SWPA to the Delivery Point.

A1 = PSO's applicable Oklahoma Corporation Commission approved embedded fuel cost (Exhibit B).

A2 = Fuel Cost Adjustment (FCA) in accordance with PSO's Oklahoma Corporation Commission approved Fuel Cost Adjustment Rider (Exhibit C).

## ARTICLE 5
## DELIVERIES, SCHEDULING AGENT, TITLE

5.1 **Deliveries.** All deliveries and receipts of Federal Energy under this agreement shall be made at the Delivery Point.

5.2 **Scheduling Agent Designation.**

(a) MCAAP hereby designates PSO as MCAAP's duly authorized scheduling agent through which all transactions with SWPA, within the provisions of the MCAAP/SWPA contract, are to be executed between MCAAP and SWPA, other than those pertaining to billing and payment. PSO shall be, and hereby is authorized and directed by MCAAP to accept and receive from SWPA for the account of MCAAP, all of the Federal Energy made available to MCAAP by SWPA, in accordance with Power Sales Contract No. DE-PM75-97SW00352 **(Exhibit E)** between SWPA and MCAAP.

(b) PSO shall be authorized to prepare and submit, and to receive and accept, all necessary notices and accounting statements, and to act for and on behalf of MCAAP as in regard to all matters arising under the MCAAP/SWPA contract, other than matters pertaining to billing and payment, and in all respects and with the same force and effect as could be MCAAP acting through its duly authorized officials. The term of that appointment shall run concurrently with the contract term pursuant to Section 2.1 and cannot

otherwise be terminated. Such energy accounting statements and notices shall be deemed properly given to or served on PSO if mailed to:

Central and South West Services, Inc.
ATTN: Control Area Operations
P.O. Box 680164
1616 Woodall Rogers Freeway
Dallas, Texas 74266-0164

5.3 **Transmission and Scheduling**. MCAAP shall arrange and be responsible for transmission service to the Delivery Point. PSO shall arrange and be responsible for transmission service at and from the Delivery Point.

5.4 **Title and Risk of Loss**. Title to and risk of loss related to the Contract Quantity shall transfer from MCAAP to PSO at the Delivery Point.

## ARTICLE 6
## EVENTS OF DEFAULT AND REMEDIES

6.1 **Event of Default**. An "Event of Default" shall mean, with respect to a Party alleged to have taken or been affected by any of the actions set forth below in this Section 6.1 (the "Defaulting Party"):

(a) the failure by the Defaulting Party to make, when due, any payment required under this agreement if such failure is not remedied within five (5) business days after written notice of such failure is given to the Defaulting Party by the other ("Non-Defaulting Party") and provided the payment is not the subject of a good faith dispute as described in the billing and payment provisions under Article 7; or

(b) any representation or warranty made by the Defaulting Party in this Agreement shall prove to have been false or misleading in any material respect when made or ceases to remain true during the term of this Agreement; or

(c) the failure by the Defaulting Party to perform any covenant set forth in this agreement (other than the events that are otherwise specifically covered in this Section 6.1 as a separate Event of Default or its obligations to deliver or receive energy and such failure is not excused by Uncontrollable Force or cured within five (5) business days after written notice thereto to the Defaulting party; or

(d) the Defaulting Party shall;

(i) make an assignment or any general arrangement for the benefit of creditors;

(ii) file a petition or acquiesce in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, or have such petition filed against it and such petition is not withdrawn or dismissed within thirty(30) days after such filing;

(iii) otherwise become bankrupt or insolvent(however evidenced); or

(iv) be unable to pay its debts as they fall due.

## ARTICLE 7
## BILLING AND PAYMENT

7.1 **Billing and Payment.** MCAAP shall either authorize SWPA to send a copy of MCAAP's bill, for its purchase of Federal Energy from SWPA for each Billing Period to PSO, or MCAAP will send by facsimile or electronically a copy of its SWPA bill within two (2) business days of receipt, to the PSO Pricing Department, P.O. Box 201, 212 East 6th Street, Tulsa, Oklahoma 74102 or facsimile 918-599-2968. PSO shall use the stated KWH and KW's sold to MCAAP as its KWH and KW's purchased from MCAAP in calculating the amount of money owed by PSO to MCAAP. The amount of money owed by PSO to MCAAP will be made through setoff as described in Section 7.2.

7.2 **Setoff.** If PSO and MCAAP are each required to pay each other an amount of money in the same month, then such amounts with respect to each Party may be aggregated and the Parties may discharge their obligations to pay through netting, in which case the Party, if any, owing the greater aggregate amount may pay to the other Party the difference between the amounts owed. Each Party reserves to itself all rights, setoffs, counterclaims and other remedies and defenses consistent with Article 9 (to the extent not expressly herein waived or denied) which such Party has or may be entitled to arising from or out of this Agreement. The obligations to make payment under this Agreement or any other agreement between the Parties may be offset against each other, set off or recouped therefrom.

7.3 **Audit.** Each Party (and its representatives) shall have the right, at its sole expense and during normal working hours, to examine the records of the other Party to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made pursuant to this Agreement. If requested, a Party shall provide to the other Party statements evidencing the quantities of energy delivered at the delivery point. If any such examination reveals any inaccuracy in any statement, the necessary adjustments in such statement and the payments due in respect thereof will be promptly made, provided, however, that no adjustment for any statement of payment will be made unless objection to the accuracy thereof was made prior to the lapse of one year from the rendition thereof; and provided further that this Section 7.3 will survive any termination of this Agreement for a period on one (1) year from the date of such termination for the purpose of such statement and payment objections.

## ARTICLE 8
## ASSIGNMENT; BINDING EFFECT

8.1 **Assignment.** Either Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party.

8.2 **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns. No assignment or transfer hereunder shall relieve MCAAP or PSO of any of their respective obligations under this Agreement.

## ARTICLE 9
## UNCONTROLLABLE FORCE AND LIMITATION OF LIABILITY

9.1 **Uncontrollable Force.** No Party shall be responsible to the other Party for delay in or failure of performance of its obligations hereunder (except the obligations to pay monies which are due under the provisions of this Agreement shall not be excused) when such delay or failure is caused by an Uncontrollable Force. The Party subject to Uncontrollable Force shall use all reasonable diligence to remove or cure the inability, provided that no Party shall be required to settle or resolve labor disturbances or strikes or accept or agree to governmental or regulatory orders or conditions without objection or consent on any basis not acceptable to such Party in its sole discretion. notice of Uncontrollable Force shall be given by the Party affected as soon as reasonable possible.

9.2 **Limitation of Remedies, Liability and Damages.** The Parties confirm that the express remedies and measures of damages provided in this agreement satisfy the essential purposes hereof. For breach of any provision for which an express remedy or measure of damages is herein provided, such express remedy or measure of damages shall be the sole and exclusive remedy, the Obligor's liability shall be limited as set forth in such provision and all other remedies or damages at law or in equity are waived. If no remedy or measure of damages is expressly herein provided, the Obligor's liability shall be limited to direct actual damages only, such direct actual damages shall be the sole and exclusive remedy and all other remedies or damages at law or in equity are waived. Unless expressly provided in this Agreement, neither party shall be liable for consequential, incidental, punitive, exemplary or indirect damages, lost profits or other business interruption damages, by statue, in tort or contract, under any indemnity provision or otherwise. It is the intent of the Parties that the limitations herein imposed on remedies and the measure of damages be without regard to the cause or causes related thereto, including, without limitation, the negligence of any party, whether such negligence be sole, joint or concurrent, or active or passive. To the extent any damages required to be paid hereunder are liquidated, the Parties acknowledge that the damages are difficult or impossible to determine, otherwise obtaining an adequate remedy is inconvenient and the liquidated damages constitute a reasonable approximation of the harm or loss.

9.3 **Duty to Mitigate.** Each Party agrees that it has a duty to mitigate damages and covenants that it will use commercially reasonable efforts to minimize any damages it may incur as a result of the other Party's performance or non-performance of this Agreement.

## ARTICLE 10
## TERMINATION

10.1 This Agreement may be terminated on midnight December 31, 1998 or thereafter by the Party desiring termination giving the other Party at least 12 months prior written notice.

## ARTICLE 11
## NOTICES

11.1 **Notices.** All notices, requests, statements or payments shall be made as specified in Exhibit D hereto. Notices required to be in writing shall be delivered by letter, facsimile or other documentary form. Notice by facsimile or hand delivery shall be deemed to have been received by the close of the business day on which it was transmitted or hand delivered (unless transmitted or hand delivered after close in which case it shall be deemed received at the close of the next business day). Notice by overnight mail or courier shall be deemed to have been received one (1) business day after it was sent. A Party may change its addresses by providing notice of same in accordance herewith.

## ARTICLE 12
## STANDARD PROVISIONS

12.1 **Officials Not to Benefit.** No member of or delegate to Congress or Resident Commissioner shall be admitted to any share or part of this Agreement or to any benefit that may arise therefrom, but this restriction shall not be construed to extend to this Agreement if made with a corporation or company for its general benefit.

12.2 **Covenant Against Contingent Fees.** PSO warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except bona fide employees or bona fide established commercial or selling agencies maintained by PSO for the purpose of securing business. For breach or violation of this warranty, the United States shall have the right to annul this Agreement without liability, or, at its discretion, to add to the Agreement price or consideration the full amount of such commission, percentage, brokerage or contingent fee.

12.3 **Convict Labor.** In connection with the performance of work under this Agreement, PSO agrees not to employ any person undergoing sentence of imprisonment except as provided by Public Law 89-176, September 10, 1965 (18 U.S.C. 4062 (c)(2)), and Executive Order 11755, December 29, 1973.

12.4 **Equal Employment Opportunity.** During the performance of this Agreement, PSO agrees to abide by and to fulfill the nondiscrimination requirement of the "equal opportunity clause" contained in Section 202 of Executive Order 11246 dated September 24, 1965 (30 FR 12319), and Executive Order amending such order, and any other Executive Order superseding such order.

12.5 **Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era.** During the performance of this Agreement, PSO agrees to comply with Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, Public Law 93-508 as it amends Public Law 92-540, to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam era, and to fulfill the requirement of the affirmative action clause." 38 USCA Sections 2011 and 2012 (1979); 41 CFR 60-250 et seq.

12.6 **Affirmative Action for Handicapped Workers.** During the performance of this Agreement, PSO agrees to comply with Section 503 of the Rehabilitation Act of 1973, Public Law 93-516, to take affirmative action to employ and advance in employment qualified handicapped individuals, and to otherwise fulfill the requirements of the "affirmative action clause." 29 USCA Section 793 (1979); 41 CFR 60-741 et seq.

## ARTICLE 13
## MISCELLANEOUS

13.1 **Entirety**. This Agreement and the Exhibits hereto constitute the entire Agreement between the Parties. There are no prior or contemporaneous agreements or representations affecting the same subject matter other than herein expressed. Except for any matters which, in accordance with the express provisions of this Agreement, may be resolved by verbal agreement between the Parties, no amendment, modification or change herein shall be enforceable unless reduced to writing and executed by both Parties.

13.2 **Governing Law**. This Agreement and the rights and duties of the Parties hereunder shall be governed by and construed, enforced and performed in accordance with the laws of the State of Oklahoma, without giving effect to principles of conflicts of laws, except as to matters governed by Federal Law.

13.3 **Non-Waiver**. No waiver by any Party hereto of any one or more defaults by the other Party in the performance of any of the provisions of this Agreement shall be construed as a waiver of any other default or defaults whether of a like kind or different nature.

13.4 **Severability**. Except as otherwise stated herein, any provisions or article declared or rendered unlawful by a court of law or regulatory agency with jurisdiction over the Parties, or deemed unlawful because of a statutory change, will not otherwise affect the lawful obligations that arise under this Agreement.

13.5 **Heading; Exhibits**. The headings used for the sections and articles herein are for convenience and reference purposes only and shall in no way affect the meaning or interpretation of the provisions of this Agreement. Any and all Exhibits referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes.

13.6 **Winding Up Arrangements**. All indemnity and audit rights shall survive the termination of this Agreement. All obligations provided in this Agreement shall remain in effect for the purposes of complying herewith.

13.7 **No Third Party Beneficiaries**. Nothing in this Agreement shall provide any benefit to any third party or entitle any third party to any claim, cause of action, remedy or right of any kind, it being the intent of the Parties that this Agreement shall not be construed as a third party beneficiary contract.

13.8 **Counterparts**. This Agreement may be executed in several counterparts, each of which is an original and all of which constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties, by their respective duly authorized representatives, have executed this Agreement effective as of the Effective Date. This Agreement shall not become effective as to either Party unless and until executed by both Parties. This Agreement is subject to the written approval of the Army Power Procurement Officer or his duly authorized representative. It is understood by both Parties that nothing contained in this Agreement is meant to cause MCAAP to relinquish its entitlement to its Federal Power Allocation from SWPA. This Agreement is made with the full knowledge and assistance of SWPA.

**PUBLIC SERVICE COMPANY OF OKLAHOMA**

By: William R. McKamey

Name: William R. McKamey

Title: General Manager

**DEPARTMENT OF THE ARMY**
**MCALESTER ARMY AMMUNITION PLANT**

By: ______________________

Name: ______________________

Title: ______________________

Approved as to Legal Form and Sufficiency

______________________________
Army Power Procurement Officer

SECTION G

CONTRACT ADMINISTRATION DATA

G.1 ACCOUNTING AND APPROPRIATION DATA:

APPLICABLE FUNDS WILL BE CITED ON EACH PAYMENT DOCUMENT.

END OF SECTION G

SECTION I

CONTRACT CLAUSES

I.1 52.252-2 CLAUSES INCORPORATED BY REFERENCE (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

(End of clause)

I.2 52.202-1 DEFINITIONS (OCT 1995)
(Reference 2.201)

I.3 52.203-3 GRATUITIES (APR 1984)
(Reference 3.202)

I.4 52.203-5 COVENANT AGAINST CONTINGENT FEES (APR 1984)
(Reference 3.404)

I.5 52.203-6 RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1995)
(Reference 3.503-2)

I.6 52.203-7 ANTI-KICKBACK PROCEDURES (JUL 1995)
(Reference 3.502-3)

I.7 52.203-9 reserved
(Reference )

I.8 52.203-10 PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997)
(Reference 3.104-9(b))

I.9 252.203-7001 SPECIAL PROHIBITION ON EMPLOYMENT (NOV 1995)
(Reference 03.570-5)

I.10 52.204-1 APPROVAL OF CONTRACT (DEC 1989)

This contract is subject to the written approval of ARMY POWER PROCUREMENT OFFICER OR HIS/HER DESIGNEE and shall not be binding until so approved.

(End of clause)

I.11 252.204-7003 CONTROL OF GOVERNMENT PERSONNEL WORK PRODUCT (APR 1992)

The Contractor's procedures for protecting against unauthorized disclosure of information shall not require Department of Defense employees or members of the Armed Forces to relinquish control of their work products, whether classified or not, to the Contractor.

(End of clause)

I.12 252.205-7000 PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS (DEC 1991) (Reference 05.470-2)

I.13 52.209-6 PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (JUL 1995)

(a) The Government suspends or debars Contractors to protect the Government's interest. The Contractor shall not enter into any subcontract in excess of $25,000 with a Contractor that is debarred, suspended, or proposed for debarment unless there is a compelling reason to do so.

(b) The Contractor shall require each proposed first-tier subcontractor, whose subcontract will exceed $25,000, to disclose to the Contractor, in writing, whether as of the time of award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the Federal Government.

(c) A corporate officer or a designee of the Contractor shall notify the Contracting Officer, in writing, before entering into a subcontract with a party that is debarred, suspended, or proposed for debarment (see FAR 9.404 for information on the List of Parties Excluded from Federal Procurement and Nonprocurement Programs). The notice must include the following:

(1) The name of the subcontractor.

(2) The Contractor's knowledge of the reasons for the subcontractor being on the List of Parties Excluded from Federal Procurement and Nonprocurement Programs.

(3) The compelling reason(s) for doing business with the subcontractor notwithstanding its inclusion on the List of Parties Excluded from Federal Procurement and Nonprocurement Programs.

(4) The systems and procedures the Contractor has established to ensure that it is fully protecting the Government's interests when dealing with such subcontractor in view of the specific basis for the party's

debarment, suspension, or proposed debarment.

