# EXHIBIT B

Public Service Company of Oklahoma
P.O. Box 947
McAlester, OK 74502-0947
www.aep.com

AEP
PUBLIC SERVICE COMPANY OF OKLAHOMA®

May 8th 2007

Stephen R. Dunbar
Contracting Officer
McAlester Army Ammunition Plant
1 C Tree Rd.
McAlester, OK 74501
918 420-6423

RE: **PSO's Request for Payment of Past Due Amount on McAlester Army Ammunition Plant (MCAAP) Account (Second Request by Letter)**

Dear Mr. Dunbar:

PSO is in receipt of your letter dated April 17, 2007 in response to our request for payment on a delinquent account by letter sent out on April 2, 2007. In your letter, you state that PSO is required to make a certification pursuant to FAR Part 33, Subpart 33.207 paragraph (c) before MCAAP can review PSO's claim for the past due amount in excess of $100,000.

It is worth noting that the aforementioned FAR reference only applies to disputes arising out of "contractor adjustments" in excess of $100,000.[1] That is not the case in this matter. PSO is asserting a claim for past due amounts caused by the unilateral actions of MCAAP. Therefore, I cannot assert on behalf of PSO that a contract adjustment by PSO is at the heart of this dispute when it is patently clear that it is not.

I can, however, certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the past due amount for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

The principal amount on the past due account is now $159,007.94[2].

I have attached for your reference the letter you previously received from Ray Staggers, counsel for PSO sent out on April 2, 2007. Please review its content for a recap of our claim for past due payments. Also, it is instructive to note that Ken Kincel contacted PSO personnel regarding this matter on MCAAP's behalf. We presumed he did so at the behest of MCAAP.

Your immediate attention is required in this matter. Please contact me at (918)426-7961or rebonnet@aep.com to discuss payment and bring this account current.

Yours truly,

Robert Bonnet

---

[1] FAR section 33.207 (c) expressly references and applies to claims based on "contractor adjustments".
[2] This amount includes a principal balance of $149,497.17 plus PSO's weighted cost of capital of which a calculation can be provided upon request.

EXHIBIT
B

AEP
PUBLIC SERVICE COMPANY OF OKLAHOMA
A unit of American Electric Power

Public Service Company of Oklahoma
212 East Sixth Street
Tulsa, OK 74119
aep.com

Lynn Sturges, Esq.
c/o McAlester Army Ammunition Plant
1 C Tree Rd.
McAlester, OK 74501
918 420-6439

RE: **PSO's Request for Payment of Past Due Amount on McAlester Army Ammunition Plant (MCAAP) Account**

Dear Ms. Sturges,

Per our conversation, I am writing this letter to formally request payment on the delinquent account in the amount of $110,484.73[1] in connection with that certain agreement between MCAAP and Public Service Company of Oklahoma (PSO) dated June 9, 1997 (Contract).[2] By way of background, it appears that MCAAP has been making insufficient payments for a period beginning in February 2006 based on a mistaken belief that PSO has applied, inappropriately, a Federal Tax Credit pursuant to a Southwest Power Authority (SWPA) rate schedule.

Mr. Robert Bonnet of PSO spoke with Lenora Gardner, Contracting Agent for MCAAP, and Kevin Henderson, MCAAP Energy Coordinator, on September 15, 2005 to discuss the SWPA rate calculation and again on September 12, 2006 after the default began.

We believe that MCAAP is in default, in principle, based on the following: (i) PSO, as Contractor, has made all rate adjustments in accordance with the Contract; and (ii) MCAAP's unilateral amendment to the Contract, in this instance, was beyond the scope of the Contracting Agent's authority. Consequently, such action places MCAAP in breach of contract.

PSO's authority to change a rate schedule is found in Section 6 of the Contract. Pursuant to Section 6, a contractor can change a rate schedule; provided, that the Oklahoma Corporation Commission (OCC) authorizes such change. It further states that MCAAP is required to pay such change in rate whether the rate is higher or lower, subject to rights of judicial appeal. The changes affect all PSO customers in that rate class.[3]

---

[1] This amount includes a principal balance of $104, 652.72 plus PSO's weighted cost of capital of which a calculation can be provided upon request.
[2] Contract is entitled, "McAlester Army Ammunition Plant General, Technical & Incorporated Contractor Provisions for Electric Utility Service".
[3] Fort Sill, another similarly situated entity, has paid all invoices in accordance with the rate schedule.