(End of clause)

| | | |
|---|---|---|
| I.14 | 252.209-7000 | ACQUISITION FROM SUBCONTRACTORS SUBJECT TO ON-SITE INSPECTION UNDER THE INTERMEDIATE-RANGE NUCLEAR FORCES (INF) TREATY (NOV 1995) (Reference 09.103-70) |
| I.15 | 52.219-8 | UTILIZATION OF SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED SMALL BUSINESS CONCERNS (OCT 1995) (Reference 19.708(a)) |
| I.16 | 52.222-3 | CONVICT LABOR (AUG 1996) (Reference 22.202) |
| I.17 | 52.222-4 | CONTRACT WORK HOURS AND SAFETY STANDARDS ACT--OVERTIME COMPENSATION (JUL 1995) (Reference 22.305) |
| I.18 | 52.222-26 | EQUAL OPPORTUNITY (APR 1984) (Reference 22.810(e)) |
| I.19 | 52.222-35 | AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS (APR 1984) (Reference 22.1308) |
| I.20 | 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS (APR 1984) (Reference 22.1408) |
| I.21 | 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (JAN 1988) (Reference 22.1308(b)) |
| I.22 | 52.223-2 | CLEAN AIR AND WATER (APR 1984) (Reference 23.105(b)) |
| I.23 | 52.223-6 | DRUG-FREE WORKPLACE (JAN 1997) |

(a) Definitions. As used in this clause--

"Controlled substance" means a controlled substance in schedules I

through V of section 202 of the Controlled Substances Act (21 U.S.C. 812) and as further defined in regulation at 21 CFR 1308.11 - 1308.15.

"Conviction" means a finding of guilt (including a plea of nolo contendere) or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes.

"Criminal drug statute" means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, possession or use of any controlled substance.

"Drug-free workplace" means the site(s) for the performance of work done by the Contractor in connection with a specific contract at which employees of the Contractor are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.

"Employee" means an employee of a Contractor directly engaged in the performance of work under a Government contract. "Directly engaged" is defined to include all direct cost employees and any other Contractor employee who has other than a minimal impact or involvement in contract performance.

"Individual" means an offeror/contractor that has no more than one employee including the offeror/contractor.

(b) The Contractor, if other than an individual, shall--within 30 days after award (unless a longer period is agreed to in writing for contracts of 30 days or more performance duration), or as soon as possible for contracts of less than 30 days performance duration--

(1) Publish a statement notifying its employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

(2) Establish an ongoing drug-free awareness program to inform such employees about--

(i) The dangers of drug abuse in the workplace;

(ii) The Contractor's policy of maintaining a drug-free workplace;

(iii) Any available drug counseling, rehabilitation, and employee assistance programs; and

(iv) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(3) Provide all employees engaged in performance of the contract with a copy of the statement required by subparagraph (b)(1) of this clause;

(4) Notify such employees in writing in the statement required by subparagraph (b)(1) of this clause that, as a condition of continued

employment on this contract, the employee will--

(i) Abide by the terms of the statement; and

(ii) Notify the employer in writing of the employee's conviction under a criminal drug statute for a violation occurring in the workplace no later than 5 days after such conviction.

(5) Notify the Contracting Officer in writing within 10 days after receiving notice under subdivision (b)(4)(ii) of this clause, from an employee or otherwise receiving actual notice of such conviction. The notice shall include the position title of the employee;

(6) Within 30 days after receiving notice under subdivision (b)(4)(ii) of this clause of a conviction, take one of the following actions with respect to any employee who is convicted of a drug abuse violation occurring in the workplace:

(i) Taking appropriate personnel action against such employee, up to and including termination; or

(ii) Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency, and

(7) Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs (b)(1) through (b)(6) of this clause.

(c) The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, not to engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance while performing this contract.

(d) In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraph (b) or (c) of this clause may, pursuant to FAR 23.506, render the Contractor subject to suspension of contract payments, termination of the contract for default, and suspension or debarment.

(End of clause)

I.24 252.225-7031 SECONDARY ARAB BOYCOTT OF ISRAEL (JUN 1992)
(Reference 25.770-5)

I.25 52.227-1 AUTHORIZATION AND CONSENT (JUL 1995)
(Reference 27.201-2(a))

| | | |
|---|---|---|
| I.26 | 52.229-4 | FEDERAL, STATE, AND LOCAL TAXES (NONCOMPETITIVE CONTRACT) (JAN 1991) (Reference 29.401-4) |
| I.27 | 52.229-5 | TAXES--CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO (APR 1984) (Reference 29.401-5) |
| I.28 | 52.232-11 | EXTRAS (APR 1984) (Reference 32.111(d)(2) |
| I.29 | 52.232-17 | INTEREST (JUN 1996) (Reference 32.617(a)&() |
| I.30 | 52.232-23 | ASSIGNMENT OF CLAIMS (JAN 1986) (Reference 32.806(a)(1) |
| I.31 | 52.232-34 | OPTIONAL INFORMATION FOR ELECTRONIC FUNDS TRANSFER PAYMENT (AUG 1996) (Reference 32.1103(b)&) |
| I.32 | 252.232-7006 | REDUCTION OR SUSPENSION OF CONTRACT PAYMENTS UPON FINDING OF FRAUD (AUG 1992) (Reference 32.111-70) |
| I.33 | 52.233-1 | DISPUTES (OCT 1995) |

(a) This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph (d)(2) of this clause. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with

the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(d)(1) A claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

(2)(i) Contractors shall provide the certification specified in subparagraph (d)(2)(iii) of this clause when submitting any claim--

(A) Exceeding $100,000; or

(B) Regardless of the amount claimed, when using--

(1) Arbitration conducted pursuant to 5 U.S.C. 575-580; or

(2) Any other alternative means of dispute resolution (ADR) technique that the agency elects to handle in accordance with the Administrative Dispute Resolution Act (ADRA).

(ii) The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

(iii) The certification shall state as follows:

"I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

(3) The certification may be executed by any person duly authorized to bind the Contractor with respect to the claim.

(e) For Contractor claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(f) The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

(g) If the claim by the Contractor is submitted to the Contracting Officer or a claim by the Government is presented to the Contractor, the parties, by mutual consent, may agree to use ADR. If the Contractor refuses an offer for alternative disputes resolution, the Contractor shall inform the Contracting Officer, in writing, of the Contractor's specific reasons for rejecting the request. When using arbitration conducted pursuant to 5 U.S.C. 575-580, or when using any other ADR technique that the agency elects to handle in accordance with the ADRA, any claim,

regardless of amount, shall be accompanied by the certification described in subparagraph (d)(2)(iii) of this clause, and executed in accordance with subparagraph (d)(3) of this clause.

(h) The Government shall pay interest on the amount found due and unpaid from (1) the date that the Contracting Officer receives the claim (certified, if required); or (2) the date that payment otherwise would be due, if that date is later, until the date of payment. With regard to claims having defective certifications, as defined in (FAR) 48 CFR 33.201, interest shall be paid from the date that the Contracting Officer initially receives the claim. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

(i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

(End of clause)

I.34 52.233-3 PROTEST AFTER AWARD (AUG 1996)
(Reference 33.106(b))

I.35 52.241-2 ORDER OF PRECEDENCE-UTILITIES (FEB 1995)

In the event of any inconsistency between the terms of this contract (including the specifications) and any rate schedule, rider, or exhibit incorporated in this contract by reference or otherwise, or any of the Contractor's rules and regulations, the terms of this contract shall control.

(End of clause)

I.36 52.241-3 SCOPE AND DURATION OF CONTRACT (FEB 1995)

(a) For the period 1 June 1997 through 31 December 1998 or one (1) year from when written notice requesting termination is first submitted by either party to the other, the Contractor agrees to furnish and the Government

agrees to purchase electric utility service in accordance with the applicable tariff(s), rules, and regulations as approved by the applicable governing regulatory body and as set forth in the contract.

(b) It is expressly understood that neither the Contractor nor the Government is under any obligation to continue any service under the terms and conditions of this contract beyond the expiration date.

(c) The Contractor shall provide the Government with one complete set of rates, terms, and conditions of service which are in effect as of the date of this contract and any subsequently approved rates.

(d) The Contractor shall be paid at the applicable rate(s) under the tariff and the Government shall be liable for the minimum monthly charge, if any, specified in this contract commencing with the period in which service is initially furnished and continuing for the terms of this contract. Any minimum monthly charge specified in this contract shall be equitably prorated for the periods in which commencement and termination of this contract become effective.

(End of clause)

I.37 52.241-4 CHANGE IN CLASS OF SERVICE (FEB 1995)

(a) In the event of a change in the class of service, such service shall be provided at the Contractor's lowest available rate schedule applicable to the class of service furnished.

(b) Where the Contractor does not have on file with the regulatory body approved rate schedules applicable to services provided, no clause in this contract shall preclude the parties from negotiating a rate schedule applicable to the class of service furnished.

(End of clause)

I.38 52.241-5 CONTRACTOR'S FACILITIES (FEB 1995)

(a) The Contractor, at its expense, unless otherwise provided for in this contract, shall furnish, install, operate, and maintain all facilities required to furnish service hereunder, and measure such service at the point of delivery specified in the Service Specifications. Title to all such facilities shall remain with the Contractor and the Contractor shall

be responsible for loss or damage to such facilities, except that the Government shall be responsible to the extent that loss or damage has been caused by the Government's negligent acts or omissions.

(b) Notwithstanding any terms expressed in this clause, the Contractor shall obtain approval from the Contracting Officer prior to any equipment installation, construction, or removal. The Government hereby grants to the Contractor, free of any rental or similar charge, but subject to the limitations specified in this contract, a revocable permit or license to enter the service location for any proper purpose under this contract. This permit or license includes use of the site or sites agreed upon by the parties hereto for the installation, operation, maintenance, and repair of the facilities of the Contractor required to be located upon Government premises. All applicable taxes and other charges in connection therewith, together with all liability of the Contractor in construction, operation, maintenance and repair of such facilities, shall be the obligation of the Contractor.

(c) Authorized representatives of the Contractor will be allowed access to the facilities on Government premises at reasonable times to perform the obligations of the Contractor regarding such facilities. It is expressly understood that the Government may limit or restrict the right of access herein granted in any manner considered necessary (e.g., national security, public safety).

(d) Unless otherwise specified in this contract, the Contractor shall, at its expense, remove such facilities and restore Government premises to their original condition as near as practicable within a reasonable time after the Government terminates this contract. In the event such termination of this contract is due to the fault of the Contractor, such facilities may be retained in place at the option of the Government for a reasonable time while the Government attempts to obtain service elsewhere comparable to that provided for hereunder.

(End of clause)

I.39 52.241-6 SERVICE PROVISIONS (FEB 1995)

(a) Measurement of service. (1) All service furnished by the Contractor shall be measured by suitable metering equipment of standard manufacture, to be furnished, installed, maintained, repaired, calibrated, and read by the Contractor at its expense. When more than a single meter is installed at a service location, the reading thereof may be billed

(End of clause)

I.40 52.241-7 CHANGE IN RATES OR TERMS AND CONDITIONS OF SERVICE FOR REGULATED SERVICES (FEB 1995)

(a) This clause applies to the extent services furnished under this contract are subject to regulation by a regulatory body. The contractor agrees to give the Contracting Officer written notice of (1) the filing of an application for change in rates or terms and conditions of service concurrently with the filing of the application and (2) any changes pending with the regulatory body as of the date of contract award. Such notice shall fully describe the proposed change. If, during the term of this contract, the regulatory body having jurisdiction approves any changes, the Contractor shall forward to the Contracting Officer a copy of such changes within 15 days after the effective date thereof. The Contractor agrees to continue furnishing service under this contract in accordance with the amended tariff, and the Government agrees to pay for such service at the higher or lower rates as of the date when such rates are made effective.

(b) The Contractor agrees that throughout the life of this contract the applicable published and unpublished rate schedule(s) shall not be in excess of the lowest cost published and unpublished rate schedule(s) available to any other customers of the same class under similar conditions of use and service.

(c) In the event that the regulatory body promulgates any regulation concerning matters other than rates which affects this contract, the Contractor shall immediately provide a copy to the Contracting Officer. The Government shall not be bound to accept any new regulation inconsistent with Federal laws or regulations.

(d) Any changes to rates or terms and conditions of service shall be made a part of this contract by the issuance of a contract modification unless otherwise specified in the contract. The effective date of the change shall be the effective date by the regulatory body. Any factors not governed by the regulatory body will have an effective date as agreed to by the parties.

(End of clause)

I.41 52.242-13 BANKRUPTCY (JUL 1995)
(Reference 42.903)

I.42 52.243-1 I CHANGES--FIXED-PRICE (AUG 1987)--ALTERNATE I (APR 1984)

(a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:

(1) Description of services to be performed.

(2) Time of performance (i.e., hours of the day, days of the week, etc.).

(3) Place of performance of the services.

(b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

(c) The Contractor must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.

(d) If the Contractor's proposal includes the cost of property made obsolete or excess by the change, the Contracting Officer shall have the right to prescribe the manner of the disposition of the property.

(e) Failure to agree to any adjustment shall be a dispute under the Disputes clause. However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

(End of clause)

(R 7-1902.2 1971 NOV)

I.43 52.244-1 SUBCONTRACTS (FIXED-PRICE CONTRACTS) (FEB 1995)

(a) This clause does not apply to firm-fixed-price contracts and fixed-price contracts with economic price adjustment. However, it does apply to subcontracts resulting from unpriced modifications to such contracts.

(b) "Subcontract," as used in this clause, includes but is not limited to purchase orders, and changes and modifications to purchase orders. The Contractor shall notify the Contracting Officer reasonably in advance of entering into any subcontract if the Contractor does not have an approved purchasing system and if the subcontract--

(1) Is proposed to exceed $100,000; or

(2) Is one of a number of subcontracts with a single subcontractor, under this contract, for the same or related supplies or services, that in the aggregate are expected to exceed $100,000.

(c) The advance notification required by paragraph (b) above shall include--

(1) A description of the supplies or services to be subcontracted;

(2) Identification of the type of subcontract to be used;

(3) Identification of the proposed subcontractor and an explanation of why and how the proposed subcontractor was selected, including the competition obtained;

(4) The proposed subcontract price and the Contractor's cost or price analysis;

(5) The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions;

(6) The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract; and

(7) A negotiation memorandum reflecting--

(i) The principal elements of the subcontract price negotiations;

(ii) The most significant considerations controlling establishment of initial or revised prices;

(iii) The reason cost or pricing data were or were not required;

(iv) The extent, if any, to which the Contractor did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(v) The extent, if any, to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Contractor and subcontractor; and the effect of any such defective data on the total price negotiated;

(vi) The reasons for any significant difference between the Contractor's price objective and the price negotiated; and

(vii) A complete explanation of the incentive fee or profit plan when incentives are used. The explanation shall identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

(d) The Contractor shall obtain the Contracting Officer's written consent before placing any subcontract for which advance notification is

required under paragraph (b) above. However, the Contracting Officer may ratify in writing any such subcontract. Ratification shall constitute the consent of the Contracting Officer.

(e) Even if the Contractor's purchasing system has been approved, the Contractor shall obtain the Contracting Officer's written consent before placing subcontracts identified below: __________

(f) Unless the consent or approval specifically provides otherwise, neither consent by the Contracting Officer to any subcontract nor approval of the Contractor's purchasing system shall constitute a determination (1) of the acceptability of any subcontract terms or conditions, (2) of the acceptability of any subcontract price or of any amount paid under any subcontract, or (3) to relieve the Contractor of any responsibility for performing this contract.

(g) No subcontract placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis, and any fee payable under cost-reimbursement subcontracts shall not exceed the fee limitations in subsection 15.903(d) of the Federal Acquisition Regulation (FAR).

(h) The Government reserves the right to review the Contractor's purchasing system as set forth in FAR Subpart 44.3.