It is my understanding that PSO's ability to change rates based on OCC approval is not in dispute; however, MCAAP's ability to change its Federal Tax Credit rate schedule is at issue. It is my further understanding based on a telephone conversation with Ken Kincel, an Army representative, that MCAAP finds its authority to unilaterally modify the contract based on Federal Acquisition Regulation 52.241-7 (FAR 52.241-7).[4] This provision does, in fact, allow a contracting agent to modify a contract, albeit, in limited circumstances, and, provided, that certain procedures are adhered to.

Unfortunately, the manner in which this provision was utilized misconstrues its intended purpose. FAR 52.241-7 states that a contracting agent can modify a contract, but only in three very specific circumstances causing a change in the scope of the contract. Specifically, such events are limited to changes in: 1) description of services to be performed; 2) time of performance (i.e. hours of the day, days of the week, etc.); and 3) place of performance. None of these criteria, which could allow a contracting agent to make a unilateral modification, apply to a lawful change in rate schedule by a contractor. In short, the criteria, under this provision, are based on changes in performance not rate.

Based on these facts, we reiterate our position that MCAAP remit payment of the past due amounts and begin to make accurate payments going forward. If you have any additional questions or comments, please contact me at (614) 716-1265.

Yours truly,

Ray Staggers, Esq.
Counsel for PSO

cc: Randy Ryan
Robert Bonnet

[4] Certain FAR provisions are incorporated into the Contract

# EXHIBIT C

**DEPARTMENT OF THE ARMY**
**McALESTER ARMY AMMUNITION PLANT**
**McALESTER, OKLAHOMA 74501-9002**

REPLY TO ATTENTION OF

July 23, 2007

Directorate of Contracting

CERTIFIED – RETURN RECEIPT

Public Service Company of Oklahoma
Attn: Mr. Stuart Solomon, President
212 East Sixth Street
Tulsa, OK 74119

Dear Mr. Solomon:

I have reviewed the claim asserted by Public Service Company of Oklahoma (PSO) in an undated letter signed by Mr. Ray Staggers and followed by a certification provided by Robert Bonnet in a letter dated May 8, 2007. By letter dated July 2, 2007, I notified you that I would be issuing a final decision on PSO's certified claim by July 23, 2007. My final decision denying PSO's claim is set forth herein.

McAlester Army Ammunition Plant (MCAAP) and PSO entered into Contract No. DAAA31-97-0002 (the "Contract") on June 9, 1997 for electric power and energy to fulfill MCAAP's electric service requirements. The Contract term was for an initial period of 19 months, beginning June 1, 1997 and ending at midnight on December 31, 1998; however, if MCAAP continued to take service after the expiration of the initial period, the Contract was to continue in full force and effect from year to year thereafter, until terminated by the party desiring termination giving the other party at least 12 months prior written notice. The Contract has been in full force and effect to date, and neither party has provided notice regarding termination.

The Contract, in Section C, includes the "McAlester Army Ammunition Plant General, Technical & Incorporated Contractor Provisions for Electric Utility Service" (hereinafter "the Provisions"). Section I.6 of the Provisions, entitled "Rates and Charges: Public Regulation and Change of Rates," provides in pertinent part as follows:

A. Service furnished under this contract shall be subject to regulation in the manner and to the extent prescribed by law through any federal, state or local regulatory commission having jurisdiction. A copy of the contractor's current existing rates (including changes) shall be furnished promptly to the contracting officer upon request.

B. Change in Rates, Character of Service, or Volume

(I) If, during the term of this contract, the public regulatory commission having jurisdiction receives for filing in an authorized

EXHIBIT C

> manner any change in the rate schedule(s) stipulated herein directly or by reference which result in higher or lower charges for service, the contractor shall continue to furnish service as stipulated in this contract and MCAAP shall pay for service at the higher or lower charges from the effective date thereof, subject to judicial appeal.

The Provisions also include language in Section I.6.B. subparagraphs (II) (III) and (IV) providing MCAAP the opportunity to take advantage of lower rates offered by the contractor in the event that (i) new or amended rates are made effective by the contractor, (ii) a permanent change is made in the class of service furnished MCAAP under the Contract or (iii) MCAAP requests a change in the character of service during the term of the Contract.

Section III of the Provisions, entitled, "Incorporated Contractor Provisions: Contract for Electric Service" includes in Article III, subparagraph 2, a "Rate Schedule Choice" describing the two particular PSO rate schedules determined "most favorable for MCAAP given its conditions of service" at the two delivery points. The "Rate Schedule Choice" included a provision that "in the future, MCAAP will be provided notification of rate schedule changes and if MCAAP believes another rate schedule is more favorable to it, MCAAP may change to the more favorable schedule . . . ."