(End of clause)

| | | |
|---|---|---|
| I.44 | 52.246-25 | LIMITATION OF LIABILITY--SERVICES (FEB 1997)<br>(Reference 46.805) |
| I.45 | 52.249-4 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (SERVICES) (SHORT FORM) (APR 1984)<br>(Reference 49.502(c)) |
| I.46 | 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984)<br>(Reference 49.504(a)(1)) |
| I.47 | 52.253-1 | COMPUTER GENERATED FORMS (JAN 1991)<br>(Reference 53.111) |

END OF SECTION I


TYPICAL KW DEMAND DURING A SUMMER WORK WEEK
SUNDAY
MONDAY
TUESDAY
WEDNESDAY
THURSDAY
FRIDAY
SATURDAY
KW DEMAND
5000
4500
4000
3500
3000
2500
2000
1500
1000
500
0
VERTICAL LINES ARE FOR 12 NOON OF DAY INDICATED

ENCLOSURE 1

| MONTH | YEAR | MAXIMUM KW DEMANDED | MAX KW DEMANDED TIME: 2400 HR CLOCK | DAY | POWER FACTOR | AMOUNT ABOVE CONTRACT DEMAND OF 2688 KW | TOTAL KWH USED BY MCAAP FOR SERVICE MONTH | SWPA HYDRO KWH USED BY MCAAP FOR SERVICE MONTH | HYDRO-ENERGY AS A % OF TOTAL KWH USED | THERMAL ENERGY USED BY MCAAP FOR SERVICE MONTH | THERMAL ENERGY AS A % OF TOTAL KWH USED |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OCTOBER | 1986 | 2,581.2 | 1330 | 2 | 86.5% | (107) | 737,049 | 197,808 | 27% | 539,241 | 73% |
| NOVEMBER | 1986 | 2,430.0 | 800 | 18 | 89.1% | (258) | 649,767 | 318,368 | 49% | 331,399 | 51% |
| DECEMBER | 1986 | 2,430.0 | 1100 | 10 | 88.6% | (258) | 877,670 | 531,410 | 61% | 346,260 | 39% |
| JANUARY | 1987 | 2,145.6 | 745 | 8 | 87.8% | (542) | 780,690 | 434,053 | 56% | 346,637 | 44% |
| FEBRUARY | 1987 | 2,275.2 | 1015 | 26 | 90.4% | (413) | 722,503 | 494,314 | 68% | 228,189 | 32% |
| MARCH | 1987 | 2,138.4 | 1000 | 30 | 88.8% | (550) | 829,180 | 465,654 | 56% | 363,526 | 44% |
| APRIL | 1987 | 2,426.4 | 1415 | 29 | 85.2% | (262) | 766,143 | 677,939 | 88% | 88,204 | 12% |
| MAY | 1987 | 2,484.0 | 1500 | 5 | 85.0% | (204) | 843,727 | 532,906 | 63% | 310,821 | 37% |
| JUNE | 1987 | 2,754.0 | 1415 | 17 | 86.5% | 66 | 882,520 | 519,206 | 59% | 363,314 | 41% |
| JULY | 1987 | 2,728.8 | 1330 | 27 | 87.3% | 41 | 906,765 | 523,995 | 58% | 382,770 | 42% |
| AUGUST | 1987 | 2,815.2 | 1415 | 3 | 88.5% | 127 | 940,618 | 514,825 | 55% | 425,793 | 45% |
| SEPTEMBER | 1987 | 2,296.8 | 1530 | 17 | 89.0% | (391) | 736,979 | 261,342 | 35% | 475,637 | 65% |
| OCTOBER | 1987 | 2,145.6 | 945 | 13 | 91.9% | (542) | 683,644 | 193,878 | 28% | 489,766 | 72% |
| NOVEMBER | 1987 | 2,077.2 | 1315 | 18 | 90.2% | (611) | 698,190 | 124,449 | 18% | 573,741 | 82% |
| DECEMBER | 1987 | 2,012.0 | 1300 | 14 | 90.3% | (676) | 766,069 | 190,603 | 25% | 575,466 | 75% |
| JANUARY | 1988 | 2,242.6 | 1045 | 26 | 86.5% | (445) | 843,647 | 360,561 | 43% | 483,086 | 57% |
| FEBRUARY | 1988 | 2,368.6 | 1115 | 18 | 88.7% | (319) | 751,523 | 561,691 | 75% | 189,832 | 25% |
| MARCH | 1988 | 2,131.2 | 1015 | 2 | 89.5% | (557) | 795,161 | 588,449 | 74% | 206,712 | 26% |
| APRIL | 1988 | 2,084.4 | 1515 | 5 | 87.5% | (604) | 644,857 | 615,651 | 95% | 29,206 | 5% |
| MAY | 1988 | 2,221.2 | 1500 | 17 | 84.3% | (467) | 722,433 | 689,714 | 95% | 32,719 | 5% |
| JUNE | 1988 | 2,862.0 | 1445 | 27 | 86.3% | 174 | 930,956 | 259,377 | 28% | 671,579 | 72% |
| JULY | 1988 | 2,786.4 | 1400 | 19 | 87.2% | 98 | 911,561 | 387,756 | 43% | 523,805 | 57% |
| AUGUST | 1988 | 2,962.8 | 1400 | 23 | 86.2% | 275 | 1,091,050 | 451,945 | 41% | 639,105 | 59% |
| SEPTEMBER | 1988 | 2,541.6 | 1545 | 21 | 96.1% | (146) | 824,349 | 353,696 | 43% | 470,653 | 57% |
| OCTOBER | 1988 | 2,142.0 | 1330 | 17 | 97.9% | (546) | 688,573 | 217,458 | 32% | 471,115 | 68% |
| NOVEMBER | 1988 | 2,041.2 | 1015 | 31 | 99.3% | (647) | 717,669 | 39,300 | 5% | 678,369 | 95% |
| DECEMBER | 1988 | 2,149.2 | 1030 | 8 | 99.5% | (539) | 732,215 | 96,939 | 13% | 635,276 | 87% |
| JANUARY | 1989 | 2,199.6 | 815 | 12 | 99.7% | (488) | 824,349 | 298,677 | 36% | 525,672 | 64% |
| FEBRUARY | 1989 | 2,318.4 | 1015 | 16 | 99.3% | (370) | 780,707 | 424,201 | 54% | 356,506 | 46% |
| MARCH | 1989 | 2,214.0 | 1030 | 2 | 99.0% | (474) | 790,406 | 538,126 | 68% | 252,280 | 32% |
| APRIL | 1989 | 2,343.0 | 1400 | 27 | 99.0% | (345) | 669,178 | 443,354 | 66% | 225,824 | 34% |
| MAY | 1989 | 2,491.2 | 1500 | 23 | 97.2% | (197) | 829,198 | 110,366 | 13% | 718,832 | 87% |
| JUNE | 1989 | 2,448.0 | 1400 | 26 | 88.4% | (240) | 843,745 | 231,868 | 27% | 611,877 | 73% |
| JULY | 1989 | 2,480.4 | 1515 | 10 | 97.0% | (208) | 863,143 | 523,995 | 61% | 339,148 | 39% |
| AUGUST | 1989 | 2,923.2 | 1030 | 29 | 95.5% | 235 | 1,027,980 | 403,476 | 39% | 624,504 | 61% |
| SEPTEMBER | 1989 | 2,804.4 | 1300 | 31 | 95.8% | 116 | 737,043 | 168,988 | 23% | 568,055 | 77% |
| OCTOBER | 1989 | 2,106.0 | 1300 | 16 | 97.8% | (582) | 712,799 | 655,316 | 92% | 57,482 | 8% |
| NOVEMBER | 1989 | 1,846.8 | 1100 | 29 | 99.7% | (841) | 678,855 | 339,156 | 50% | 339,699 | 50% |
| DECEMBER | 1989 | 2,322.0 | 1015 | 19 | 98.9% | (366) | 761,287 | 0 | 0% | 761,287 | 100% |
| JANUARY | 1990 | 2,246.4 | 1015 | 18 | 99.2% | (442) | 897,058 | 515,770 | 57% | 381,288 | 43% |
| FEBRUARY | 1990 | 2,372.4 | 800 | 22 | 99.6% | (316) | 785,533 | 722,185 | 92% | 63,348 | 8% |
| MARCH | 1990 | 2,433.6 | 1330 | 1 | 99.4% | (254) | 829,182 | 762,306 | 92% | 66,876 | 8% |
| APRIL | 1990 | 2,318.4 | 800 | 11 | 98.6% | (370) | 766,137 | 704,353 | 92% | 61,784 | 8% |
| MAY | 1990 | 2,545.2 | 1345 | 15 | 97.1% | (143) | 795,231 | 731,101 | 92% | 64,130 | 8% |
| JUNE | 1990 | 3,052.8 | 1300 | 20 | 96.9% | 365 | 979,585 | 862,273 | 88% | 117,312 | 12% |
| JULY | 1990 | 3,085.2 | 1445 | 10 | 97.0% | 397 | 1,071,749 | 933,471 | 87% | 138,278 | 13% |
| AUGUST | 1990 | 3,142.8 | 1500 | 29 | 95.6% | 455 | 1,134,838 | 765,013 | 67% | 369,825 | 33% |
| SEPTEMBER | 1990 | 3,106.8 | 1315 | 6 | 96.7% | 419 | 950,549 | 398,236 | 42% | 552,313 | 58% |
| OCTOBER | 1990 | 2,667.6 | 1400 | 1 | 95.9% | (20) | 974,797 | 298,677 | 31% | 676,120 | 69% |
| NOVEMBER | 1990 | 2,617.2 | 900 | 1 | 98.0% | (71) | 848,704 | 137,549 | 16% | 711,155 | 84% |
| DECEMBER | 1990 | 2,664.0 | 830 | 2 | 97.1% | (24) | 1,081,491 | 87,638 | 8% | 993,853 | 92% |
| JANUARY | 1991 | 3,049.2 | 830 | 17 | 97.7% | 361 | 1,217,284 | 717,303 | 59% | 499,981 | 41% |
| FEBRUARY | 1991 | 3,052.8 | 815 | 6 | 98.6% | 365 | 1,207,584 | 1,032,463 | 85% | 175,121 | 15% |
| MARCH | 1991 | 2,908.8 | 1015 | 7 | 97.1% | 221 | 955,397 | 346,539 | 36% | 608,858 | 64% |
| APRIL | 1991 | 2,865.6 | 1330 | 25 | 97.4% | 178 | 1,047,543 | 895,631 | 85% | 151,912 | 15% |
| MAY | 1991 | 3,510.0 | 1300 | 29 | 95.5% | 822 | 1,173,896 | 898,463 | 77% | 275,433 | 23% |
| JUNE | 1991 | 3,610.8 | 1300 | 18 | 94.3% | 923 | 1,110,894 | 826,464 | 74% | 284,430 | 26% |
| JULY | 1991 | 3,664.8 | 1345 | 1 | 95.5% | 977 | 1,382,592 | 465,045 | 34% | 917,547 | 66% |
| AUGUST | 1991 | 3,531.6 | 1315 | 6 | 93.3% | 844 | 1,377,740 | 479,455 | 35% | 898,285 | 65% |
| SEPTEMBER | 1991 | 3,524.4 | 1515 | 11 | 93.5% | 836 | 984,792 | 196,498 | 20% | 788,294 | 80% |
| OCTOBER | 1991 | 2,941.2 | 1500 | 3 | 95.9% | 253 | 1,013,901 | 426,580 | 42% | 587,321 | 58% |
| NOVEMBER | 1991 | 2,728.8 | 1530 | 7 | 98.6% | 41 | 882,919 | 647,162 | 73% | 235,757 | 27% |
| DECEMBER | 1991 | 2,736.0 | 1300 | 2 | 97.5% | 48 | 1,076,965 | 789,395 | 73% | 287,570 | 27% |
| JANUARY | 1992 | 2,908.8 | 1045 | 13 | 97.6% | 221 | 994,495 | 728,946 | 73% | 265,549 | 27% |
| FEBRUARY | 1992 | 3,146.4 | 1000 | 26 | 97.5% | 458 | 984,792 | 721,834 | 73% | 262,958 | 27% |
| MARCH | 1992 | 2,988.0 | 1000 | 10 | 99.5% | 300 | 1,115,775 | 817,842 | 73% | 297,933 | 27% |
| APRIL | 1992 | 2,973.6 | 1030 | 6 | 98.6% | 286 | 975,091 | 293,680 | 30% | 681,411 | 70% |
| MAY | 1992 | 2,988.0 | 1315 | 14 | 97.7% | 300 | 873,216 | 548,372 | 63% | 324,844 | 37% |