Section IV of the Provisions, entitled, "Incorporated Contractor Provisions: Power Agreement," provides in Article 3.1 as follows:

> 3.1 **Sale and Purchase Obligations**. MCAAP shall sell and cause to be delivered, and PSO shall purchase and receive all the Federal Energy to which MCAAP is entitled to receive pursuant to MCAAP's contract with SWPA during the Delivery Term. PSO will accept and purchase every KWH of supplemental peaking energy that is offered to MCAAP by SWPA under the MCAAP/SWPA contract.

Article 4 of Section IV, entitled, "Energy Charge," includes the following formula for calculating the Energy Charge:

> 4.1 **Energy Charge**. PSO will pay MCAAP each month during the Delivery Term in accordance with the following formula:
>
> $$\mathbf{FSE = SE + ME\ (A1 + A2)}$$
>
> with the factors defined as follows:
>
> FSE = Total amount payable by PSO to MCAAP for the purchase of Federal Energy.

SE = Amount payable in dollars by MCAAP to SWPA for Federal Energy Scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P90A in effect on May 22, 1997. (EXHIBIT E).

ME = An amount of PSO energy (KWH) equivalent to the amount of energy (KWH) multiplied by a factor of .9744 scheduled for and delivered to MCAAP by SWPA to the Delivery Point.

A1 = PSO's applicable Oklahoma Corporation Commission approved embedded fuel cost (Exhibit B).

A2 = Fuel Cost Adjustment (FCA) in accordance with PSO's Oklahoma Corporation Commission approved Fuel Cost Adjustment Rider (Exhibit C).

Exhibit E, referenced in the definition of "SE" above, consists of Contract No. DE-PM75-97SW00352 (hereinafter "the SWPA Contract") between the United States Department of Energy Southwestern Power Administration (SWPA) and MCAAP for the sale of hydroelectric power by SWPA to MCAAP. The SWPA Contract addresses compensation in Article II, Section 7 and includes the following:

> (a) McAlester AAP shall compensate Southwestern each month for Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy purchased during the preceding month, at the rates and under the terms and conditions set forth in Rate Schedule P-90A, attached hereto . . . McAlester AAP understands and agrees that the rates and/or terms and conditions set forth in the said rate schedule may, upon confirmation and/or approval by the appropriate authority having responsibility to so confirm and/or approve rate schedules, and whether on an interim basis or as finally confirmed and/or approved, be increased, decreased, modified, or superseded, at any time, and from time to time, and that if so increased, decreased, modified, or superseded, the rates and terms and conditions shall thereupon become effective and applicable to the purchase and sale under this Contract of Hydro Peaking Power, Peaking Energy, and Supplemental Peaking Energy, in accordance with and on the effective date specified in the order of the appropriate authority.

Based on earlier discussions with PSO representatives, my understanding is that PSO's current claim is based on its interpretation that under the Contract, the "SE" portion of the formula for the Energy Charge discussed in Section IV, Article 4 of the Provisions is not required to be updated to reflect changes in the SWPA rate schedule; instead, PSO apparently takes the position that because the "SE" portion of the formula makes reference to "Schedule P90A in effect on May 22, 1997," then so long as the Contract is in effect, the "SE" portion of the Energy Charge is to be calculated using the

SWPA rate schedule in effect on May 22, 1997.[1] PSO essentially is arguing that MCAAP agreed to accept a formula which calculates a portion of the payment due from PSO to MCAAP (for the energy that PSO purchases from MCAAP that MCAAP is entitled to receive from SWPA) using SWPA rates forever locked at the May 22, 1997 rates, even though MCAAP is subject to updated and increasingly higher rates in its payments to SWPA for the energy.

PSO's interpretation of the "SE" portion of the Energy Charge is not a reasonable interpretation. When interpreting a contract, the parties must read the contract as a whole and give meaning to each of its provisions. The language regarding the "SE" portion of the formula for the Energy Charge in Section IV, Article 4, of the Provisions cannot be read in isolation, but must be construed in the context of the rest of the Contract. When read in the context of Section I.6 of the Provisions and in light of Exhibit E, it is clear that the "SE" portion of the Energy Charge must be adjusted to incorporate higher or lower SWPA rates that come into effect.