| MONTH | YEAR | MAXIMUM KW DEMANDED | MAX KW DEMANDED TIME: 2400 HR CLOCK | DAY | POWER FACTOR | AMOUNT ABOVE CONTRACT DEMAND OF 2688 KW | TOTAL KWH USED BY MCAAP FOR SERVICE MONTH | HYDRO KWH USED BY MCAAP FOR SERVICE MONTH | HYDRO-ENERGY AS A % OF TOTAL KWH USED | ENERGY USED BY MCAAP FOR SERVICE MONTH | THERMAL ENERGY AS A % OF TOTAL KWH USED |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JUNE | 1992 | 3,747.6 | 1345 | 16 | 88.7% | 1,060 | 1,232,254 | 883,227 | 72% | 349,027 | 28% |
| JULY | 1992 | 3,798.0 | 1330 | 22 | 95.8% | 1,110 | 1,377,828 | 974,440 | 71% | 403,388 | 29% |
| AUGUST | 1992 | 3,884.4 | 1400 | 26 | 94.7% | 1,196 | 1,251,738 | 589,494 | 47% | 662,244 | 53% |
| SEPTEMBER | 1992 | 4,104.0 | 1315 | 9 | 93.6% | 1,416 | 1,149,957 | 653,108 | 57% | 496,849 | 43% |
| OCTOBER | 1992 | 2,937.6 | 1345 | 13 | 97.3% | 250 | 941,315 | 525,417 | 56% | 415,898 | 44% |
| NOVEMBER | 1992 | 3,063.5 | 1015 | 25 | 99.3% | 376 | 965,576 | 99,559 | 10% | 866,017 | 90% |
| DECEMBER | 1992 | 3,265.2 | 730 | 8 | 98.9% | 577 | 1,086,879 | 711,267 | 65% | 375,612 | 35% |
| JANUARY | 1993 | 2,995.2 | 730 | 14 | 98.9% | 307 | 1,009,245 | 660,462 | 65% | 348,783 | 35% |
| FEBRUARY | 1993 | 2,815.2 | 1015 | 17 | 98.4% | 127 | 917,055 | 600,131 | 65% | 316,924 | 35% |
| MARCH | 1993 | 2,790.0 | 1030 | 31 | 99.0% | 102 | 1,086,879 | 711,267 | 65% | 375,612 | 35% |
| APRIL | 1993 | 2,772.0 | 1045 | 5 | 99.1% | 84 | 926,759 | 606,482 | 65% | 320,277 | 35% |
| MAY | 1993 | 2,970.0 | 1400 | 17 | 97.3% | 282 | 839,420 | 549,327 | 65% | 290,093 | 35% |
| JUNE | 1993 | 3,391.2 | 1345 | 29 | 94.6% | 703 | 1,237,296 | 809,701 | 65% | 427,595 | 35% |
| JULY | 1993 | 3,628.8 | 1345 | 19 | 93.7% | 941 | 1,387,712 | 908,135 | 65% | 479,577 | 35% |
| AUGUST | 1993 | 3,724.8 | 1400 | 18 | 95.0% | 1,037 | 1,382,860 | 904,960 | 65% | 477,900 | 35% |
| SEPTEMBER | 1993 | 3,340.8 | 1345 | 22 | 95.8% | 653 | 1,135,213 | 677,433 | 60% | 457,780 | 40% |
| OCTOBER | 1993 | 2,812.8 | 1415 | 7 | 97.1% | 125 | 941,160 | 678,720 | 72% | 262,440 | 28% |
| NOVEMBER | 1993 | 2,985.6 | 1015 | 16 | 91.0% | 298 | 1,023,631 | 719,821 | 70% | 303,810 | 30% |
| DECEMBER | 1993 | 2,683.2 | 1045 | 14 | 89.3% | (5) | 999,376 | 385,474 | 39% | 613,902 | 61% |
| JANUARY | 1994 | 2,870.4 | 1015 | 31 | 97.9% | 182 | 1,086,700 | 477,969 | 44% | 608,731 | 56% |
| FEBRUARY | 1994 | 2,779.2 | 1030 | 23 | 97.6% | 91 | 941,160 | 621,988 | 66% | 319,172 | 34% |
| MARCH | 1994 | 2,875.2 | 1400 | 23 | 96.7% | 187 | 1,067,294 | 769,682 | 72% | 297,612 | 28% |
| APRIL | 1994 | 3,115.2 | 1030 | 6 | 96.9% | 427 | 955,714 | 689,216 | 72% | 266,498 | 28% |
| MAY | 1994 | 3,384.0 | 1345 | 31 | 85.9% | 696 | 1,101,254 | 794,172 | 72% | 307,082 | 28% |
| JUNE | 1994 | 3,969.6 | 1300 | 28 | 85.6% | 1,282 | 1,426,451 | 881,985 | 62% | 544,466 | 38% |
| JULY | 1994 | 3,633.6 | 1315 | 19 | 87.6% | 946 | 1,353,674 | 361,556 | 27% | 992,118 | 73% |
| AUGUST | 1994 | 3,878.4 | 1300 | 18 | 93.7% | 1,190 | 1,334,265 | 798,061 | 60% | 536,204 | 40% |
| SEPTEMBER | 1994 | 3,436.8 | 1330 | 12 | 95.9% | 749 | 1,115,930 | 246,277 | 22% | 869,653 | 78% |
| OCTOBER | 1994 | 2,793.6 | 1400 | 3 | 97.2% | 106 | 917,004 | 68,774 | 7% | 848,230 | 93% |
| NOVEMBER | 1994 | 2,582.4 | 1100 | 30 | 97.3% | (106) | 960,671 | 649,995 | 68% | 310,676 | 32% |
| DECEMBER | 1994 | 2,606.4 | 830 | 20 | 98.9% | (82) | 960,671 | 649,995 | 68% | 310,676 | 32% |
| JANUARY | 1995 | 3,139.2 | 1030 | 30 | 97.5% | 451 | 1,125,635 | 761,611 | 68% | 364,024 | 32% |
| FEBRUARY | 1995 | 2,942.4 | 1015 | 7 | 98.5% | 254 | 989,782 | 669,692 | 68% | 320,090 | 32% |
| MARCH | 1995 | 2,942.4 | 1045 | 7 | 98.9% | 254 | 1,077,116 | 728,783 | 68% | 348,333 | 32% |
| APRIL | 1995 | 2,932.8 | 845 | 24 | 98.6% | 245 | 1,023,745 | 692,672 | 68% | 331,073 | 32% |
| MAY | 1995 | 3,384.0 | 1330 | 16 | 95.9% | 696 | 1,164,449 | 787,873 | 68% | 376,576 | 32% |
| JUNE | 1995 | 3,614.4 | 1345 | 7 | 96.0% | 926 | 1,314,806 | 910,560 | 69% | 404,246 | 31% |
| JULY | 1995 | 3,897.6 | 1330 | 11 | 94.7% | 1,210 | 1,426,407 | 982,974 | 69% | 443,433 | 31% |
| AUGUST | 1995 | 3,825.6 | 1300 | 14 | 94.3% | 1,138 | 1,547,700 | 1,066,560 | 69% | 481,140 | 31% |
| SEPTEMBER | 1995 | 3,489.6 | 1500 | 6 | 96.0% | 802 | 1,145,007 | 327,420 | 29% | 817,587 | 71% |
| OCTOBER | 1995 | 2,884.8 | 745 | 26 | 99.0% | 197 | 966,621 | 127,541 | 13% | 839,080 | 87% |
| NOVEMBER | 1995 | 2,721.6 | 1000 | 28 | 99.3% | 34 | 946,086 | 130,999 | 14% | 815,087 | 86% |
| DECEMBER | 1995 | 2,808.0 | 800 | 11 | 95.2% | 120 | 984,900 | 130,999 | 13% | 853,901 | 87% |
| JANUARY | 1996 | 3,345.6 | 1015 | 31 | 96.8% | 658 | 1,164,414 | 518,677 | 45% | 645,737 | 55% |
| FEBRUARY | 1996 | 3,369.6 | 1000 | 1 | 98.0% | 682 | 1,101,342 | 752,747 | 68% | 348,595 | 32% |
| MARCH | 1996 | 3,196.8 | 1000 | 7 | 97.9% | 509 | 1,101,342 | 176,882 | 16% | 924,460 | 84% |
| APRIL | 1996 | 2,544.0 | 830 | 4 | 98.6% | (144) | 902,420 | 488,222 | 54% | 414,198 | 46% |
| MAY | 1996 | 3,014.4 | 1500 | 22 | 96.2% | 326 | 1,057,676 | 684,189 | 65% | 373,487 | 35% |
| JUNE | 1996 | 3,600.0 | 1500 | 18 | 95.0% | 912 | 1,266,300 | 186,657 | 15% | 1,079,643 | 85% |
| JULY | 1996 | 3,340.8 | 1545 | 29 | 95.2% | 653 | 1,309,923 | 654,797 | 50% | 655,126 | 50% |
| AUGUST | 1996 | 3,436.8 | 1315 | 19 | 95.6% | 749 | 1,013,555 | 958,289 | 95% | 55,266 | 5% |
| SEPTEMBER | 1996 | 3,259.2 | 1445 | 11 | 96.8% | 571 | 854,282 | 339,468 | 40% | 514,814 | 60% |

ENCLOSURE 2, PAGE 2 OF 2

PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201

EXHIBIT "A"

PAGE NO. 1 OF 3
REVISION NO. ORIGINAL
CANCELING REVISION NO.

**SCHEDULE:** LARGE POWER AND LIGHT 1-3 (LPL1-3) PRICE CODE 0610-0630

## AVAILABILITY

This price schedule is available on an annual basis to any Service Level 1, 2, or 3 retail customer as defined below:

| PRICE CODE | DESCRIPTION |
|---|---|
| 0610 | Service Level 1 is defined as service taken directly from the transmission system (69 kV or greater) with no transformation provided by the Company. |
| 0620 | Service Level 2 is defined as service taken directly from the transmission system (69 kV or greater) with one transformation provided through a Company owned substation or transformer. |
| 0630 | Service Level 3 is defined as service taken from a primary distribution line (34 kV or lower) with only one transformation provided by the Company from the transmission system (69 kV or higher). |

This schedule is not available to Service Level 4 and 5 customers. This schedule is not available for resale, stand-by, breakdown, auxiliary or supplemental service. It is the customer's option whether service will be supplied under this schedule or any other schedule for which the customer is eligible. Once this schedule is selected, service will continue to be supplied under this schedule for twelve consecutive months unless a material and permanent change in the customer's load occurs.

A written contract is required for service under this price schedule.

The Company requires the use of a telephone line or other communication link deemed acceptable by the Company for meter reading.

Service will be supplied at one delivery point and shall be at one standard voltage.

The Company will furnish service in accordance with the Company's Rules, Regulations, and Conditions of Service, and the Rules and Regulations of the Oklahoma Corporation Commission.

EXHIBIT "A"

PSO
PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201

PAGE NO. 2 OF 5
REVISION NO. ORIGINAL
CANCELING REVISION NO.

**SCHEDULE:** LARGE POWER AND LIGHT 1-3 (LPL1-3) PRICE CODE 0610-0630

## MONTHLY PRICES

Base Service Charge: $125.00

If the customer provides the Company access to and the customer pays for installation and use of a telephone line (or other communication link deemed acceptable by the Company) which meets the Company's requirements for meter reading, the *Base Service Charge* will be reduced to $75.00 per month.

Energy Charge:

| | | |
|---|---|---|
| Service Level 1 | 2.80¢ | per kilowatt-hour (kWh) for all kWh. |
| Service Level 2 | 2.85¢ | per kWh for all kWh. |
| Service Level 3 | 2.95¢ | per kWh for all kWh. |

Demand Charges:

Peak Demand Charge:

| | | |
|---|---|---|
| Service Level 1 | $5.15 | per kilowatt (kW) of billing demand. |
| Service Level 2 | $5.70 | per kW of billing demand. |
| Service Level 3 | $6.10 | per kW of billing demand. |

PLUS:

Monthly Maximum Demand Charge:

| | | |
|---|---|---|
| Service Level 1 | $0.50 | per kW of the demand requirement. |
| Service Level 2 | $0.85 | per kW of the demand requirement. |
| Service Level 3 | $1.10 | per kW of the demand requirement. |

PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201



**SCHEDULE: LARGE POWER AND LIGHT 1-3 (LPL1-3)** **PRICE CODE 0610-0630**

- **Reactive Power Charge:**

These prices are based upon the customer's monthly maximum Reactive Power (kVAR) requirement being no more than 30% of the monthly maximum demand (kW) requirement. When the Company determines the Reactive Power exceeds 30%, the Company may install suitable measuring equipment at the metering point to determine the customer's monthly maximum kVAR and monthly maximum kW requirements.

For customers whose monthly maximum kVAR requirements exceed 30% of the monthly maximum kW requirement, an additional charge of **$0.20** will be assessed for each kVAR required above 30% of the monthly maximum kW requirement.

## DETERMINATION OF MONTHLY BILLING DEMANDS

Two demand values are required for monthly billing; (1) **PEAK DEMAND** and (2) **MONTHLY MAXIMUM DEMAND.**

**Peak Demand:**

June 1 through September 30 – the greater of the current month's maximum *On-Peak period* demand or ninety percent (90%) of the highest *On-Peak period* demand occurring during the preceding eleven (11) months.

October 1 through May 31 -- is equal to ninety percent (90%) of the highest *On-Peak period* demand occurring during the preceding eleven (11) months.
The Peak Demand for premises without previously established *On-Peak period* demand history will be seventy-five percent (75%) of the current month's maximum demand until an *On-Peak period* demand is established.

**Monthly Maximum Demand:**

The Monthly Maximum Demand and the monthly maximum kVAR requirements will be the highest metered kW and kVAR occurring during the month. Metered data is based on thirty minute integrated periods measured by demand recording meters.

PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201



SCHEDULE: LARGE POWER AND LIGHT 1-3 (LPL1-3)

PRICE CODE 0610-0630

## DETERMINATION OF ON-PEAK PERIOD

The On-Peak Period is defined as those hours between 2:00 P.M. and 9:00 P.M. local time, Monday through Friday, from June 1 through September 30, excluding Independence Day and Labor Day as they are nationally observed.

## DETERMINATION OF MINIMUM MONTHLY BILL

The Minimum Monthly Bill is the *Base Service Charge* plus the demand charges.

The Minimum Monthly Bill shall be adjusted according to ***Adjustments to Billing***. If the customer's load is highly fluctuating to the extent that it causes interference with standard quality service to other loads, the Minimum Monthly Bill will be increased by $0.50 per kVA of transformer capacity necessary to correct such interference.

## ADJUSTMENTS TO BILLING

### Fuel Cost Adjustment:

The amount calculated at the above prices is subject to adjustment under the provisions of the Company's Fuel Cost Adjustment Rider and Fuel Over/Under Recovery Adjustment Rider.

### Tax Adjustment:

The amount calculated at the above prices is subject to adjustment under the provisions of the Company's Tax Adjustment Rider.

### Metering Adjustment:

The amount calculated at the above prices is subject to adjustment under the provisions of the Company's Metering Adjustment Rider.

PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201

PAGE NO. 5 OF 5
REVISION NO. ORIGINAL
CANCELING REVISION NO.

SCHEDULE: LARGE POWER AND LIGHT 1-3 (LPL1-3) PRICE CODE 0610-0630

## TERMS OF PAYMENT

A late payment charge, pursuant to the Company's Service Charge price schedule, will be assessed on all delinquent bills.

ISSUE DATE: January 27, 1994

EFFECTIVE DATE: January 28, 1994

AUTHORIZED BY: 379628 (Order Number) PUD 001342 (Cause Number)

ISSUED BY: [signature] (Signature of Officer) Vice President (Title)

APPROVED JAN 28 1994 DIRECTOR OF PUBLIC UTILITIES

*PSO*
PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201



**SCHEDULE:** LIMITED USAGE GENERAL SERVICE 5 (LUGS-5) PRICE CODE 0675

## AVAILABILITY

This price schedule is available on an annual basis only to Service Level 5 retail customers who take service from: 1) distribution secondary lines or transformers; or 2) a primary distribution line (34 kV or lower) with a second transformation provided by the Company (Service Levels 4 and 5).

This schedule is not available for resale, stand-by, breakdown, auxiliary or supplemental service. It is the customer's option whether service will be supplied under this schedule or any other schedule for which the customer is eligible. Once this schedule is selected, service will continue to be supplied under this schedule for twelve consecutive months unless a material and permanent change in the customer's load occurs or the customer is no longer eligible as described in the *Special Conditions of Service*.

A written contract may be required at the Company's option.

Service will be supplied at one delivery point and shall be at one standard voltage.

The Company will furnish service in accordance with the Company's Rules, Regulations, and Conditions of Service, and the Rules and Regulations of the Oklahoma Corporation Commission.

## SPECIAL CONDITIONS OF SERVICE

1. An existing customer is eligible for this schedule only if the customer has an average On-Peak monthly kilowatt-hour (kWh) usage of 8,000 kWh or less. At the end of the On-Peak season, the average On-Peak daily kWh usage cannot exceed 266.67 kWh.

2. The Company will assist new customers in determining eligibility for this price or any other price schedule for which they may be eligible.

3. When a customer exceeds 40,000 kWh in total during the current On-Peak season, the customer is billed under the applicable GS-5 or PL-5 schedule for the current month and through the next On-Peak season before being eligible again for service under this schedule.

*PSO*
PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201



**SCHEDULE: LIMITED USAGE GENERAL SERVICE 5 (LUGS-5)** **PRICE CODE 0675**

## MONTHLY PRICES

**Base Service Charge:** $16.00

**Energy Charge:**

On-Peak Season

6.4¢ per kWh for the first 1,500 kWh or less.
7.0¢ per kWh for all additional kWh.

Off-Peak Season

5.5¢ per kWh for the first 1,200 kWh or less.
4.3¢ per kWh for all additional kWh.

**Reactive Power Charges:**

These prices are based upon the customer's monthly maximum Reactive Power (kVAR) requirement being no more than 30% of the monthly maximum demand (kW) requirement. When the Company determines the Reactive Power exceeds 30%, the Company may install suitable measuring equipment at the metering point to determine the customer's monthly maximum kVAR and monthly maximum kW requirements.

For customers whose monthly maximum kVAR requirements exceed 30% of the monthly maximum kW requirement, an additional charge of $0.20 will be assessed for each kVAR required above 30% of the monthly maximum kW requirement.

## DETERMINATION OF SEASON

The On-Peak season is the Company's billing months of June through October inclusive. The Off-Peak season is the Company's billing months of November through May inclusive.

*PSO*
PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. BOX 201
TULSA, OKLAHOMA 74102-0201

PAGE NO. 3 OF 3
REVISION NO. TWO
CANCELING REVISION NO. ONE

**SCHEDULE: LIMITED USAGE GENERAL SERVICE 5 (LUGS-5)** **PRICE CODE 0675**

## DETERMINATION OF MINIMUM MONTHLY BILL

The Minimum Monthly Bill is the *Base Service Charge* of $16.00. The Minimum Monthly Bill shall be adjusted according to *Adjustments to Billing*. If the customer's load is highly fluctuating to the extent that it causes interference with standard quality service to other loads, the Minimum Monthly Bill will be increased $.50 per kVA of transformer capacity necessary to correct such interference.

## ADJUSTMENTS TO BILLING

### Fuel Cost Adjustment:

The amount calculated at the above prices is subject to adjustment under the provisions of the Company's Fuel Cost Adjustment Rider and Fuel Over/Under Recovery Adjustment Rider.

### Tax Adjustment:

The amount calculated at the above prices is subject to adjustment under the provisions of the Company's Tax Adjustment Rider.

## TERMS OF PAYMENT

A late payment charge, pursuant to the Company's Service Charge schedule will be assessed on all delinquent bills.