Specifically, the language of Section I.6.B.(I) provides that if "the public regulatory commission having jurisdiction receives for filing in an authorized manner any change in the rate schedule(s) stipulated herein directly or by reference which result in higher or lower charges for service, the contractor shall continue to furnish service as stipulated in this contract and MCAAP shall pay for service at the higher or lower charges from the effective date thereof, subject to judicial appeal." The SWPA rate referenced in the definition of "SE" and included in Exhibit E is a rate schedule incorporated in the Contract and therefore, according to the terms of Section I.6.B.(I) of the Provisions, if the SWPA rate schedule changes, resulting in MCAAP paying lower or higher charges for service to PSO, then such rate schedule change must be taken into consideration in the calculation of "SE."

Moreover, Exhibit E, itself, is part of the definition of "SE," and, according to Article II, Section 7 of Exhibit E, if SWPA rates are increased, decreased, modified, or superseded, such changes in the rates will apply to the amount payable from MCAAP to SWPA. Since "SE" is defined as the amount payable in dollars by MCAAP to SWPA in accordance with the terms in Exhibit E, such changes in SWPA rates must also be applied to the calculation of "SE." The language in the "SE" definition regarding "SWPA rate schedule P90A in effect on May 22, 1997," is not meant to forever lock the SWPA rates at May 22, 1997 levels, but instead simply indicates a reference point for the starting SWPA rates at the beginning of the Contract.

---

[1] During an earlier meeting between PSO and MCAAP, PSO indicated that in order to effectuate a change in the SWPA rates when calculating the "SE" portion of the Energy Charge formula, the parties would need to enter into a bilateral modification to the Contract pursuant to Article 13.1 in Section IV of the Provisions. Section 13.1 provides in pertinent part that "[e]xcept for any matters which, in accordance with the express provisions of this Agreement, may be resolved by verbal agreement between the Parties, no amendment, modification or change herein shall be enforceable unless reduced to writing and executed by both Parties." As explained in this final decision, the Contract already provides for the "SE" portion of the Energy Charge to incorporate changes to the SWPA rates as they come into effect. Because MCAAP is simply implementing provisions already in the Contract, rather than amending, modifying or changing Contract terms, Article 13.1 is not applicable.

In addition, as discussed earlier, there are other provisions in the Contract providing MCAAP the opportunity to take advantage of lower rates offered by PSO under certain circumstances. These provisions reflect MCAAP's interest in always being able to avail itself of the lowest rates possible. In light of the specific language in Section I.6.B.(I) of the Provisions and the incorporation of Exhibit E into the "SE" definition, and considering the various other contract provisions giving MCAAP the opportunity to avail itself of more favorable rates when available, PSO's interpretation of the "SE" portion of the Energy Charge formula, which would prevent MCAAP from receiving the benefit of approved SWPA rate increases that would go into effect throughout the life of a contract with an indefinite term, is not reasonable.

Moreover, the parties' course of conduct during the period of contract performance before PSO's claim was asserted is helpful in discerning the parties' interpretation of the "SE" portion of the Energy Charge formula. Beginning in approximately January 2004, when PSO failed to update the "SE" portion of the Energy Charge formula to reflect current SWPA rates, and a representative from MCAAP contacted PSO to request that updated SWPA rates be utilized, PSO accommodated such request and used updated SWPA rates instead of the 1997 P90A rates in the "SE" portion of the Energy Charge formula. PSO continued to use updated rates until approximately January 2006, when PSO unilaterally decided to return to the 1997 P90A rates. The parties' prior conduct in updating the relevant rates in the "SE" portion of the Energy Charge provides support, in addition to the language in the Contract, for the position that the parties intended that SWPA rates were meant to be updated as new rates came into effect throughout the term of the Contract.

Based on the Contract language and the parties' course of conduct, a more reasonable explanation for why the parties included the reference to the SWPA rate schedule "P90A in effect on May 22, 1997" in the "SE" portion of the Energy Charge formula is that, as stated earlier, the parties simply were providing a reference to the initial rates that were in effect at the time of contract formation. Although the May 22, 1997 SWPA rates might have been in effect when the Contract was awarded, it is apparent that the parties intended that the SWPA rates, rather than being forever fixed at the May 22, 1997 levels, were meant to be updated throughout the life of the Contract. Accordingly, PSO's claim, based on an unreasonable interpretation of the "SE" portion of the Energy Charge formula, is denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended,

reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Stephen R. Dunbar
Contracting Officer