ISSUE DATE: January 27, 1994

EFFECTIVE DATE: January 28, 1994

AUTHORIZED BY: 379628 (Order Number) PUD 001342 (Cause Number)

ISSUED BY: [signature] (Signature of Officer) Vice President (Title)

APPROVED JAN 28 1994 DIRECTOR OF PUBLIC UTILITIES



EXHIBIT "A1"

EXHIBIT "B"

EXHIBIT B

Revised BJS2A

# PUBLIC SERVICE COMPANY OF OKLAHOMA

***1991 Embedded Fuel Calculation (w/o T and A Fee)***

OCC PUD 920 001342
ORDER NO. 390696

| LINE NO. DESCRIPTION | SL1 | SL2 | SL3 | SL4 | SL5 | SL4&5 |
|---|---|---|---|---|---|---|
| 1 1991 Loss Expansion Factor | 1.0239429 | 1.0306946 | 1.0449913 | 1.0763663 | 1.079865 | 1.079742 |
| 2 1991 Average Heat Rate(Btu/kWh) | 10,289 | 10,289 | 10,289 | 10,289 | 10,289 | 10,289 |
| 3 Embedded Fuel Cost At Generator ($/MMBtu) | $2.50 | $2.50 | $2.50 | $2.50 | $2.50 | $2.50 |
| 4 Embedded Fuel Cost At Generator ($/kWh) | $0.025723 | $0.025723 | $0.025723 | $0.025723 | $0.025723 | $0.025723 |
| 5 Embedded Fuel Cost at Meter ($/kWh) | $0.026316 | $0.026513 | $0.026880 | $0.027687 | $0.027777 | $0.027774 |
| 6 Transportation & Agency Fee at Generator ($/kWh) | $0.002040 | $0.002040 | $0.002040 | $0.002040 | $0.002040 | $0.002040 |
| 7 Embedded Fuel Cost w/o T&A Fee ($/kWh) | $0.023683 | $0.023683 | $0.023683 | $0.023683 | $0.023683 | $0.023683 |
| 8 T&A Fee at Generator using D03 Allocator ($/kWh) | $0.001190 | $0.001320 | $0.001640 | $0.002160 | $0.002330 | $0.002327 |
| 9 Revised Embedded Fuel Cost at Generator ($/kWh) | $0.024873 | $0.025003 | $0.025323 | $0.025843 | $0.026013 | $0.026010 |
| 10 Revised Embedded Fuel Cost at Meter ($/kWh) | $0.025446 | $0.025770 | $0.026462 | $0.027817 | $0.028091 | $0.028084 |
| 11 Difference: line 10-line 5 ($/kWh) | -$0.000870 | -$0.000743 | -$0.000418 | $0.000130 | $0.000314 | $0.000310 |
| 12 T&A Fee at Meter ($kWh) | $0.001217 | $0.001361 | $0.001714 | $0.002325 | $0.002516 | $0.002513 |
| 13 Revised Embedded Fuel Cost at Meter w/o T&A Fee($/kWh) | $0.024229 | $0.024409 | $0.024748 | $0.025492 | $0.025575 | $0.025571 |

EXHIBIT "B"

*PSO*
**PUBLIC SERVICE COMPANY OF OKLAHOMA**
**P.O. BOX 201**
**TULSA, OKLAHOMA 74102-0201**

EXHIBIT "C"

PAGE NO. 1 OF 3
REVISION NO. TWO
CANCELING REVISION NO. ONE

**SCHEDULE: FUEL COST ADJUSTMENT RIDER (FA)**

**AVAILABILITY**

This Rider is applicable to and becomes a part of each OCC jurisdiction pricing schedule in which reference is made to Fuel Cost Adjustment.

**ADJUSTMENT**

The Fuel Cost Adjustment shall be calculated by multiplying the total billing kilowatt-hours (kWh) by the Fuel Cost Adjustment Factor for the current billing period. The Fuel Cost Adjustment Factor shall be determined in the following manner:

$$FA = A \times \frac{(B \times C) - D}{10^6} + PPA - OSEC$$

**WHERE:**

FA = The fuel cost adjustment factor (expressed in dollars per kWh) to be applied per kWh consumed.

A = The weighted average BTU/kWh for net generation from the Company's thermal plants during the second calendar month preceding the end of the billing period for which the kWh usage is billed.

B = The average cost of fuel per million BTU of the Company's thermal generating units during the second calendar month preceding the end of the billing period. Any credits, refunds or allowances on previously purchased fuel, received by the Company from any source, shall be deducted from the cost of fuel before calculating "B" each month.

C = The ratio (expressed decimally) of the total net generation from all the Company's thermal plants during the second calendar month preceding the end of the billing period for which the kWh usage is billed to the total net generation from all the Company's plants including hydro generation owned by the Company, or kWh produced by hydro generation and purchased by the Company, and kWh purchased by the Company which are associated with the cost set out in FERC Account 5550 and recorded in subaccount Nos. .0100, .0200, .0800, .0900, .1100, .1200, .2000, .2100, .2200, .2300, .2400, .2500, .2600, .2700, .2800, .2900, and .9900 during the same period.

EXHIBIT "C"

EXHIBIT D
to the
Power Agreement

Notices

MCAAP

NOTICES, CORRESPONDENCE

COMMANDER
McAlester Army Ammunition Plant
Attn SIOMC-PC (Stephen Dunbar, Bldg 8)
1 C Tree Road
McAlester, OK 74501-9002
Phone: 918-421-3401
Fax: 918-421-3391

INVOICES

COMMANDER
McAlester Army Ammunition Plant
Attn SIOMC-DEW (Scott Kosco, Bldg 9)
1 C Tree Road
McAlester, OK 74501-9002
Phone: 918-421-3455
Fax: 918-421-3453

BUYER

NOTICES, CORRESPONDENCE
& INVOICES

PUBLIC SERVICE COMPANY OF OKLAHOMA
P.O. Box 201
212 East 6th Street
Tulsa, OK 74102-0201
Attn: General Manager
Phone: 918-599-2400
Fax: 918-599-3388

Contract No. DE-PM75-97SW00352

UNITED STATES
DEPARTMENT OF ENERGY
SOUTHWESTERN POWER ADMINISTRATION

POWER SALES CONTRACT

COPY

Between

UNITED STATES OF AMERICA

and

DEPARTMENT OF THE ARMY


| Article | Title | Page |
|---|---|---|
| | Preamble | |
| | Preliminary Recitals | |
| I | DEFINITIONS | |
| | 1. Contract Year | 2 |
| | 2. Scheduling Agent | 2 |
| | 3. System of McAlester AAP | 3 |
| | 4. System of Southwestern | 3 |
| | 5. Month and Billing Period | 3 |
| | 6. Uncontrollable Force | 3 |
| | 7. General Contract Provisions | 4 |
| II | SALE OF HYDRO PEAKING POWER AND ASSOCIATED ENERGY BY SOUTHWESTERN | |
| | 1. Sale of Hydro Peaking Power | 4 |
| | 2. Definitions Applicable to the Sale of Hydro Peaking Power | 4 |
| | 3. Sale of Peaking Energy | 5 |
| | 4. Scheduling of Peaking Energy | 6 |
| | 5. Parameters for Submitting Peaking Energy Schedules to Southwestern | 7 |
| | 6. Sale and Scheduling of Supplemental Peaking Energy | 8 |
| | 7. Compensation by McAlester AAP to Southwestern for Hydro Peaking Power and Associated Energy | 8 |
| | 8. Nominal Point of Delivery | 10 |
| III | DESIGNATION OF SCHEDULING AGENT BY MCALESTER AAP | |
| | 1. Purpose | 11 |
| | 2. Designation and Authority of Scheduling Agent | 11 |

| Article | Title | Page |
|---|---|---|
| III (cont.) | | |
| | 3. Changes in Scheduling Agent or in Authority of Scheduling Agent | 11 |
| IV | CHARACTER OF DELIVERIES, POWER FACTOR, AND INADVERTENT FLOW | |
| | 1. Character of Deliveries | 12 |
| | 2. Power Factor | 12 |
| | 3. Inadvertent Flow and Balancing Off | 13 |
| V | INTEGRATED RESOURCE PLANNING | 14 |
| VI | PHASE-OUT OF TRANSMISSION AND ASSOCIATED SERVICE BENEFITS | |
| | 1. Scope | 15 |
| | 2. Phase-Out of Transmission and Associated Service Benefits | 16 |
| VII | EFFECTIVE DATE, TERM, CONTINGENCIES, NOTICES, REPORTS AND INFORMATION | |
| | 1. Effective Date and Term of Contract | 16 |
| | 2. Contingencies | 16 |
| | 3. Notices | 17 |
| | 4. Reports and Information | 18 |

<u>Exhibits Attached</u>:
Exhibit "1" - General Contract Provisions (061693, Power Sales)
Exhibit "2" - Rate Schedule P-90A

Contract No. DE-PM75-97SW00352

UNITED STATES
DEPARTMENT OF ENERGY
SOUTHWESTERN POWER ADMINISTRATION

POWER SALES CONTRACT

Between

COPY

UNITED STATES OF AMERICA

and

DEPARTMENT OF THE ARMY

THIS CONTRACT, made and entered into this 31st day of December, 1996, by and between the UNITED STATES OF AMERICA, represented by the Secretary of Energy, acting by and through the Administrator, Southwestern Power Administration (hereinafter "Southwestern"), an Administration within the Department of Energy, and the DEPARTMENT OF THE ARMY, acting through its duly authorized officials at McAlester Army Ammunition Plant (hereinafter "McAlester AAP"); WITNESSETH, That,

WHEREAS, pursuant to Section 302(a)(1) of the Department of Energy Organization Act (91 Stat. 578; 42 U.S.C. 7152), and Section 5 of the Flood Control Act of 1944 (58 Stat. 887, 890; 16 U.S.C. 825s), and Public Law 95-456 (92 Stat. 1230; 16 U.S.C. 825s-3), the Secretary of Energy is authorized to transmit and dispose of electric power and energy generated at reservoir projects under the control of the Department of the Army; and

WHEREAS, the Administrator of Southwestern has been delegated the authority to market available hydroelectric power and energy; and

110696

WHEREAS, on September 21, 1981, the parties entered into a Power Sales Contract (No. EW-78-Y-75-0020), the term of which expires on May 31, 1997; and

WHEREAS, transmission facilities owned and operated by the United States are not available for the delivery of the electric power and energy purchased by McAlester AAP under this Contract; and

WHEREAS, McAlester AAP will be required to make separate contractual arrangements in order to provide for scheduling and delivery of the power and energy purchased under this Contract; and

WHEREAS, the parties hereto desire to provide for the continued purchase by McAlester AAP of Federal power and energy from Southwestern, under the terms and conditions set forth hereunder;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto contract and agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1. Contract Year. The term "Contract Year," as used herein, shall mean the 12-month period beginning on June 1 of each year and extending through May 31 of the following year.

Section 2. Scheduling Agent. The term "Scheduling Agent," as used herein, shall mean the utility which McAlester AAP has designated as its agent under a separate contractual agreement for the scheduling of Federal power and energy purchased under this Contract with authority set forth in Article III hereof.

Section 3. System of McAlester AAP. The term "System of McAlester AAP," as used herein, shall mean the generation, transmission, and related facilities owned by McAlester AAP and/or the generation, transmission, and related facilities owned by others, the capacity of which, by contract, is available to and utilized by McAlester AAP to receive power and energy purchased under this Contract.

Section 4. System of Southwestern. The term "System of Southwestern," as used herein, shall mean the generation, transmission, and related facilities owned by Southwestern, and/or the generation, transmission, and related facilities owned by others, the capacity of which, by contract, is available to and utilized by Southwestern to satisfy its obligations to McAlester AAP under this Contract.

Section 5. Month and Billing Period. The terms "month" and "billing period," as used herein, shall mean the period beginning on the first day and extending through the last day of each calendar month.

Section 6. Uncontrollable Force. The term "Uncontrollable Force," as used herein, shall mean any force which is not within the control of the party affected, including, but not limited to, failure of water supply, failure of facilities, flood, earthquake, storm, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, or restraint by court of general jurisdiction, which by exercise of due diligence and foresight such party could not reasonably have been expected to avoid.

Section 7. General Contract Provisions. (a) General Contract Provisions which are applicable to this Contract are set forth in Exhibit "1," attached hereto and by this reference made a part hereof. Definitions set forth in the Articles of this Contract shall also apply to their respective terms used in Exhibit "1" and the term "Customer," used in Exhibit "1," shall mean McAlester AAP.

(b) Any specific terms set forth in the Articles of this Contract shall have precedence over any general provision contained in Exhibit "1," to the extent consistent with statutes and regulations of the United States.

ARTICLE II

SALE OF HYDRO PEAKING POWER
AND ASSOCIATED ENERGY BY SOUTHWESTERN

Section 1. Sale of Hydro Peaking Power. (a) Southwestern shall sell and make available, and McAlester AAP shall purchase and cause to be received, 2,688 kilowatts of hydroelectric power (hereinafter "Hydro Peaking Power") with associated energy as set forth in Sections 3 and 6 of this Article II.

Section 2. Definitions Applicable to the Sale of Hydro Peaking Power. The following definitions shall apply to the sale of Hydro Peaking Power under this Article II:

(1) The "Peaking Contract Demand" shall be the maximum rate in kilowatts at which Southwestern is obligated to deliver energy associated with Hydro Peaking Power as set forth in Section 1 of this Article II.

(ii) The "Peaking Billing Demand" for any month shall be the Peaking Contract Demand.

Section 3. Sale of Peaking Energy. (a) During each Contract Year, Southwestern shall sell and make available, and McAlester AAP shall purchase and cause to be received, a quantity of energy to accompany Hydro Peaking Power (hereinafter "Peaking Energy") equal to 1,200 kilowatthours per kilowatt of Peaking Contract Demand; Provided, That, if McAlester AAP's Peaking Contract Demand is increased or decreased during any Contract Year, the quantity of Peaking Energy sold by Southwestern to McAlester AAP during the remainder of such Contract Year shall be specified in an amendment to this Contract which will effect the change in McAlester AAP's Peaking Contract Demand.

(b) If the sale of Hydro Peaking Power to McAlester AAP is initiated on other than the beginning of a Contract Year, the total quantity of Peaking Energy to be furnished and delivered by Southwestern during the remainder of such Contract Year shall be computed by multiplying the ratio of the number of months remaining in the initial Contract Year to 12 months, times 1,200 hours, times McAlester AAP's Peaking Contract Demand; Provided, That, if this Contract goes into effect on other than the beginning of a Contract Year and if sales of Hydro Peaking Power were made to McAlester AAP during that Contract Year under a preceding contract, the sum of the sales of Peaking Energy to McAlester AAP under the previous contract and under this Contract for such Contract Year shall not exceed 1,200 kilowatthours per kilowatt of Peaking Contract Demand.

Section 4. Scheduling of Peaking Energy. (a) McAlester AAP or its Scheduling Agent, as designated in Article III hereof, shall schedule during each Contract Year the entire quantity of Peaking Energy set forth in Section 3 of this Article II in accordance with the following requirements:

(i) McAlester AAP or its Scheduling Agent shall schedule a minimum of 60 kilowatthours per kilowatt of McAlester AAP's Peaking Contract Demand during each month; and

(ii) McAlester AAP or its Scheduling Agent shall not schedule more than 200 kilowatthours per kilowatt of McAlester AAP's Peaking Contract Demand during any one month; and

(iii) McAlester AAP or its Scheduling Agent shall not schedule more than 600 kilowatthours per kilowatt of McAlester AAP's Peaking Contract Demand during any 4 consecutive months, irrespective of Contract Year.

(b) If, during any month, McAlester AAP or its Scheduling Agent fails to schedule the minimum quantity of Peaking Energy specified in Section 4(a)(i) of this Article II, Southwestern's invoice for service during such month shall include a charge for such minimum quantity of Peaking Energy.

(c) If, during any Contract Year, McAlester AAP or its Scheduling Agent fails to schedule the quantity of Peaking Energy specified in Section 3 of this Article II, Southwestern's invoice for service during the last month of such Contract Year shall include a charge for the quantity of Peaking Energy which McAlester AAP is obligated to purchase but which was not scheduled in accordance with this Section 4.

(d) McAlester AAP understands that it forgoes entitlement to any quantity of Peaking Energy which was purchased pursuant to Sections 4(b)

and 4(c) of this Article II, but which was not scheduled for delivery by McAlester AAP or its Scheduling Agent.

Section 5. Parameters for Submitting Peaking Energy Schedules to Southwestern. (a) Schedules for Peaking Energy shall be submitted in writing to Southwestern's Dispatch Center in Springfield, Missouri, in a format which shows each day's deliveries in an hour-by-hour format, with all energy quantities expressed in whole megawatthours.

(b) Written schedules may be submitted to Southwestern's Dispatch Center by mail or by facsimile transmission, or schedules may be converted to electronic data and transmitted via modem. Electronic data shall be submitted in accordance with protocols set by Southwestern.

(c) All schedules for Peaking Energy shall comply with the minimum and maximum quantities set forth in Section 4(a) of this Article II.

(d) McAlester AAP or its Scheduling Agent shall submit firm schedules for the longest time period over which McAlester AAP's schedules are unlikely to require adjustment, and shall adhere to the following time parameters:

(i) Schedules for one month shall be submitted no later than the 20th day of the month preceding service under the schedule; and

(ii) Schedules for one week shall be submitted no later than 2:00 p.m. of the Friday preceding the scheduled deliveries.

(e) Necessary adjustments to submitted schedules may be made by telephone or facsimile transmission to Southwestern's Dispatch Center, and all changes shall be made as far in advance of the delivery date for the

adjusted schedule as is practicable; Provided, That, schedule adjustments shall be submitted on or before 2:00 p.m. of the day preceding deliveries under an adjusted schedule.

(f) Southwestern may request written confirmation of any changes to submitted schedules.

Section 6. Sale and Scheduling of Supplemental Peaking Energy.

(a) From time to time, Southwestern may have hydroelectric energy associated with Hydro Peaking Power (hereinafter "Supplemental Peaking Energy") which is available for purchase by McAlester AAP in addition to the quantity of Peaking Energy purchased by McAlester AAP under Section 3 of this Article II.

(b) When Southwestern, in its sole judgment and at its sole option, determines that Supplemental Peaking Energy will be available for utilization under this Contract, Southwestern shall, with as much notice as possible, notify McAlester AAP or its Scheduling Agent of such availability, along with the approximate rate at which Supplemental Peaking Energy may be delivered, and the period(s) of time during which such energy will be available.

(c) In the event that McAlester AAP is able to utilize such energy, Southwestern will establish with McAlester AAP, or its Scheduling Agent, an hourly schedule for the delivery of Supplemental Peaking Energy to be purchased by McAlester AAP.

Section 7. Compensation by McAlester AAP to Southwestern For Hydro Peaking Power and Associated Energy. (a) McAlester AAP shall compensate

Southwestern each month for Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy purchased during the preceding month, at the rates and under the terms and conditions set forth in Rate Schedule P-90A, attached hereto as Exhibit "2," and by this reference made a part hereof. McAlester AAP understands and agrees that the rates and/or terms and conditions set forth in the said rate schedule may, upon confirmation and/or approval by the appropriate authority having responsibility to so confirm and/or approve rate schedules, and whether on an interim basis or as finally confirmed and/or approved, be increased, decreased, modified, or superseded, at any time, and from time to time, and that if so increased, decreased, modified, or superseded, the rates and terms and conditions shall thereupon become effective and applicable to the purchase and sale under this Contract of Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy, in accordance with and on the effective date specified in the order of the appropriate authority.

(b) Southwestern shall promptly notify McAlester AAP in writing if the rates and/or terms and conditions set forth in the said Rate Schedule P-90A, or the then-effective rate schedule for the sale of Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy, have been increased, decreased, modified, or superseded.

(c) If the rates and/or terms and conditions in the said Rate Schedule P-90A, or the then-effective rate schedule, are increased, decreased, modified, or superseded, as provided in this Section 7, and if McAlester AAP does not wish to continue the purchase of Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy under this Contract, McAlester AAP shall, within 6 months after receipt of notice from

Southwestern under Section 7(b) of this Article II, notify Southwestern in writing of its election to terminate this Contract, such termination to be effective as of midnight at the end of the Contract Year specified by McAlester AAP, but not earlier than 6 months nor later than 36 months from the date of receipt by Southwestern of such notice from McAlester AAP. Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy purchased by McAlester AAP during the period up to the effective date of such termination shall be paid for at the then-effective rates and terms and conditions whether in effect on an interim basis or as finally confirmed and/or approved by the appropriate authority.

Section 8. Nominal Point of Delivery. (a) The nominal point of delivery for Federal Power and Federal Energy purchased and sold under this Contract shall be at the points of electrical interconnection between the System of Southwestern and the System of McAlester AAP or at such other point or points of interconnection as may be agreed upon in writing by the parties hereto.

(b) Pursuant to Article III hereof, power and energy purchased by McAlester AAP under this Contract will be delivered from the System of Southwestern into the system of McAlester AAP's Scheduling Agent (as part of the defined System of McAlester AAP) for the account of McAlester AAP, and McAlester AAP expressly understands and agrees that title to and responsibility for such power and energy passes to and is vested in McAlester AAP when such power and energy is delivered from the System of Southwestern into the system of McAlester AAP's Scheduling Agent at the point of delivery set forth in this Section 8. Southwestern neither has

nor assumes any responsibility or obligation under this Contract for the transmission or displacement of such power and energy from or beyond such point of delivery.

## ARTICLE III

## DESIGNATION OF SCHEDULING AGENT BY MCALESTER AAP

Section 1. Purpose. The parties hereto recognize that power and energy purchased by McAlester AAP under this Contract will be scheduled for delivery to McAlester AAP and transmitted by the Scheduling Agent.

Section 2. Designation and Authority of Scheduling Agent. The Scheduling Agent for McAlester AAP shall be designated in writing by McAlester AAP from time to time. The Scheduling Agent shall be authorized and directed to accept and receive from Southwestern, for the account of McAlester AAP, the power and energy purchased by McAlester AAP under this Contract; to prepare and submit, and to receive and accept, all necessary notices and accounting statements; and to act for and on behalf of McAlester AAP as in regard to all matters arising under this Contract, other than matters pertaining to billing and payment, and in all respects and with the same force and effect as could McAlester AAP acting through its duly authorized officials.

Section 3. Changes in Scheduling Agent or in Authority of Scheduling Agent. McAlester AAP may change its Scheduling Agent or the authority of its Scheduling Agent at any time during the term of this Contract by giving

written notice to Southwestern. Such change shall be effective not sooner than 60 days after written notice is received by Southwestern.

ARTICLE IV

CHARACTER OF DELIVERIES, POWER FACTOR, AND INADVERTENT FLOW

Section 1. Character of Deliveries. Power and energy furnished by Southwestern under this Contract shall be delivered by Southwestern at nominal voltages of 138-kV or 161-kV, as 3-phase alternating current and at a frequency of approximately 60 Hertz.

Section 2. Power Factor. (a) Because the System of Southwestern and the System of McAlester AAP are interconnected with other electrical systems in the area, neither Southwestern nor McAlester AAP will at all times have complete control of the power factor relating to the power and energy delivered to or received at the points of delivery under this Contract.

(b) McAlester AAP shall cause power and energy to be taken from the System of Southwestern at the said points of delivery at such power factor as will best fulfill the requirements of the party receiving such power and energy, but such party shall not impose a reactive power loading on the System of Southwestern which will result in an overload or impairment of Southwestern's service or facilities.

(c) If the reactive power loading imposed at any point of delivery causes such overload or impairment, the party adversely affected shall have the right to open, or to cause the other to open, such

interconnecting switches as may be necessary to eliminate such overload or impairment.

Section 3. Inadvertent Flow and Balancing Off. (a) The flow of electric power and energy to the points of delivery under this Contract will not be completely within the control of Southwestern but will be, in part, controlled by the electrical characteristics of the systems interconnected with Southwestern at such points of delivery and by the manner in which such systems are operated. By reason of such characteristics and operation, the delivery of electric power and energy may vary from scheduled deliveries, and power and energy may flow inadvertently.

(b) Southwestern agrees to follow as closely as practicable the scheduled delivery and receipt of power and energy, but the inadvertent flow of power and energy in excess of, or less than, the amount scheduled shall not constitute a breach of this Contract.

(c) Such inadvertent deviations from schedule shall be balanced off between Southwestern and the control area interconnected with Southwestern at the points of delivery under this Contract as soon as practicable in the subsequent delivery and receipt of electric power and energy, and under load conditions as nearly as possible comparable to those existing at the time said inadvertent deviations occurred, and no charge shall be made for inadvertent flows of power and energy or for power and energy delivered to balance off the same.

(d) If any such inadvertent flow of power and energy causes an overload on the system of Southwestern or on the system interconnected with

Southwestern at the points of delivery under this Contract, or if such inadvertent flow interferes with service rendered by Southwestern or such other system to either party's customers, the party adversely affected shall have the right to open, or cause the other to open, such switches interconnecting the systems as may be necessary to eliminate such overload or interference.

## ARTICLE V

## INTEGRATED RESOURCE PLANNING

In order to encourage the process of comparing supply and demand options as a mechanism for meeting future electrical power requirements, McAlester AAP covenants and agrees to the extent practicable to perform activities associated with Integrated Resource Planning (hereinafter "IRP") in securing future power resources. Such activities shall include the analyses of both supply-side and demand-side measures in order to evaluate the full range of applicable alternatives for satisfying future load requirements. Such activities shall treat supply-side and demand-side resources on a consistent and integrated basis and shall provide for the inclusion of public participation appropriate to McAlester AAP. In analyzing supply and demand resource options, McAlester AAP shall consider all direct and quantifiable net costs for an energy resource over its available life, including the cost of production, transportation, utilization, waste management, and compliance with environmental laws. McAlester AAP further agrees to furnish non-proprietary information relative to its IRP activities as may be requested periodically by Southwestern and agrees that such information may be furnished by

Southwestern to its other customers in order to promote the IRP process for Southwestern's marketing region. Completion of IRP activities, which are required of McAlester AAP by a State or another Federal agency, shall be acceptable to Southwestern as compliance with this Article V.

ARTICLE VI

PHASE-OUT OF TRANSMISSION AND ASSOCIATED SERVICE BENEFITS

Section 1. Scope. (a) On September 21, 1981, Southwestern and McAlester AAP executed Contract EW-78-Y-75-0020 (hereinafter "Contract-0020") which provided, among other things, for Southwestern to arrange transmission and associated services necessary to deliver Federal power and associated energy to McAlester AAP's load center. Under Contract-0020, Southwestern paid for such transmission and associated services to a third party and assessed McAlester AAP a total charge for Federal power which included a component for transmission and associated services. Insofar as the component did not recover from McAlester AAP the total amount of such transmission and associated service costs to Southwestern, and Southwestern recovered the costs in its system rates, McAlester AAP received a benefit associated with these services.

(b) Subsequent to the execution of Contract-0020, Southwestern adopted the practice of requiring all customers to make their own arrangements for transmission and associated services necessary to receive Federal power and associated energy.

Section 2. Phase-out of Transmission and Associated Service Benefits. In order to phase out the transmission and associated service benefits that McAlester AAP received under Contract-0020, Southwestern will give a credit to McAlester AAP totaling $18,198 over a four-year period, beginning with the effective date of this Contract. Such credit will appear on each of McAlester AAP's monthly power sales invoices equal to the following monthly amounts:

(i) From June 1, 1997, through May 31, 1998 - $606.60

(ii) From June 1, 1998, through May 31, 1999 - $454.95

(iii) From June 1, 1999, through May 31, 2000 - $303.30

(iv) From June 1, 2000, through May 31, 2001 - $151.65

## ARTICLE VII

## EFFECTIVE DATE, TERM, CONTINGENCIES, NOTICES, REPORTS, AND INFORMATION

Section 1. Effective Date and Term of Contract. This Contract shall become effective at 12:01 a.m., on June 1, 1997, and shall remain in force and effect until 12:00 midnight, May 31, ~~2012~~ 2007 Coe 12/16/96 [initials] 12/31/96, unless terminated earlier pursuant to provisions set forth herein. Both parties hereto agree that no further notice of termination need be given.

Section 2. Contingencies. (a) Operations under this Contract are conditioned and contingent on the authority McAlester AAP shall grant to its Scheduling Agent. If McAlester AAP has not made suitable arrangements with a Scheduling Agent for receipt of the power and energy purchased under

this Contract, by 60 days prior to the effective date of this Contract, Southwestern shall have the right to terminate this Contract.

(b) If, for any reason, McAlester AAP terminates, suspends, or renders inoperative its contract with its Scheduling Agent, then and in that event, this Contract shall terminate and be without further force or effect as of the effective date of such termination, suspension, or having been rendered inoperative.

(c) Notwithstanding the provisions of Section 2(b) of this Article VII, this Contract shall not terminate for the reasons set forth therein if McAlester AAP has made other contractual arrangements satisfactory to Southwestern for the receipt of power and energy purchased hereunder and has coordinated the establishment of such arrangements with Southwestern as provided for in Section 3 of Article III, hereof.

(d) Termination of this Contract pursuant to the provisions of Section 2(a) or 2(b) of this Article VII, shall be without penalty to either of the parties hereto, except that the rights and obligations of the parties hereto which accrued prior to the date of such termination, if any, shall be and hereby are preserved.

Section 3. Notices. Any written notice, demand, or request required or authorized under this Contract shall be deemed properly given to or served on Southwestern if mailed to:

Administrator
Southwestern Power Administration
P.O. Box 1619
Tulsa, OK 74101-1619

Any such notice, demand, or request shall be deemed properly given to or served on McAlester AAP if mailed to:

Administrative Contracting Officer
McAlester Army Ammunition Plant
ATTN: SIOMC-PC
McAlester, OK 74501-9002

The designation of the persons to be notified, or the address of such persons, may be changed at any time by either party upon written notice of such change to the other party.

Section 4. Reports and Information. Each party hereto shall furnish to the other such reports and information concerning its operations as the other party may reasonably request from time to time.

IN WITNESS WHEREOF, the parties hereto have executed this Contract in several counterparts as of the day and year first above written, each of which shall constitute an original.

UNITED STATES OF AMERICA

By [signature]
Administrator
Southwestern Power Administration

Approved as to Legal
Form and Sufficiency

[signature]
General Counsel
Southwestern Power Administration

COPY

DEPARTMENT OF THE ARMY

By Clifford H Caldwell

Title Contracting officer

Exhibit "1"

# Southwestern Power Administration
# GENERAL CONTRACT PROVISIONS
## Power Sales Contract


| Provision | Title | Page |
|---|---|---|
| A. | ACCOUNTING, BILLING, PAYMENT, AND LATE PAYMENT CHARGES | |
| 1. | Billing by Southwestern | 1 |
| 2. | Payment Terms | 1 |
| 3. | Net Billing | 2 |
| 4. | Propriety of Rates | 2 |
| 5. | Late Payment Charge | 2 |
| 6. | Late Payment Interest Charge | 2 |
| 7. | Late Payment Penalty Charge | 2 |
| 8. | Late Payment Administrative Charge | 2 |
| 9. | Partial Payment | 3 |
| 10. | Discontinuance of Service | 3 |
| B. | FACILITIES AND CONDITIONS OF SERVICE | |
| 1. | Facilities to be Furnished by Southwestern and the Customer | 3 |
| 2. | Reliability, Safety, Health, and Environmental Requirements in Regard to Construction, Operation, and Maintenance of Non-Federal Facilities on U.S. Government Property | 3 |
| 3. | Right of Installation and Access | 5 |
| 4. | Rights for Land Use Acquired by the Customer | 6 |
| 5. | Right of Removal | 6 |
| 6. | Right to Upgrade Facilities | 6 |
| 7. | Limitation of Rights of Entry | 7 |
| 8. | Reliability and Adequacy of Service | 7 |
| 9. | Continuity of Service | 7 |
| 10. | Assistance by Contracting Parties | 8 |
| C. | STANDARD PROVISIONS | |
| 1. | Officials Not to Benefit | 9 |
| 2. | Covenant Against Contingent Fees | 9 |
| 3. | Convict Labor | 9 |
| 4. | Equal Employment Opportunity | 9 |
| 5. | Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era | 9 |
| 6. | Affirmative Action for Handicapped Workers | 10 |
| 7. | Resale Rates | 10 |
| 8. | Availability of Funds to Southwestern | 11 |
| 9. | Termination for Breach | 11 |
| 10. | Waivers | 11 |
| 11. | Transfer of Interest and Abrogation of Rights to Federal Power | 11 |

Southwestern Power Administration

# GENERAL CONTRACT PROVISIONS

## POWER SALES CONTRACT

## A. ACCOUNTING, BILLING, PAYMENT, AND LATE PAYMENT

1. Billing by Southwestern. Southwestern shall maintain an accurate record of the power, energy, and any other services purchased by the Customer under this Contract and shall prepare and submit to the Customer an invoice setting forth in necessary detail such quantities as were purchased by the Customer during the preceding billing period and the amount of compensation due Southwestern. Such quantities may be based on estimates if actual quantities are not available. Adjustments that become necessary because of a difference between estimated and actual invoiced quantities will be made on the invoice for the succeeding month.

2. Payment Terms. Invoices shall be due and payable by the Customer on or before the close of business on the twentieth (20th) calendar day after the date of issuance of the invoice, or on the next business day thereafter if said due date is a Saturday, Sunday, or official Federal holiday as observed by Southwestern (for customers remitting payments by mail) or by the Federal Reserve offices (for customers remitting payment by direct wire transfer through the Federal Deposit System (FDS)). Payment of amounts due Southwestern may be made through the FDS or mailed to:

Southwestern Power Administration
P.O. Box 845994
Dallas, Texas 75284-5994

The designation of the address where payment is to be submitted may be changed by Southwestern upon 30-days' written notice to the Customer of such change. Invoices shall be considered paid when payment is received into Southwestern's designated depository account or credited to Southwestern's depository account in the U.S. Treasury by the end of the business day; Provided, That payments received by mail will be accepted as being timely and without assessment of late charges if a first-class-mail postmark indicates that the payment was mailed at least two (2) calendar days before the due date; and Provided Further, That payments through the FDS will be accepted as being timely and without assessment of late charges if credited to Southwestern's depository account in the U.S. Treasury on or before the third (3rd) day after the due date or on the next business day thereafter if said third day is a Saturday, Sunday, or official Federal holiday as observed by the Federal Reserve office(s) responsible for receipt of payment made through the FDS.

3. Net Billing. Whenever the parties agree, payments due Southwestern by the Customer may be offset against payments due the Customer by Southwestern for the sale or exchange of electric power, energy, and other services. For services included in net billing procedures, payments due one party in any month shall be offset against payments due the other party in such month, and the resulting net balance shall be paid to the party in whose favor such balance exists. The parties shall exchange such reports and information that either party requires for billing purposes. Net billing shall not be used for any amounts which are in dispute.

4. Propriety of Rates. Southwestern shall bill the Customer for the power, energy, and other services purchased at the rates placed in effect pursuant to statute. The Customer hereby agrees to promptly pay Southwestern under such rate schedules, whether or not the Customer agrees with the propriety or the levels of the rates placed into effect. In the event Congress amends the manner in which Southwestern calculates or charges for its power sales, the Customer hereby agrees to promptly pay in such an amended manner, subject to its right to terminate.

5. Late Payment Charge. Southwestern shall assess a late payment charge to the Customer if it is delinquent in making payment to Southwestern. Such charge shall be based on an annual rate of interest calculated periodically and published in the Federal Register by the Department of Treasury. For any amount invoiced by Southwestern that is not paid by the Customer on or before the due date, a late payment charge shall be assessed equal to 1/12 of the aforementioned rate times the principal amount past due.

6. Late Payment Interest Charge. In addition to the late payment charge provided for in Section 5 of this Provision A, an interest charge equal to the aforementioned annual interest rate, recalculated on a daily basis, times the principal amount past due, shall be assessed for each day after the due date until the amount past due is paid in full.

7. Late Payment Penalty Charge. Southwestern shall assess a penalty charge of 6 percent a year on any outstanding principal portion of a debt owed by the Customer to Southwestern that is more than 90 days past due. This charge shall accrue from the date that the debt becomes past due and shall be in addition to the late payment charge and late payment interest charge as prescribed in Sections 5 and 6 of this Provision A.

8. Late Payment Administrative Charge. Southwestern shall assess charges to cover administrative costs incurred as a result of a collection action against the Customer. Such charge shall be for the additional costs incurred in processing and handling the debt collection. Calculation of administrative costs shall be based upon actual costs

incurred by Southwestern in processing and handling claims against other debtors in similar stages of delinquency.

9. Partial Payment. In the event a bill is not paid in full, amounts received by Southwestern shall be applied first to outstanding late payment penalty and administrative charges, second to outstanding interest charges for late payments assessed on the principal, and then to payment of the principal, unless a different rule is prescribed by statute or Federal Regulation.

10. Discontinuance of Service. If the Customer fails to pay any amount due under this Contract, Southwestern may, at its option, cause the delivery of power, energy, and other services under this Contract to be discontinued upon 90 days' prior written notice to the Customer, unless payment of the amount due is made by the Customer within such 90-day period. Such discontinuance of the delivery of power, energy, and other services, as herein provided, shall not relieve the Customer of liability for any minimum Southwestern rate schedule charges during the period of such discontinuance, and the rights granted Southwestern herein shall be in addition to all other remedies available to Southwestern, either by law or in equity, for the breach of any of the provisions of this Contract.

## B. FACILITIES AND CONDITIONS OF SERVICE

1. Facilities to be Furnished by Southwestern and the Customer. Southwestern and the Customer shall furnish, install, maintain, and operate, or cause to be furnished, installed, maintained, and operated, such facilities and equipment, including metering equipment, as may be necessary to fulfill their respective obligations under this Contract and to assure reasonable protection to the facilities of others.

2. Reliability, Safety, Health, and Environmental Requirements in Regard to Construction, Operation, and Maintenance on U.S. Government Property. (a) The provisions of this Section 2 shall apply only if the Customer, its agents or contractors, or its member entities perform maintenance, operations, or construction on the property of the U.S. Government (Government), or on easements shared by the Government and the Customer.

(b) Such construction, maintenance, and operation shall be performed in accordance with standards at least equal to those provided by the National Electrical Safety Code and shall conform to safety, environmental, and security procedures identified by Southwestern as appropriate to each facility in which such work is performed. Southwestern provides such written procedures in each of the facilities it maintains and to affected customers.

(c) The Customer and/or its member entities shall take all reasonable precautions in the performance of such work to protect the public and the environment. The Customer and/or its member entities shall comply with all applicable local, state, and Federal regulations and requirements in the performance of such work, including, but not limited to, the National Environmental Policy Act, the Clean Air Act; the Clean Water Act; the Comprehensive Environmental Responsibility, Compensation, and Liability Act; the Toxic Substances Control Act; the Resource Conservation and Recovery Act; the Superfund Amendments and Reauthorization Act (SARA); SARA Title III (Emergency Planning and Community Right-to-Know Act of 1986); and the Occupational Safety and Health Act.

(d) In the event that Southwestern, at its sole option and in its sole judgment, determines that construction, maintenance, or operation of facilities which are performed under this Contract by the Customer, and/or one of its member entities, does not meet the standards and/or regulations and requirements specified in this Section 2, or determines that a condition exists which, in Southwestern's sole judgment, provides a potentially adverse impact (1) on the reliability of services provided by Southwestern to its customers, (2) on the safety and/or health of the public or employees and agents of the parties hereto, and/or (3) on the environment, then Southwestern may provide written notice to the Customer and/or its member entity of the deficient condition; Provided, That, if such condition, in Southwestern's sole judgment and at Southwestern's sole option, requires immediate attention and does not allow time for such notice, Southwestern will remedy the condition and, where appropriate, bill the Customer in accordance with Section 10(b) of this Provision 8.

(e) Where, in Southwestern's sole judgment, remedy of the said deficient condition is not time critical, the Customer and/or its member entity shall provide a written plan and schedule to Southwestern within 30 days of receipt of the said written notice. Such plan and schedule shall provide for correction of the said deficiency at the earliest possible time available to the Customer and/or its member entity; Provided, That, the maximum time allowed for the Customer and/or its member entity to correct any such deficiency shall not exceed 18 months from receipt of the said written notice. The Customer shall coordinate or, if applicable, cause its member entity to coordinate, any work and outages which may involve Southwestern's facilities with Southwestern's Dispatch Center (Dispatch Center) in Springfield, Missouri.

(f) Unless otherwise agreed in writing, correction of deficiencies pursuant to this Section 2 shall be at the expense of the Customer.

(g) If the Customer and/or its member entity fails to correct the deficiency within the time provided pursuant to this Section 2, Southwestern shall have the right, at its sole option and in its sole discretion, to terminate service through the affected facilities until such deficiencies are corrected to the satisfaction of Southwestern.

(h) If, within the time period provided pursuant to this Section 2, an emergency condition occurs which, in the sole judgment of Southwestern, may cause an adverse impact on the reliability of the System of Southwestern and/or on the environment, or which poses a hazard to the safety and/or health of the public or employees and agents of the parties hereto, then Southwestern may, at its sole option, remedy or repair such condition or equipment and bill the Customer in accordance with Section 10(b) of this Provision 8, and the Customer agrees to render Southwestern reimbursement as provided in the said Section 10(b).

3. Right of Installation and Access. (a) Each party hereto grants to the other permission, or will obtain such permission for the other party, to install, maintain, and operate, or cause to be installed, maintained, and operated, on the System of Southwestern and on the System of the Customer at the points of delivery between the System of Southwestern and the System of the Customer described in this Contract, any and all terminal equipment and associated electrical apparatus and devices necessary in the performance of this Contract.

(b) Each party hereto shall permit, or shall obtain permission for, duly authorized representatives and employees of the other party to enter upon the System of Southwestern and the System of the Customer at the said points of delivery for the purpose of reading or checking meters; for inspecting, testing, repairing, renewing, or exchanging any or all of the equipment owned by the other party located on such premises; or for the purpose of performing any other work necessary in the performance of this Contract.

(c) Access for any work performed by one party under this Section 3 which may affect the other party's equipment shall normally be preceded by at least one day's notice to the affected party, except in the event of an emergency, in which case such notice shall be made as soon as possible after such emergency occurrence. Notice to Southwestern pursuant to this Section 3 shall be made to the Dispatch Center.

(d) Any access to property controlled by Southwestern shall include notification to Southwestern at the time of entry. Any employee or agent of the Customer, or of its member entities, who enters a Southwestern facility is expected to call the Dispatch Center from a telephone located in the control building in that facility and to identify himself or herself. Security devices located in the control buildings at Southwestern facilities sound an alarm in the Dispatch Center when the building is entered. Local law enforcement officers may be asked to investigate any unidentified entry.

(e) Any equipment, apparatus, or devices installed on the System of Southwestern by the Customer, as provided under this Section 3, shall be clearly and permanently marked to indicate ownership, and, in addition, a detailed description of each item so installed (including, if applicable, manufacturer's name, serial number, model number, etc.) shall be transmitted to Southwestern to aid in maintenance of plant accounts.

(f) In the event the equipment, apparatus, or devices are not marked in accordance with Section 3(e) of this Provision B, ownership of said equipment, apparatus, or devices shall be presumed to be vested in Southwestern.

(g) The Customer agrees that, if requested by Southwestern, the description required under Section 3(e) of this Provision B shall include a detailed analysis of all dielectrical oil, including, but not limited to, tests for polychlorinated biphenyls (PCBs). If such analysis indicates the presence of a known hazardous substance, which, in Southwestern's sole judgment, presents a significant hazard to the environment or to the health and safety of employees of the parties hereto, Southwestern may require, at its sole option, by written request, removal of any equipment containing such substance, and the Customer agrees to comply with such request for removal at no cost to Southwestern.

4. Rights for Land Use Acquired by the Customer. The System of Southwestern is constructed, operated, and maintained by Southwestern subject to and in accordance with the terms and conditions of certain transmission line right-of-way easements. Rights and privileges granted thereunder to the Government may not be available to the Customer for operations connected with performance of this Contract. The Customer is therefore responsible for acquiring, or causing to be acquired, from the appropriate landowners any and all rights and privileges for land use by good and sufficient legal instruments to authorize and permit entry by the Customer upon and across tracts affected by such land use as may be necessary and appropriate for performance of this Contract.

5. Right of Removal. Any and all equipment, apparatus, or devices placed or installed or caused to be placed or installed by the parties hereto on or in the System of Southwestern or the System of the Customer shall be and shall remain the property of the party owning and installing such equipment, apparatus, devices, or facilities, regardless of the mode or manner of annexation or attachment to real property, and, upon the termination of this Contract, the owner thereof shall have the right to enter upon the premises or system of the other and shall, within a reasonable time, remove such equipment, apparatus, devices, or facilities, subject to the provisions of Section 3 of this Provision B.

6. Right to Upgrade Facilities. (a) Southwestern reserves the right to modify or upgrade its transmission system and any of the elements which support the Southwestern transmission system, including, but not limited to, changes in: (1) Southwestern's transmission voltages, (2) Southwestern's transmission system components, (3) Southwestern's communications system, (4) Southwestern's Supervisory Control and Data Acquisition (SCADA) System, and (5) other modifications necessary to comply with the standards and/or regulations and requirements mentioned in Section 2 of this Provision B.

(b) If, during the term of this Contract, Southwestern determines, in its sole judgment and at its sole option, that modifications or upgrades are required, then, in that event, the Customer shall be responsible for any and all costs and expenses incurred by the Customer in order to continue to receive services provided under this Contract, or the Customer will discontinue receipt of service pursuant to this Contract and this Contract ipso facto shall terminate.

7. Limitation on Rights of Entry. Southwestern reserves the right, upon notice to the Customer, to revoke or cancel the rights of entry granted under this Contract with regard to any particular representative of the Customer, if, in the sole judgment of Southwestern, such revocation or cancellation is required in the interest of national security.

8. Reliability and Adequacy of Service. Electric service rendered by Southwestern under this Contract shall meet accepted standards of reliability and adequacy. If questions are raised concerning the quality of service, factual data shall be obtained with respect to the character of such service, and appropriate corrective or remedial action shall be promptly taken by the party at fault.

9. Continuity of Service. (a) Services provided by Southwestern to the Customer under this Contract shall be delivered by Southwestern as scheduled, except for interruptions or curtailments in delivery caused by an Uncontrollable Force, by the operation of devices or dispatcher action for system protection, or by the necessary installation, maintenance, repair, and replacement of equipment.

(b) Such interruptions or reductions in service, as hereinbefore set forth, shall not constitute a breach of this Contract, and neither party shall be liable to the other for damages resulting therefrom.

(c) Except in case of an emergency, Southwestern shall give the Customer reasonable advance notice of temporary interruptions or curtailments in service necessary for such installation, maintenance, repair, and replacement of equipment, and shall, insofar as is practicable, schedule such interruptions or curtailments so as to cause the least inconvenience to the Customer.

10. Assistance by Contracting Parties. If assistance in maintenance and utilization of their respective systems is rendered by Southwestern and/or the Customer, the following terms and conditions shall apply:

(a) If, in the maintenance or utilization of their respective transmission systems and related facilities for the purpose of this Contract, it becomes necessary by reason of any emergency or extraordinary condition for Southwestern or the Customer to request the other to furnish

personnel, materials, tools, and equipment for the maintenance or modification of, or other work on, such transmission systems and related facilities to insure continuity of power and energy deliveries, the party requested shall cooperate with the other and render such assistance as the party requested may determine to be available.

(b) The party making such request, upon receipt of properly itemized bills, shall reimburse the party rendering such assistance, including overhead and administrative and general expenses. The Customer and Southwestern agree to account for any incurred costs under a Work Order accounting procedure and in accordance with the Uniform System of Accounts prescribed for public utilities by the Federal Energy Regulatory Commission. Billing statements rendered by the Customer and Southwestern for such reimbursement shall be due 20 days from the date thereof.

(c) No laborer or mechanic in the employ of the Customer, or its agents and contractors, for any of the work contemplated by this Section 10 shall be required or permited to work in excess of 40 hours in any workweek except upon the condition that compensation is paid to such laborer or mechanic in accordance with the provisions of this Section 10.

(d) The wages of each laborer or mechanic employed by the Customer, or its agents and contractors, in the performance of any of the work contemplated by this Section 10 shall be computed on the basis of a standard workweek of 40 hours, and work performed in excess of such standard workweek may be permitted only upon the condition that each laborer or mechanic receives compensation at a rate not less than 1.5 times that worker's basic rate of pay for all hours worked in excess of 40 hours in any such workweek.

(e) For each violation of this Section 10, the Customer, or its agents and contractors, will be liable to the employee for his unpaid wages and, in addition, a penalty shall be imposed upon the Customer in the amount of ten dollars ($10) for each laborer or mechanic for each calendar day in which such laborer or mechanic is required or permitted to work in excess of the standard workweek of 40 hours upon said work without receiving compensation computed in accordance with this Section 10, and all penalties thus imposed shall be withheld for the use and benefit of the Government; Provided, That this Section 10 is subject to the provisions of the Contract Work Hours and Safety Standards Act of 1962 (Public Law 87-581, 76 Stat. 357-360), as amended; Provided Further, That if, from time to time, there is a conflict or inconsistency between the terms and conditions hereinbefore set forth and the provisions of any contract between the Customer and a labor union, the provisions of the labor union contract shall prevail if determined to be in compliance with then-applicable statutes and regulations issued thereunder.

## C. STANDARD PROVISIONS

1. Officials Not to Benefit. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this Contract or to any benefit that may arise therefrom, but this restriction shall not be construed to extend to this Contract if made with a corporation or company for its general benefit.

2. Covenant Against Contingent Fees. The Customer warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except bona fide employees or bona fide established commercial or selling agencies maintained by the Customer for the purpose of securing business. For breach or violation of this warranty, the United States shall have the right to annul this Contract without liability, or, at its discretion, to add to the Contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.

3. Convict Labor. In connection with the performance of work under this Contract, the Customer agrees not to employ any person undergoing sentence of imprisonment except as provided by Public Law 89-176, September 10, 1965 (18 U.S.C. 4062 (c)(2)), and Executive Order 11755, December 29, 1973.

4. Equal Employment Opportunity. During the performance of this Contract, the Customer agrees to abide by and to fulfill the nondiscrimination requirements of the "equal opportunity clause" contained in Section 202 of Executive Order 11246 dated September 24, 1965 (30 FR 12319), any Executive Order amending such order, and any other Executive Order superseding such order.

5. Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era. During the performance of this Contract, the Customer agrees to comply with Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, Public Law 93-508 as it amends Public Law 92-540, to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam era, and to fulfill the requirements of the "affirmative action clause." 38 USCA Sections 2011 and 2012 (1979); 41 CFR 60-250 et seq.

6. Affirmative Action for Handicapped Workers. During the performance of this Contract, the Customer agrees to comply with Section 503 of the Rehabilitation Act of 1973, Public Law 93-516, to take affirmative action to employ and advance in employment qualified handicapped

individuals, and to otherwise fulfill the requirements of the "affirmative action clause." 29 USCA Section 793 (1979); 41 CFR 60-741 et seq.

7. Resale Rates. The parties hereto understand and agree that the purpose of making federally generated power available is to encourage the most widespread use thereof, and the Customer therefore agrees:

(a) That the benefits of federally generated power shall be made available at fair and reasonable terms to all of its consumers at the lowest possible rates consistent with sound business principles.

(b) That it will, to the extent that different rules are not prescribed by State law or by State or Federal agencies, maintain proper books of account in accordance with the system of accounts prescribed for public utilities and licensees and/or cooperatives by the Federal Energy Regulatory Commission or Rural Electrification Administration, as the case may be.

(c) That it will furnish for the information of the Administrator, Southwestern, copies of schedules of resale rates in effect on the date of the execution of this Contract, and will also furnish for information of the Administrator, Southwestern, schedules of resale rates thereafter adopted.

(d) That it will provide to the Administrator, Southwestern, an annual statement indicating the financial operations of the Customer's electrical distribution system, and indicating that the charges to consumers are consistent with this Section 7.

(e) That it will publish annually a report in a newspaper of general circulation in the area served by the Customer and will include in such report the operating and financial data of the Customer's electrical system, setting forth in detail the gross revenues and disposition thereof. The first of such reports shall be published on or before the first day of September in the year following execution of this Contract and annually thereafter. In lieu of the published annual report, the Customer may furnish such information by mailing copies of the annual report to each of its consumers and a copy to the Administrator, Southwestern.

(f) The Customer will encourage its wholesale customers to implement the distribution principles of this Section 7, and, whenever a wholesale customer contract is executed, modified, or amended, will include in such contract arrangements similar to those set forth in this Section 7.

8. Availability of Funds to Southwestern. (a) This Contract and all rights and obligations hereunder, and the expenditure of funds by Southwestern under the provisions hereof, are expressly conditioned and contingent upon Congress making available (through direct appropriation,

authorization of a revolving fund, the authority to borrow funds, or through such other means as it may provide) the necessary funds to enable Southwestern to carry out the provisions of this Contract, and if such funds are not available, this Contract shall terminate and have no further force or effect as of the last day for which funds were available, and the Customer hereby releases Southwestern from any and all liability for failure to perform and fulfill its obligations under this Contract for that reason.

(b) No obligation contained herein for the future payment of money by Southwestern, or liability on the part of Southwestern for breach of any of the provisions contained herein, shall be binding upon or enforceable against Southwestern unless and until funds, as provided in Section 8(a) of this Provision C, are available out of which such obligations or liability can be legally paid.

(c) Nothing in this Contract may be considered as implying that Congress will, at a later date, appropriate funds sufficient to meet any deficiencies or obligations incurred under this Contract.

9. Termination for Breach. If either party hereto breaches a material provision of this Contract, the other party, at its option, may terminate this Contract upon 30 days' prior written notice of its intention to do so, and this Contract *ipso facto* shall terminate at the end of such 30-day period unless such violation is corrected within that period. Neither party hereto, however, shall be considered to be in default or breach with respect to any obligation under this Contract if prevented from fulfilling such obligation by reason of an Uncontrollable Force.

10. Waivers. Waiver at any time of rights with respect to a default or any other matter arising in connection with this Contract shall not be deemed to be a waiver with respect to any subsequent default or matter.

11. Transfer of Interest and Abrogation of Rights to Federal Power.

(a) No voluntary transfer of this Contract or of the rights of the Customer hereunder shall be made without the written approval of the Administrator, Southwestern; Provided, That any successor to or assignee of the rights of the Customer, whether by voluntary transfer, judicial sale, foreclosure sale, or otherwise; shall be subject to all the provisions and conditions of this Contract to the same extent as though such successor or assignee were the original contractor hereunder; and Provided Further, That the execution of a mortgage or trust deed, or judicial or foreclosure sale made thereunder, shall not be deemed voluntary transfers within the meaning of this Section 11.

(b) The Customer will not sell, lease, or otherwise dispose of its electrical distribution system without giving Southwestern at least 120 days' prior written notice.

(c) The Customer's rights to Federal power and concomitant services, as set forth in this Contract and Southwestern's Final Power Allocations (1980-1988) 45 FR 19032 (1980), come by virtue of the Customer's status as an entity entitled to preference in Southwestern's marketing of Federal power pursuant to Section 5 of the Flood Control Act of 1944 (58 Stat. 887,890; 16 U.S.C. 825s). If the Administrator, Southwestern, determines, in his sole judgment, that actions taken by the Customer have abrogated its status as a "preference" entity, then the Administrator may, at his sole option, terminate this Contract, such termination to become effective on the date specified by Southwestern, in an official written notice to the Customer.

Exhibit "2"

UNITED STATES DEPARTMENT OF ENERGY
SOUTHWESTERN POWER ADMINISTRATION

RATE SCHEDULE P-90A*
WHOLESALE RATES FOR HYDRO PEAKING POWER
AND SEASONAL PEAKING POWER

Effective:

During the period October 1, 1990, through September 30, 1994, in accordance with the Order of the Federal Energy Regulatory Commission issued September 18, 1991 (Docket No. EF91-4011-000). This rate schedule was extended for one year effective October 1, 1994, through September 30, 1995. This rate schedule has been extended for another one year period effective October 1, 1995, through September 30, 1996, in accordance with the Deputy Secretary of Energy's interim approval dated August 16, 1995, (60 FR 42559).

Available:

In the marketing area of Southwestern Power Administration (Southwestern), described generally as the States of Arkansas, Kansas, Louisiana, Missouri, Oklahoma, and Texas.

Applicable:

To wholesale power customers purchasing Hydro and/or Seasonal Peaking Power and associated energy.

Character and Conditions of Service:

Three-phase, alternating current, delivered at approximately 60 hertz, at the nominal voltage and points of delivery, and in such quantities as specified by contract.

Energy Associated with Hydro and/or Seasonal Peaking Power:

PEAKING ENERGY:

1,200 kilowatthours of Peaking Energy per kilowatt of Hydro Peaking and/or Seasonal Peaking Power will be furnished during each contract year.

SUPPLEMENTAL PEAKING ENERGY:

Supplemental Peaking Energy (in addition to Peaking Energy) will be furnished if and when determined by Southwestern to be available.

A quantity of Hydro and/or Seasonal Peaking Power without associated Peaking Energy may be purchased on a month-to-month basis for use in scheduling Supplemental Peaking Energy, if determined by Southwestern to be available.

*Supersedes Rate Schedule P-87A

Monthly Rates:

CAPACITY CHARGE:

$2.52 per kilowatt of Peaking Billing Demand.

ENERGY CHARGE:

(a) During the period until the first day of April, 1992:

$0.0042 per kilowatthour of Peaking Energy and Supplemental Peaking Energy; plus (c).

(b) Commencing on the first day of April, 1992:

$0.0052 per kilowatthour of Peaking Energy and Supplemental Peaking Energy; plus (c).

(c) A purchased power adder of $0.0009 per kilowatthour of Peaking Energy during the period through September 30, 1993, as adjusted by the Administrator in accordance with the attached procedure, with a credit per kilowatthour of Peaking Energy as specified for each customer for the period October 1, 1990, through September 30, 1993 (maximum applicable credit in any billing period, including any deferred credits, shall be limited to total charges for all other services to the customer during such billing period with any excess to be deferred for application in succeeding billing periods).

This adder does not apply to:

Sales to any customer which, by contract, has assumed the obligation to supply energy to fulfill the minimum of 1200 kilowatthours of Peaking Energy per kilowatt of Peaking Power during a contract year (Contract Support Arrangements).

CAPACITY CHARGE ADJUSTMENTS FOR CONDITIONS OF SERVICE:

(a) A charge of $0.12 per kilowatt of Peaking Billing Demand will be added to the total monthly charge for Hydro and/or Seasonal Peaking Power Service if delivery of such power and energy is made at a nominal delivery voltage of 69 kilovolts where Southwestern has provided transformation for such service from higher voltage, or

(b) A charge of $0.55 per kilowatt of Peaking Billing Demand will be added to the total monthly charge for Hydro and/or Seasonal Peaking Power service if delivery of such power and energy is made at nominal delivery voltages of

less than 69 kilovolts, where Southwestern has provided transformation for such service from higher voltage, and

(c) Unless otherwise specified by contract, a customer which receives Hydro and/or Seasonal Peaking Power at two or more delivery voltages will be charged the adjustment associated with the lowest voltage. In the event the Southwestern facilities installed to make the lowest voltage deliveries to such customer have insufficient capacity to deliver such customer's Peaking Contract Demand, such power exceeding the lowest voltage delivery capacity shall be considered to be delivered at successively higher voltages and the appropriate Adjustment for Conditions of Service shall be applied.

BILLING FOR UNAUTHORIZED OVERRUN:

For each billing period during which there is a violation involving an unauthorized overrun of Southwestern's capacity and/or energy obligation, such capacity overrun shall be billed and paid for at twelve times the above capacity rate adjusted for conditions of service and such energy overrun shall be billed and paid for at eleven times the rate for Peaking Energy set forth in Part (a) of the above Energy Charge. Billing for unauthorized capacity overrun shall not apply during the period 10:00 p.m. until 6:00 a.m.

Adjustment for Power Factor:

Any customer served directly from facilities owned by or available by contract to Southwestern will be required to maintain a power factor of not less than 95 percent (95%) lagging for each electrically integrated load except where delivery point(s) are point(s) of system integration for mutual system support. The power factor may be determined at intervals or continuously at the option of Southwestern and shall be computed under the formula:

$$PF = \frac{kWh \times 100}{kWh^2 + rkVAh^2},$$

with the factors defined as follows:

PF = the power factor (in percentage) for any 60-minute period of the month.

kWh = the total quantity of energy delivered to the customer's electrically integrated load through all Southwestern points of delivery which are not points of system integration for mutual system support during such 60-minute period.

rkVAh = the total quantity of reactive kilovolt-ampere-hours delivered to the customer's electrically integrated load through all Southwestern points of delivery which are not points of system integration for mutual system support during the 60-minute period.

The quantities of energy and reactive kilovolt-ampere-hours delivered through all non-Southwestern delivery points to such electrically integrated load will also be included in the above calculation, if such information is available to the customer for such 60-minute period.

For any month that a customer's power factor as determined above during the 60-minute period of the maximum rate of energy delivery is less than 95 percent (95%) lagging, the customer's monthly bill for Hydro and/or Seasonal Peaking Power and associated energy will be increased by one percent (1%) for each one percent (1%), or major fraction thereof, by which the customer's power factor is less than 95 percent (95%). Where a customer has more than one electrically integrated load served by Southwestern under a particular contract, such increase will be applied only to electrically integrated loads with power factors of less than 95 percent (95%).

Minimum Bill:

The minimum bill each month is the Peaking Contract Demand times the Capacity Charge, including any applicable Capacity Charge Adjustments for Conditions of Service, plus applicable Energy Charges times contract scheduling requirements.

Peaking Actual Demand:

The term "Peaking Actual Demand" for any month means the maximum integrated demand recorded or computed by contract formula for such month which represents the maximum rate of delivery for Peaking Energy and/or Supplemental Peaking Energy averaged over a 60-minute period.

Peaking Contract Demand:

The term "Peaking Contract Demand" means the maximum rate in kilowatts which Southwestern is, by contract, obligated to deliver Peaking Energy during any 60-minute period of any month.

Peaking Billing Demand:

Unless otherwise provided by contract, the "Peaking Billing Demand" for any month shall be equal to the "Peaking Contract Demand."

Adjustment for Reduction in Service:

If during any month, the quantity of Hydro and/or Seasonal Peaking Power scheduled for delivery is reduced by Southwestern for a period or periods of not less than two consecutive hours by reason of an outage caused by either an uncontrollable force, or the installation, maintenance, replacement or malfunction of transmission and/or related facilities on the system of Southwestern, the customer's capacity charges for such month will be reduced for each such reduction in service by an amount computed under the formula:

$$R = \frac{C \times K \times H}{S},$$

with the factors defined as follows:

R = the amount of reduction in the monthly capacity charges for a particular reduction of not less than two consecutive hours during any month, except that the total amount of any such reduction in the capacity charge for any month shall not be greater than the product of the Capacity Charge times the Peaking Contract Demand.

C = the Capacity Charge plus applicable Adjustments for Conditions of Service for Hydro and/or Seasonal Peaking Power for such month.

K = the number of kilowatts of such particular reduction in Hydro and/or Seasonal Peaking Power.

H = the number of hours of such particular reduction.

S = the number of hours that Peaking Energy is scheduled during such month, but not less than 60.

PURCHASED POWER ADDER CREDIT:

| Customer | Credit ($) |
|---|---|
| Arkansas Electric Cooperative Corp | 0.002452 |
| Brazos Electric Power Cooperative | 0.002019 |
| Cajun Electric Power Cooperative | 0.001965 |
| Kansas Electric Power Cooperative | 0.001572 |
| Kaw Valley Electric Cooperative | 0.002141 |
| Northeast Texas Electric Cooperative | 0.003259 |
| Rayburn Country Electric Cooperative | 0.000471 |

Rate Schedule P-90A
Page 6 of 6

| Customer | Credit ($) |
|---|---|
| Tex-La Electric Cooperative | 0.004565 |
| Western Farmers Electric Cooperative | 0.002475 |
| Anthony, Kansas | 0.001864 |
| Augusta, Arkansas | 0.002474 |
| Bentonville, Arkansas | 0.002482 |
| Carthage, Missouri | 0.002471 |
| Clarksville, Arkansas | 0.002402 |
| Coffeyville, Kansas | 0.002052 |
| Fulton, Missouri | 0.016735 |
| Hermann, Missouri | 0.002434 |
| Higginsville, Missouri | 0.002449 |
| Jonesboro, Arkansas | 0.010688 |
| Kansas City, Kansas | 0.002325 |
| Kansas Municipal Energy Agency | 0.002053 |
| Kennett, Missouri | 0.009451 |
| Lafayette, Louisiana | 0.001772 |
| Lamar, Missouri | 0.015794 |
| Louisiana Electric Power Authority | 0.001712 |
| Malden, Missouri | 0.002150 |
| Natchitoches, Louisiana | 0.001769 |
| New Madrid, Missouri | 0.015124 |
| Nixa, Missouri | 0.017066 |
| Paragould, Arkansas | 0.010859 |
| Piggott, Arkansas | 0.016452 |
| Poplar Bluff, Missouri | 0.014209 |
| Sikeston, Missouri | 0.011733 |
| Skiatook, Oklahoma | 0.002434 |
| Springfield, Missouri | 0.002456 |
| Thayer, Missouri | 0.002416 |
| West Plains, Missouri | 0.019454 |